Frank MOORE, Petitioner,

v.

Nathaniel QUARTERMAN, Director, Texas Department of Criminal Justice, Correctional Institutions Division, Respondent.

Civil No. SA–03–CA–405–RF.

United States District Court, W.D. Texas, San Antonio Division.

Dec. 20, 2007.

David K. Sergi, David K. Sergi & Associates, P.C., San Marcos, TX, Larry Warner, Law Office of Larry Warner, Brownsville, TX, Richard Emil Langlois, Langlois & Snyder, San Antonio, TX, for Petitioner.

Baxter R. Morgan, Kelli L. Weaver, Thomas M. Jones, Assistant Attorney General, Tomee Morgan Heining, Office of the Attorney General of Texas, Austin, TX, for Respondent.

### MEMORANDUM OPINION AND ORDER DENYING RELIEF

ROYAL FURGESON, District Judge.

Petitioner Frank Moore filed this federal habeas corpus action pursuant to Title 28 U.S.C. Section 2254 challenging his July, 1999 Bexar County conviction for capital murder and sentence of death. For the reasons set forth below, petitioner is entitled to neither federal habeas corpus relief nor a Certificate of Appealability.

### I. Statement of the Case

#### A. The Events of January 21, 1994

There is no genuine dispute over the facts that (1) during the early morning hours of January 21, 1994, petitioner took an assault rifle and shot several times into a vehicle occupied by Patrick Clark (age 15) and Samuel Boyd (age 23) and (2) both Clark and Boyd died as a result of multiple gunshot wounds they each sustained in that incident.

#### B. Indictment

On April 13, 1994, a Bexar County grand jury indicted petitioner on a charge of capital murder, to wit, intentionally and fatally shooting both Clark and Boyd with a deadly weapon during the same criminal transaction.[1]

---

1. Transcript of pleadings, motions, and other documents filed in petitioner's state trial court proceedings (henceforth "Trial Transcript"), at pp. 8–9.

C. *Petitioner's First Trial, Appeal, and State Habeas Proceeding*

On June 20, 1996, a Bexar County jury convicted petitioner of capital murder.[2] On June 24, 1996, the same jury found (1) beyond a reasonable there was a probability petitioner would commit criminal acts of violence constituting a continuing threat to society and (2) there were insufficient mitigating circumstances to warrant a sentence of life imprisonment for petitioner.[3] The state trial court imposed a sentence of death.[4]

Petitioner appealed his conviction and sentence.[5] In an opinion issued June 10, 1998, the Texas Court of Criminal Appeals reversed petitioner's conviction, holding the state trial court had erred in denying petitioner's requests for jury instructions on the lesser-included offenses of voluntary manslaughter and murder. *Moore v. State*, 969 S.W.2d 4, 10–13 (Tex.Crim.App.1998)(holding the trial testimony of petitioner's half-brother Tyron Parks raised questions regarding whether petitioner was acting under the influence of sudden passion when he shot Clark and Boyd and that there was evidence (again Parks' testimony) from which a jury could conclude petitioner had acted in self-defense with regard to the fatal shooting of Clark).

On June 20, 1997, petitioner filed an application for state habeas corpus relief.[6] On January 27, 1999, the Texas Court of Criminal Appeals dismissed petitioner's first state habeas corpus application. *Ex parte Frank Moore*, App. no. 40,046–01 (Tex.Crim.App. January 27, 1999).

D. *Retrial*

1. *Guilt–Innocence Phase*

The guilt-innocence phase of petitioner's second capital murder trial commenced on July 6, 1999.

a. *Prosecution's Evidence*

As it had at petitioner's first trial, the cornerstone of the prosecution's case against petitioner consisted of the eyewitness testimony of Angela Wallace.[7] At petitioner's second trial, Ms. Wallace testified in pertinent part that (1) she had observed Boyd and petitioner shake hands and greet each other amicably inside the club several hours before the shootings, (2) she observed nothing exceptional about either Boyd's or Clark's demeanor while they were inside the club, (3) as she exited

2. Transcript of pleading, motions, and other documents filed in petitioner's first state habeas corpus proceeding, i.e., App. no. 40,046–01 (henceforth "Transcript First State Habeas Proceeding"), at p. 28.

3. Transcript First State Habeas Proceeding, at pp. 106–07.

4. Transcript First State Habeas Proceeding, at pp. 108–09.

5. No copy of petitioner's appellant's brief or the State's response thereto filed during petitioner's first direct appeal appears among the state court records submitted to this Court by respondent.

6. Transcript First State Habeas Proceeding, at pp. 1–8.

7. Angela Wallace's testimony from petitioner's first trial is summarized in the Texas Court of Criminal Appeals reversing petitioner's first conviction. *Moore v. State*, 969 S.W.2d at 7. At petitioner's first trial, Ms. Wallace had testified (1) as she left the Wheels of Joy night club during the early morning hours of January 21, 1994, she saw a confrontation outside the club between Boyd, Clark, and another man whom she did not recognize, (2) shortly thereafter, Clark drove a car into the club's parking lot and stop, (3) petitioner walked toward the back of Clark's car, (4) Ivory Sheffield got a rifle from the trunk of a Cadillac, tossed petitioner the rifle, and petitioner began firing directly into Clark's car, (5) petitioner then gave the gun back to Sheffield and drove off in a Cadillac, and (6) Sheffield then brandished the rifle and threatened others at the scene. *Id.*

the club, she observed several men, including Boyd, Clark, and another man, engaged in a confrontation during which one participant in the confrontation shoved another person, (4) at that point, the men engaged in the confrontation scattered, (5) a white vehicle drove into the club's parking lot and stopped, (6) the white vehicle did not strike petitioner and did not back up, (7) she neither saw nor head anyone threaten petitioner, (8) the petitioner walked to the rear of the white vehicle and Ivory Sheffield tossed petitioner a rifle, (9) once he received the rifle, petitioner aimed and began shooting directly into the white vehicle, (10) she neither saw nor heard any shots being fired prior to petitioner opening fire with the rifle, (11) she observed no immediate threat to petitioner at the time he began shooting into the white vehicle, and (12) after he stopped shooting, petitioner passed the rifle back to Sheffield, got into his vehicle, and drove away from the scene.[8]

The medical examiner testified (1) Clark died as a result of a total of five, non-close-range, gunshot wounds to the head (two) and upper back (three), all of which traveled from the back to the front, (2) any one of these five gunshot wounds would have been fatal, (3) Boyd died as a result of six, non-close-range, gunshot wounds to his head, neck, chest, arm, shoulder, and thigh, (4) Boyd's head, neck, and chest wounds were all fatal wounds but wounds to Boyd's arm were not life-threatening, (5) all of the gunshot wounds to both victims were consistent with someone standing outside the left rear, i.e., the driver's side, of their vehicle firing a rifle into their vehicle from a distance of at least three and a half feet, (6) Clark's blood screen and vitreous alcohol levels indicated he was acutely intoxicated on alcohol and muscle relaxants at the time of his death, and (7) Boyd had a blood alcohol level of 0.28 g/deciliter and was also acutely intoxicated at the time of his death.[9]

Police recovered six spent shell casings and two spent bullets from the crime scene from locations which were consistent with Wallace's description of petitioner's location at the time he fired into the white vehicle, i.e., outside the rear of the vehicle's driver's side.[10] All of the spent shell casings and bullets the police recovered at the crime scene were later matched to a rifle police recovered during their subsequent investigation of the crime.[11] Police recovered no other weapons, spent shell casings, or bullets linked to either victim.[12]

Barbara J. Boyd, who was Patrick Clark's older sister and Samuel Boyd's sister-in-law, testified (1) Angela Wallace, whom she had never seen before, arrived at her residence and drove Barbara and other members of her family back to the

**8.** Statement of Facts from petitioner's second trial (henceforth "S.F. Trial"), Volume 13, testimony of Angela Wallace, at pp. 148–68, 170–72, 182, 187, 210–11, 213.

**9.** S.F. Trial, Volume 14, testimony of Robert Bux, at pp. 42–59.

**10.** S.F. Trial, Volume 13, testimony of Steven Patterson, at pp. 54–47–67, Volume 13, testimony of Ronald Dodson, at pp. 122–24.

**11.** A San Antonio Police Officer testified regarding the recovery of the spent shell casings and bullets at the crime scene and identified

each such item. S.F. Trial, Volume 13, testimony of Steven Patterson, at pp. 54–47–67. The same officer also identified State Exhibit no. 14 as the rifle police subsequently recovered from an undisclosed location during their investigation of the crime. *Id.,* at p. 68, 71–73, 94. A ballistics and tool mark expert testified without contradiction that all of the spent shell casings found at the crime scene had been fired by State Exhibit no. 14. S.F. Trial, Volume 13, testimony of Ronald Dodson, *at pp.* 117–22.

**12.** S.F. Trial, Volume 13, testimony of Steven Patterson, at pp. 55–56.

crime scene shortly after the shooting, (2) they arrived at the club before any police, (3) when they arrived, Clark was laying on the ground and Samuel Boyd was still inside the white car but no one else was inside or near the white car, (4) she called out to Samuel to wake up but he never did, (5) she then entered the club and called EMS and the police, (6) she next went back outside and flagged down a police vehicle, and (7) at no time did she see anyone going through the white car or touching Clark's or Boyd's body.[13]

### b. The Defense's Evidence

The defense presented the disjointed testimony of Robert Mays, Jr., who testified (1) around closing time, he went outside the Wheels of Joy club on January 21, 1994, (2) he heard some guys say they were going to get their stuff, which he construed as meaning they planned to get guns and return to the scene, (3) he heard angry words exchanged between individuals outside the club, (4) two-to-three men with guns, including a rifle, in a white car tried to run over Mays and his cousin Tyron Parks in the parking lot, (5) earlier that evening, several of the individual inside the white car had calmly spoken inside the club of shooting Mays, (6) after unsuccessfully striking Mays the first time, the white car backed up and tried to run down Mays three or four more times, and (7) he left the scene and had been gone from the scene for five-to-ten minutes before he heard shooting coming from the direction of the club's parking lot.[14] Mays' testimony was full of contradictions. For instance, Mays claimed the petitioner was still inside the club when the white vehicle attempted to run Mays over but he then contradicted himself, testifying the petitioner was outside the club when that happened.[15] Mays also testified he left the scene before any shots were fired but then claimed the individuals inside the white car fired at least six shots at Mays as he fled the parking lot.[16] Mays claimed he went inside the club to seek sanctuary after the white car tried to run him down but then left the club and ran away as three or four individuals inside the white car got out of that vehicle and fired shots at him.[17] Mays claimed he never saw petitioner fire into the white car because he had been gone from the scene for five or ten minutes before he heard (presumably more) gun shots.[18]

### c. Waiver of Lesser–Included Offense Instructions

Both at the close of the prosecution's case and during the charge conference at the guilt-innocence phase of trial, petitioner expressly advised the trial court that, despite his own trial counsel's advice to the contrary, petitioner did *not* want the trial court to include any instructions on lesser-included offenses in the trial court's guilt-innocence phase jury instructions.[19]

### d. The Verdict

On July 8, 1999, the jury returned its verdict, finding petitioner guilty of capital murder.[20]

---

**13.** S.F. Trial, Volume 14, testimony of Barbara J. Boyd, at pp. 81–85.

**14.** S.F. Trial, Volume 15, testimony of Robert Mays, Jr., at pp. 7–33.

**15.** *Id.*, at p. 11.

**16.** *Id.*, at pp. 17, 19–20, 27–31.

**17.** *Id.*, at pp. 27–31.

**18.** *Id.*, at pp. 17, 19–21, 27–28, 29–31.

**19.** S.F. Trial, Volume 14, at pp. 103–04; Volume 15, at p. 48.

**20.** Trial Transcript, Volume IV of IV, at p. 537; S.F. Trial, Volume 15, at pp. 115–18.

## 2. *Punishment Phase*

The punishment phase of petitioner's capital trial commenced on July 9, 1999.

### a. *Prosecution's Evidence*

The prosecution presented a wide range of testimony concerning petitioner's long criminal record and propensity for violence. A San Antonio Police officer testified that, when he arrested petitioner on January 25, 1994 in connection with the shooting deaths of Clark and Boyd, petitioner was carrying a handgun and petitioner subsequently was charged in federal court with illegal possession of a firearm by a convicted felon.[21]

A fingerprint expert testified petitioner's fingerprints matched those of a Frank Wardell Moore who had been (1) charged in 1982 with murder and later convicted of negligent homicide, (2) convicted in 1983 of attempted murder, (3) convicted in 1990 of possession of cocaine, and (4) convicted in 1991 of delivery of cocaine.[22]

A San Antonio Police homicide detective testified petitioner was a member of the East Terrace Gangster, a street gang affiliated with the Crips gang and associated with violent, drug-related criminal activity.[23] Another San Antonio Police detective testified he made undercover purchases of crack cocaine from petitioner in November and December, 1993.[24]

A former parole officer testified petitioner's parole records indicated (1) petitioner identified himself during a prison interview on December 5, 1986 as a member of the Black Panthers since 1984 and described his duties within that organization as recruiting new members, obtaining, hiding, and distributing weapons for fellow gang members, (2) petitioner had juvenile convictions for burglary and arson, (3) petitioner acknowledged he was an active participant in a race riot at the Texas Department of Criminal Justice's Darrington Unit in July, 1985, (4) petitioner was involved in an incident in prison on July 7, 1994 in which he verbally threatened a guard, disobeyed an order, and pushed a guard, (5) petitioner indicated to parole officials he was a lieutenant in the Crips gang and had been a member of that gang since age 14, (6) following his conviction for attempted murder, petitioner was released from prison under mandatory supervision but he was revoked and returned to prison less than eight months later, (7) petitioner finally discharged his sentence for attempted murder in March, 1989 but was convicted of cocaine possession the following year, (8) petitioner was paroled in 1991 but revoked later that same year, and (9) petitioner received a 20–year sentence for drug-trafficking in 1991 but was released on November 3, 1993 and revoked in March, 1994.[25]

The Chief of Classification at the Texas Department of Criminal Justice's ("TDCJ's") Fabian Dominguez State Jail testified petitioner's prison disciplinary records revealed (1) during a prison stay from July, 1984 through January, 1986, petitioner was cited repeatedly for refusing to work, disobeying an order, creating a disturbance, and once for striking an

---

**21.** S.F. Trial, Volume 16, testimony of Roger McGehee, at pp. 11–16.

**22.** S.F. Trial, Volume 16, testimony of Bernice R. Rodriguez, at pp. 21–30, 37.

**23.** S.F. Trial, Volume 16, testimony of John Saidler, at pp. 45–59, 57.

**24.** S.F. Trial, Volume 17, testimony of George R. Vidal, at pp. 7–18. A forensic drug analyst testified the two purchases made by detective Vidal from petitioner consisted of bags containing 288 mg of cocaine and 253 mg of cocaine. *Id.*, testimony of Brian Cho, at pp. 28–29.

**25.** S.F. Trial, Volume 17, testimony of Maria Ramirez, at pp. 43–61.

officer, (2) after a short release on mandatory supervision, petitioner returned to prison in November, 1986 and was convicted a month later of threatening an officer and refusing to obey orders, and (3) following a second release on mandatory supervision in February, 1987, petitioner returned to prison in November, 1991 and over the next two years was convicted of eleven separate instances of refusing to work, refusing to obey orders, and creating a disturbance.[26]

A Bexar County Adult Detention Center ("BCADC") official testified (1) petitioner identified himself during a May 18, 1991 interview as a member of the Crips gang, (2) in November, 1990, petitioner was disciplined for fighting, (3) in December, 1990, petitioner was disciplined for inciting a riot, (4) petitioner was sent to TDCJ custody in January, 1991, (5) within thirty days of petitioner's return to the BCADC in May, 1991, he had been found guilty of multiple offenses, including disobeying staff, making threats, and conveying inflammatory threats, (6) in July, 1991, petitioner was placed in administrative segregation for continuing disruptive behavior, (7) throughout the Summer of 1991, petitioner continued to commit disciplinary violations, including an assault on another inmate and disruptive behavior in September, 1991, (8) petitioner was returned to administrative segregation in September, 1991 then transferred to TDCJ the following month, (9) petitioner returned to the BCADC in January, 1994 and, within 45 days, had committed multiple disciplinary violations including assaults, (10) in December, 1994 petitioner was again placed in administrative segregation for assaultive behavior, (11) after a stay at TDCJ, petitioner returned to the BCADC on July 28, 1998, (12) by October 8, 1998 petitioner was back in administrative segregation for multiple disciplinary violations, and (13) petitioner was placed back in administrative segregation in April, 1999 following petitioner's convictions for three fights with other inmates over an eight-month period.[27]

A federal probation officer testified petitioner informed her during an interview in 1994 that he was a lieutenant with the Crips gang and petitioner pleaded guilty in federal court to illegal possession of a firearm by a convicted felon.[28]

### b. *Defense's Evidence*

Petitioner presented only one witness during the punishment phase of his trial, Frederick Buhler, an eyewitness to the shooting in the Wheels of Joy club on January 21, 1994, who testified (1) the petitioner attempted to break up the disturbance between the men arguing outside the club near closing time, (2) the white car stopped only inches from Buhler's legs when it entered the club's parking lot, (3) he did not see any weapons inside the white vehicle, (4) he did not believe petitioner provoked the incident, but (5) petitioner fired five or six times into the white car.[29]

### c. *Petitioner's Waiver of Other Mitigating Evidence*

Outside the jury's presence, petitioner advised the trial judge on the record that he did not want his trial counsel to introduce any additional mitigating evidence.[30]

---

**26.** S.F. Trial, Volume 17, testimony of Mark C. Hicks, at pp. 65–78.

**27.** S.F. Trial, Volume 18, testimony of Mark Gibson, at pp. 6–32.

**28.** S.F. Trial, Volume 18, testimony of Kate Devon, at pp. 48–53.

**29.** S.F. Trial, Volume 18, testimony of Frederick Buhler, at pp. 55–61.

**30.** S.F. Trial, Volume 18, at pp. 62–63.

#### d. *The Verdict*

After deliberating approximately six hours, on July 13, 1999, the jury returned its punishment-phase verdict, finding (1) beyond a reasonable doubt there was a probability the petitioner would commit criminal acts of violence constituting a continuing threat to society and (2) there were insufficient mitigating circumstances to warrant a sentence of life imprisonment.[31]

#### E. *Second Direct Appeal*

On June 12, 2000, petitioner filed his appellant's brief, asserting sixteen points of error.[32] On January 9, 2002, the Texas Court of Criminal Appeals issued an unpublished opinion affirming petitioner's conviction and sentence. *Moore v. State*, No. 73,526 (Tex.Crim.App. January 9, 2002). Petitioner did not thereafter seek certiorari review of his conviction or sentence from the United States Supreme Court.

#### F. *Second State Habeas Corpus Proceeding*

On February 28, 2001, petitioner filed a state habeas corpus application collaterally attacking his capital murder conviction in which petitioner asserted thirty-five grounds for state habeas corpus relief.[33]

---

**31.** Trial Transcript, Volume IV of IV, at pp. 546–47; S.F. trial, Volume 18, at pp. 107–08.

**32.** As grounds for relief, petitioner argued in his appellant's brief (1) the trial court erred when it failed to grant petitioner's challenges for cause to ten different members of petitioner's jury venire, (2) the trial court erred when it failed to grant petitioner a mistrial after two different prosecution witnesses mentioned petitioner's first trial, (3) the trial court erred when it failed to admit evidence of Boyd's violent nature, (4) the trial court erred when it denied petitioner's request for a punishment-phase jury instruction on "reasoned moral response," and (5) the death penalty violates the Eighth Amendment.

**33.** Transcript of pleadings, motions, and other documents filed in petitioner's second state habeas corpus proceeding, i.e., App. no. 40,-046–02 (henceforth "Second State Habeas Transcript"), Volume I of II, at pp. 1–116.

Among his 35 grounds for state habeas corpus relief, petitioner argued in his second state habeas corpus application that (1) the state trial court denied petitioner's state and federal constitutional rights by excluding evidence of Boyd's reputation for violence, (2) the state trial court violated petitioner's state and federal constitutional rights by denying petitioner's requests for mistrial after prosecution witnesses mentioned petitioner's first trial, (3) petitioner's trial counsel rendered ineffective assistance by (a) failing to offer evidence specifying the bad acts of Boyd which petitioner wished to present to the jury, (b) introducing evidence of petitioner's drug dealing, (c) failing to request a lesser-included offense instruction on murder, (d) failing to request a jury instruction on "sudden passion," (e) failing to request a "beyond a reasonable doubt" instruction regarding evidence of extraneous offense evidence at the guilt-innocence phase of trial, (f) failing to request a "beyond a reasonable doubt burden of proof" instruction on all extraneous offense evidence at the punishment phase of trial, (g) failing to introduce the testimony of Tyron Parks in support of petitioner's self-defense claim, (h) failing to interview Josie Wilford, Darlene Hopkins, or Edmond Davis in connection with petitioner's self-defense claim, and (I) failing to investigate whether Robert Perry Smith's fingerprints were on the murder weapon, (4) Article 11.071 of the Texas Code of Criminal Procedure, i.e., the Texas habeas corpus statute applicable to death penalty cases, violates various provisions of the Texas Constitution, as well as the Equal Protection and Due Process guarantees of the Fourteenth Amendment, (5) Article 37.071 of the Texas Code of criminal Procedure, along with section 19.03 of the Texas Penal Code violate the Fourteenth Amendment and Texas Constitution, (6) various terms contained in the Texas capital sentencing special issues are inadequately defined, this violating Equal Protection, Due Process, and Eighth Amendment principles, (7) Articles 44.251(a) and 37.071, § 2(e) of the Texas Code of Criminal Procedure violate the Eighth and Fourteenth Amendments because they foreclose meaningful state appellate review of the jury's answers to the Texas capital sentencing special issues, (8) Due process principles require proportionality review of all Texas capital sentences, (9)

On August 27, 2002, the state trial court held a hearing on petitioner's state habeas corpus application but petitioner offered no witnesses and presented no evidence at that hearing.[34]

On February 7, 2003, the state habeas trial court issued an Order containing its factual findings, legal conclusions, and recommendation that petitioner's application for state habeas relief be denied.[35]

On May 14, 2003, the Texas Court of Criminal Appeals issued an unpublished, *per curiam*, Order adopting the trial court's findings and conclusions and denying state habeas relief. *Ex parte Frank Moore*, App. No. 40,046–02 (Tex.Crim.App. May 14, 2003).

### G. *Federal Habeas Corpus Proceedings*

Petitioner filed his original petition for federal habeas corpus relief in this Court on March 31, 2004, asserting twenty claims for relief therein. *Docket entry no. 15.* Respondent filed an answer thereto on August 17, 2004. *Docket entry no. 30.* Petitioner filed his reply to petitioner's answer on December 2, 2004. *Docket entry no. 40.*

On November 9, 2004, this Court granted petitioner's motion for stay and to hold this cause in abeyance so that petitioner could return to state court and exhaust his then-unexhausted *Atkins* claim and directed petitioner to file his successive state habeas application asserting his *Atkins* claim within sixty days of that date. *Docket entry no. 39.*

In an Order issued August 16, 2005, this Court directed the parties to advise the Court regarding the status of petitioner's successive state habeas corpus proceeding. *Docket entry no. 41.* In an advisory filed September 6, 2005, the respondent informed this court that petitioner had not, as of that date, filed any successive state habeas corpus' application. *Docket entry no. 42.* In an advisory filed September 30, 2005, respondent advised this Court a mental health examination of petitioner had been scheduled and should have been completed as of that date and the state

the Texas statutory definition of "mitigating evidence" violates the Eighth Amendment, (10) the Texas capital sentencing scheme's mitigation or *Penry* special issue is unconstitutional because it includes an open-ended inquiry and fails to impose a burden of proof requirement on the prosecution, (11) the many different capital sentencing schemes employed in Texas during the early–1990's rendered petitioner's sentence arbitrary and capricious, (12) the failure of the Texas capital sentencing scheme to inform the jury regarding the effect of a single holdout juror violates the Eighth and Fourteenth Amendments, and (13) the Texas capital sentencing scheme is arbitrary and capricious, cruel and unusual, and violates equal protection and due process principles.

34. The five-page verbatim transcription from the August 27, 2002 hearing held in petitioner's state habeas corpus proceeding appears among the state court records submitted to this Court by respondent on January 9, 2004. During that hearing, petitioner's state habeas corpus attorney, Richard Langlois, stated on the record as follows:

> We are present. I will tell the Court, I don't have any witnesses at this point. My allegations are established in the brief or in the writ and I don't have any witnesses I need to elaborate on any of my points or error at this time.

Statement of Facts from petitioner's state habeas corpus evidentiary hearing, August 27, 2002, at p. 2.

Thereafter, attorney Langlois merely agreed to the prosecution's request that the state habeas trial court take judicial notice of the "entire record" from the case, did not make any opposition to the prosecution's request to submit a copy of the State's reply brief for the state habeas trial court's consideration, and suggested both parties be given sixty days to submit proposed factual findings and legal conclusions. The hearing promptly ended immediately thereafter.

35. Second State Habeas Transcript, Volume II of II, at pp. 318–68.

habeas court had directed the filing of a state habeas application on petitioner's behalf within thirty days. *Docket entry no. 43.* On October 11, 2005, respondent advised this court additional testing would be performed on petitioner. *Docket entry no. 44.* On October 12, 2005, petitioner finally responded to this court's Order directing the filing of status-reports on petitioner's successive state habeas corpus proceeding by advising this Court that petitioner intended to pursue a then-unexhausted *Brady* claim but failing to mention the status of petitioner's *Atkins* claim. *Docket entry no. 45.*

On January 26, 2006, respondent filed an advisory and motion to lift stay, informing this Court that petitioner had advised respondent that, while numerous mental health examinations of petitioner had been completed, yet another mental health examination of petitioner had been scheduled for February, 2006. *Docket entry no. 48.* On March 2, 2006, this Court issued a show cause Order directing petitioner to explain why the stay previously issued in this cause should not be lifted. *Docket entry no. 50.* On March 9, 2006, petitioner responded thereto, arguing the stay should be kept in place so that petitioner could exhaust available state habeas remedies on his unexhausted *Brady* claim but otherwise furnishing no rational explanation for petitioner's failure to timely prosecute his *Atkins* claim. *Docket entry no. 51.* On March 14, 2006, petitioner filed an advisory in which he informed this court petitioner had filed a successive state habeas corpus application asserting petitioner's *Brady* claim but making no mention of petitioner's *Atkins* claim. *Docket entry no. 52.*

In an Order issued August 4, 2006, this Court lifted the stay in this case and di-rected petitioner to file his amended federal habeas corpus petition within thirty days from that date. *Docket entry no. 53.* When petitioner failed to timely comply with that Order, this Court issued a show cause Order on September 18, 2006. *Docket entry no. 54.*

On September 28, 2006, petitioner finally filed his amended federal habeas corpus petition, asserting therein twenty-two claims for relief but no *Atkins* claim. *Docket entry no. 55.* Respondent filed his answer to petitioner's amended petition on January 13, 2007. *Docket entry no. 62.* On May 30, 2007, petitioner finally replied to respondent's answer. *Docket entry no. 68.*

## H. *Third State Habeas Corpus Proceeding*

On March 13, 2006, petitioner filed his third state habeas corpus application, asserting as grounds for relief therein arguments that (1) his constitutional rights under *Brady v. Maryland* were violated when San Antonio Police withheld information regarding an incident between petitioner, Clerk, Boyd, and another man hours before petitioner's fatal shootings of Boyd and Clark, (2) San Antonio Police violated petitioner's rights under the Texas Constitution by inadequately investigating the circumstances of petitioner's fatal shootings of Boyd and Clark, and (3) the San Antonio Police department's investigation of the fatal shootings of Boyd and Clark violated federal due process principles by inadequately examining whether petitioner acted in self-defense.[36]

In an unpublished, *per curiam,* Order issued September 13, 2006, the Texas Court of Criminal Appeals dismissed petitioner's third state habeas corpus applica-

---

**36.** Transcript of pleadings, motions, and other documents filed in petitioner's *third* state habeas corpus proceeding, i.e., App. no. 40,- 046–03 (henceforth "Third State Habeas Transcript"), at pp. 2–15.

tion as an abuse of the writ. *Ex parte Frank Moore,* App. no. 40,046–03, 2006 WL 2615542 (Tex.Crim.App. September 13, 2006).

## II. *AEDPA Standard of Review*

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson,* 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton,* 544 U.S. 133, 141, 125 S.Ct. 1432, 161 L.Ed.2d 334 (2005); *Williams v. Taylor,* 529 U.S. 362, 404–05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton,* 544 U.S. at 141, 125 S.Ct. at 1438; *Mitchell v. Esparza,* 540 U.S. 12, 15–16, 124 S.Ct. 7, 10, 157 L.Ed.2d

263 (2003)("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.' "). A state court's failure to cite governing Supreme Court authority does not, *per se,* establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.' " *Mitchell v. Esparza,* 540 U.S. at 16, 124 S.Ct. at 10.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown v. Payton,* 544 U.S. at 141, 125 S.Ct. at 1439; *Wiggins v. Smith,* 539 U.S. 510, 520, 123 S.Ct. 2527, 2534–35, 156 L.Ed.2d 471 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Wiggins v. Smith,* 539 U.S. at 520–21, 123 S.Ct. at 2535. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan,* —— U.S. ——, ——, 127 S.Ct. 1933, 1939, 167 L.Ed.2d 836 (2007)("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Wiggins v. Smith,* 539 U.S. at 520, 123 S.Ct. at 2535; *Price v. Vincent,* 538 U.S. 634, 641,

123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003) ("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660–61, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004)("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.' "); *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. A petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan*, —— U.S. at ——, 127 S.Ct. at 1939–40 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.' "); *Rice v. Collins*, 546 U.S. 333, 338–39, 126 S.Ct. 969, 974, 163 L.Ed.2d 824 (2006)("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.' "); *Miller–El v. Dretke*, 545 U.S. 231, 240, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005)("we presume the Texas court's factual findings to be sound unless Miller–El rebuts the 'presumption of correctness by clear and convincing evidence.' "); 28 U.S.C. § 2254(e)(1).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandon-

ment or abdication of federal judicial review. *See Miller–El v. Dretke*, 545 U.S. at 240, 125 S.Ct. at 2325 (the standard is "demanding but not insatiable"); *Miller–El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003)("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

■ Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See St. Aubin v. Quarterman*, 470 F.3d 1096, 1100 (5th Cir.2006)(holding Section 2254(d) permits a federal habeas court to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, —— U.S. ——, 127 S.Ct. 2133, 167 L.Ed.2d 869 (2007); *Amador v. Quarterman*, 458 F.3d 397, 410 (5th Cir.2006)(holding the same), *cert. denied*, —— U.S. ——, 127 S.Ct. 2129, 167 L.Ed.2d 866 (2007); *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir.2003)(holding the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable), *cert. denied*, 541 U.S. 1045, 124 S.Ct. 2160, 158 L.Ed.2d 736 (2004); *Anderson v. Johnson*, 338 F.3d 382, 390 (5th Cir.2003)(holding a federal habeas court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir.2002) (*en banc*) (holding a federal court is authorized by § 2254(d) to review only a state court's decision and not the written opinion explaining that decision),

*cert. denied,* 537 U.S. 1104, 123 S.Ct. 963, 154 L.Ed.2d 772 (2003).

### III. *Brady Claim*

#### A. *The Claim*

In his first claim in his amended federal habeas corpus petition, petitioner argues his constitutional rights were violated when the prosecution, through the San Antonio Police Department, withheld from petitioner's defense counsel information potentially exculpatory, impeaching, and mitigating evidence in violation of the rule announced by the Supreme Court in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). More specifically, petitioner alleges the prosecution withheld from petitioner's trial counsel information consisting of (1) eyewitness accounts by unidentified persons about an incident on January 20, 1994, only hours prior to petitioner's fatal shootings of Clark and Boyd, in which a person named Ernest Bedford (acting in concert with Clark and Boyd) allegedly threatened petitioner and displayed a handgun and (2) eyewitness accounts by unidentified persons establishing that (a) Ernest Bedford was present at the Wheels of Joy club immediately before petitioner's fatal shootings of Clark and Boyd, (b) Bedford fired a handgun at petitioner and ran into the bar, and (c) when Clark and Boyd began firing at petitioner with handguns from their vehicle, petitioner returned fire with the rifle Ivory Sheffield had just given to petitioner.[37] In support of his *Brady* claim, petitioner presents the hearsay affidavit of one War-

ren Keith Huel, the owner of a private security firm who claims his employees interviewed various unidentified persons about the incidents in question but in which Mr. Huel makes no profession of personal knowledge about either incident.[38]

#### B. *State Court Disposition*

Petitioner presented his *Brady* claim to the state courts for the first and only time in his third state habeas corpus application, filed March 13, 2006, which the Texas Court of Criminal Appeals *dismissed* as an abuse of the writ. *Ex parte Frank Moore,* 2006 WL 2615542 (Tex.Crim.App. September 13, 2006).

#### C. *Procedural Default*

■ Respondent correctly points out petitioner procedurally defaulted on his *Brady* claim by failing to present same to the state habeas court in the course of petitioner's second state habeas corpus proceeding.[39]

Procedural default occurs where (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, or (2) the petitioner fails to exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred. *Coleman v. Thompson,* 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 2557 n. 1, 115 L.Ed.2d 640 (1991). In either instance, the petitioner is deemed to have

---

**37.** Petitioner's Amended Application [sic] for Writ of Habeas Corpus, filed September 28, 2006, docket entry no. 56 (henceforth "Amended Petition"), at pp. 5–12.

**38.** A poor quality copy of six of the seven pages of Mr. Huel's *handwritten* affidavit, dated March 9, 2005, appears as a part of Exhibit D attached to Petitioner's Response to Show Cause, filed March 9, 2006, docket en-

try no. 51. Page 6 of 7 is missing from the copy of Mr. Huel's affidavit attached to that pleading. An unverified, unauthenticated, three-page type-written version of the same affidavit appears as Exhibit E attached to the same pleading.

**39.** Respondent's Answer to the Amended Petition, filed January 3, 2007, docket entry no. 62, at pp. 3–6.

forfeited his federal habeas claim. *O'Sullivan v. Boerckel,* 526 U.S. 838, 848, 119 S.Ct. 1728, 1734, 144 L.Ed.2d 1 (1999). Procedural defaults only bar federal habeas review when the state procedural rule which forms the basis for the procedural default was "firmly established and regularly followed" by the time it was applied to preclude state judicial review of the merits of a federal constitutional claim. *Ford v. Georgia,* 498 U.S. 411, 424, 111 S.Ct. 850, 857–58, 112 L.Ed.2d 935 (1991).

In its September 13, 2006 Order *dismissing* petitioner's third state habeas corpus application as an abuse of the writ, the Texas Court of Criminal Appeals applied a long-recognized, firmly-established, and regularly-followed Texas state procedural barrier to federal habeas review of claims presented in a successive state habeas corpus application which were available at the time of a previous state habeas corpus proceeding and which, through the exercise of due diligence, could have been fully litigated in the previous state habeas corpus proceeding.[40] *See Coleman v. Quarterman,* 456 F.3d 537, 542 (5th Cir.2006) ("Texas's abuse of the writ doctrine is a valid state procedural bar foreclosing federal habeas review."), *cert. denied,* —— U.S. ——, 127 S.Ct. 2030, 167 L.Ed.2d 772 (2007); *Aguilar v. Dretke,* 428 F.3d 526, 533 (5th Cir.2005)("This court has consistently held that Texas' abuse-of-writ rule is ordinarily an 'adequate and independent' procedural ground on which to base a procedural default ruling."), *cert. denied,* 547 U.S. 1136, 126 S.Ct. 2059, 164 L.Ed.2d 793 (2006); *Matchett v. Dretke,* 380 F.3d 844, 848 (5th Cir.2004) ("Texas' abuse-of-the-writ rule is ordinarily an 'adequate and

independent' procedural ground on which to base a procedural default ruling."), *cert. denied,* 543 U.S. 1124, 125 S.Ct. 1067, 160 L.Ed.2d 1074 (2005); *Busby v. Dretke,* 359 F.3d 708, 724 (5th Cir.2004)("the Texas abuse of the writ doctrine is an adequate ground for considering a claim procedurally defaulted."), *cert. denied,* 541 U.S. 1087, 124 S.Ct. 2812, 159 L.Ed.2d 249 (2004); *Kunkle v. Dretke,* 352 F.3d 980, 989 (5th Cir.2003)("The abuse of writ doctrine has been consistently applied as a procedural bar in Texas since 1994, long before its codification in Tex.CodeCrim.Proc. art. 11.071 § 5, and well before Kunkle filed his second state habeas petition in 1995."), *cert. denied,* 543 U.S. 835, 125 S.Ct. 250, 160 L.Ed.2d 56 (2004); *Emery v. Johnson,* 139 F.3d 191, 201 (5th Cir.1998)(holding Texas strictly and regularly applied. its common law abuse of the writ doctrine at least as early as February 23, 1994, i.e., the date of the Texas Court of Criminal Appeals' decision in *Ex parte Barber,* 879 S.W.2d 889 (Tex.Crim.App.1994)), *cert. denied,* 525 U.S. 969, 119 S.Ct. 418, 142 L.Ed.2d 339 (1998). Thus, petitioner procedurally defaulted on his *Brady* claim.

The Supreme Court has recognized exceptions to the doctrine of procedural default where a federal habeas corpus petitioner can show "cause and actual prejudice" for his default or that failure to address the merits of his procedurally defaulted claim will work a "fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. at 750, 111 S.Ct. at 2565; *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989).

---

**40.** The Texas Court of Criminal Appeals routinely employs the term "dismissal" or "dismissed" to signify a disposition on procedural grounds rather than substantive ruling or determination "on the merits." *Singleton v. Johnson,* 178 F.3d 381, 384 (5th Cir.1999); *Jackson v. Johnson,* 150 F.3d 520, 524 (5th

Cir.1998), *cert. denied,* 526 U.S. 1041, 119 S.Ct. 1339, 143 L.Ed.2d 503 (1999); *Ex parte Grigsby,* 137 S.W.3d 673, 674 (Tex.Crim.App. 2004); *Ex parte Thomas,* 953 S.W.2d 286, 288–89 (Tex.Crim.App.1997); *Ex parte Torres,* 943 S.W.2d 469, 472 (Tex.Crim.App.1997).

To establish "cause," a petitioner must show either that some objective external factor impeded the defense counsel's ability to comply with the state's procedural rules or that petitioner's trial or appellate counsel rendered ineffective assistance. *Coleman v. Thompson*, 501 U.S. at 753, 111 S.Ct. at 2566; *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986) (holding that proof of ineffective assistance by counsel satisfies the "cause" prong of the exception to the procedural default doctrine).

█ Petitioner cannot satisfy the "cause and actual prejudice" exception to the procedural default doctrine because he cannot show he was unaware of the facts underlying his *Brady* claim at the time petitioner filed his second state habeas corpus application. Petitioner has alleged no facts showing the allegedly "newly discovered" information contained in Mr. Huel's affidavit was unavailable to petitioner at the time petitioner filed his second state habeas corpus application. Mr. Huel's affidavit purports to recount, albeit in a hearsay manner, incidents about which petitioner necessarily possessed personal knowledge at all times relevant to petitioner's trials and state habeas corpus proceedings. If Mr. Huel's unidentified employees' accounts of their interviews with unidentified witnesses are to be believed, then (1) petitioner was verbally and physically threatened by Ernest Bedford, Patrick Clark, and Samuel Boyd on January 20, 1994, only hours before petitioner's fatal shootings of Boyd and Clark and (2) at the time petitioner fatally shot Clark and Boyd, petitioner was engaged in a pitched gun battle with Bedford, Clark, and Boyd. Petitioner does not allege any facts suggesting he suffered from any mental, emotional, or physical impairment which prevented him from remembering either of those facts at the time of either of his trial or at the time he filed his second state habeas corpus application. Petitioner does not allege any facts showing that he was prevented by any external factor from informing his own trial counsel and state habeas counsel of the foregoing information. Thus, petitioner cannot show cause for his failure to present his *Brady* claim to the state courts during his second state habeas corpus proceeding.

In order to satisfy the "miscarriage of justice" test, the petitioner must supplement his constitutional claim with a colorable showing of factual innocence. *Sawyer v. Whitley*, 505 U.S. 333, 335–36, 112 S.Ct. 2514, 2519, 120 L.Ed.2d 269 (1992). In the context of the punishment phase of a capital trial, the Supreme Court has held that a showing of "actual innocence" is made when a petitioner shows by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found petitioner eligible for the death penalty under applicable state law. *Sawyer v. Whitley*, 505 U.S. at 346–48, 112 S.Ct. at 2523. The Supreme Court explained in *Sawyer v. Whitley* this "actual innocence" requirement focuses on those elements which render a defendant *eligible* for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. *Sawyer v. Whitley*, 505 U.S. at 347, 112 S.Ct. at 2523. Petitioner has alleged no specific facts satisfying this "factual innocence" standard. At best, the "newly discovered" information which petitioner uses to support his *Brady* claim consists of hearsay within hearsay statements made by unidentified persons to unidentified employees of Mr. Huel's company and address matters which, by their very nature, were within the personal knowledge of the petitioner at all times relevant to petitioner's trials and first two state habeas corpus proceedings. Because petitioner has failed to satisfy the "actual innocence" test, he is not entitled to relief from his procedural defaults under the

fundamental miscarriage of justice exception to the procedural default doctrine.

D. *Limitations*

Respondent also correctly argues petitioner's *Brady* claim is foreclosed by the AEDPA's one-year statute of limitations.

The AEDPA imposes a one-year limitations period on the filing of a federal habeas corpus petition. *Pace v. DiGuglielmo,* 544 U.S. 408, 410, 125 S.Ct. 1807, 1809, 161 L.Ed.2d 669 (2005); *Johnson v. Quarterman,* 483 F.3d 278, 285 (5th Cir.2007), *cert. denied,* — U.S. —, 128 S.Ct. 709, 169 L.Ed.2d 557, 2007 WL 2508931 (December 3, 2007); *Prieto v. Quarterman,* 456 F.3d 511, 514 (5th Cir.2006); *Emerson v. Johnson,* 243 F.3d 931, 932 (5th Cir.2001); 28 U.S.C. § 2244(d)(1). Under the AEDPA's one-year limitations provision, a convicted criminal defendant must file a Section 2254 petition within one year of the date his *conviction* becomes final generally or within one year of the AEDPA's effective date, i.e., April 24, 1996, if the defendant's *conviction* became final prior to that date. *Emerson v. Johnson,* 243 F.3d at 932; *Ybanez v. Johnson,* 204 F.3d 645, 646 (5th Cir.2000), *cert. denied,* 531 U.S. 881, 121 S.Ct. 193, 148 L.Ed.2d 134 (2000); *Felder v. Johnson,* 204 F.3d 168, 169 (5th Cir. 2000), *cert. denied,* 531 U.S. 1035, 121 S.Ct. 622, 148 L.Ed.2d 532 (2000); *Coleman v. Johnson,* 184 F.3d 398, 401 (5th Cir.1999), *cert. denied,* 529 U.S. 1057, 120 S.Ct. 1564, 146 L.Ed.2d 467 (2000).

■ The Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence in an opinion issued January 9, 2002. Petitioner's conviction became final for purposes of the AEDPA's one-year statute of limitations not later than ninety days after the Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence on direct appeal, i.e., on April 10, 2002, the date petitioner's deadline for filing a petition for certiorari with the United States Supreme Court expired. *See Foreman v. Dretke,* 383 F.3d 336, 340 (5th Cir.2004) (holding a state prisoner's conviction became final ninety days after the Texas Court of Criminal Appeals refused his petition for discretionary review where the prisoner failed to file a timely petition for writ of certiorari); *Roberts v. Cockrell,* 319 F.3d 690, 694 (5th Cir.2003) (holding direct appeal terminates with the disposition of a petition for writ of certiorari to the United States Supreme Court or with the expiration of the deadline for filing such a petition). Petitioner did not file a petition for certiorari. Thus, his state criminal conviction became final for purposes of the AEDPA's one-year statute of limitations when the time for filing a petition for writ of certiorari elapsed. *Roberts v. Cockrell,* 319 F.3d at 693–94; *Flanagan v. Johnson,* 154 F.3d 196, 197 (5th Cir.1998).

■ However, petitioner filed his second state habeas corpus application on February 28, 2001. Petitioner's second state habeas corpus application remained pending before the state courts until May 14, 2003. The AEDPA's one-year statute of limitations is statutorily tolled during the time an application for state habeas corpus relief is pending. *In re Wilson,* 442 F.3d 872, 874 (5th Cir.2006). More specifically, Title 28 U.S.C. Section 2244(d)(2) provides that the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation...." *Ott v. Johnson,* 192 F.3d 510, 512 (5th Cir.1999), *cert. denied,* 529 U.S. 1099, 120 S.Ct. 1834, 146 L.Ed.2d 777 (2000). Thus, the AEDPA's one-year statute of limitations on petitioner's claims herein was statutorily tolled until May 14, 2003.

The AEDPA's limitations period applicable to petitioner's claims herein generally

commenced to run the following date, i.e., on May 15, 2003. Petitioner is entitled to the benefit of no statutory tolling after that date.

The filing of petitioner's initial federal habeas corpus petition in this Court on March 31, 2004 did not result in any additional tolling of the AEDPA's applicable one-year statute of limitations on petitioner's then-unexhausted *Brady* claim. *See Duncan v. Walker*, 533 U.S. 167, 172–77, 121 S.Ct. 2120, 2124–27, 150 L.Ed.2d 251 (2001)(holding the pendency of a federal habeas corpus petition does *not* toll the AEDPA's one-year statute of limitations); *In re Wilson*, 442 F.3d at 876 n. 5 (holding the same).

Prior to the date petitioner filed his first *federal* habeas corpus petition in this cause, i.e., March 31, 2004, the Texas Court of Criminal Appeals had rescinded its notorious "two-forum" rule which forbade Texas habeas courts from entertaining claims that were pending before federal courts. More specifically, on February 11, 2004, the Texas Court of Criminal Appeals announced it was abandoning its long-standing "two-forum rule" and would, henceforth, entertain the merits of claims for state habeas corpus relief filed during the pendency of a federal habeas corpus proceeding in which the same claims were pending. *Ex parte Soffar*, 143 S.W.3d 804, 807 (Tex.Crim.App.2004). Petitioner is entitled to no benefit from the two-forum rule, which was abrogated more than two years *before* petitioner filed his third state habeas application.

Nothing in this Court's Order issued November 9, 2004 staying this cause tolled the applicable AEDPA limitations period on petitioner's *Brady* claim. That Order was limited to holding this cause in abeyance for the sole purpose of permitting petitioner an opportunity to "fairly present" his then-unexhausted *Atkins* claim to the state courts.

Mr. Huel's affidavit is dated March 9, 2005. Petitioner alleges no facts showing that he was unaware *after* that date of the hearsay within hearsay information contained in that document. Thus, even disregarding the reality that petitioner necessarily had to possess personal knowledge of the factual bases underlying his *Brady* claim herein at the time of his second trial and second state habeas corpus proceeding, petitioner most certainly had notice of Mr. Huel's hearsay within hearsay allegations not later than March 9, 2005. Despite this fact, petitioner waited until March 13, 2006 to file his third state habeas corpus application.

■ In rare and exceptional circumstances, equitable considerations may toll the AEDPA's statute of limitations. *Johnson v. Quarterman*, 483 F.3d at 286; *Flores v. Quarterman*, 467 F.3d 484, 486 (5th Cir.2006), *cert. denied*, —— U.S. ——, 127 S.Ct. 2909, 168 L.Ed.2d 242 (2007); *Prieto v. Quarterman*, 456 F.3d at 514; *In re Wilson*, 442 F.3d at 875. However, to be entitled to equitable tolling, a petitioner must show (1) he pursued his rights diligently but (2) some extraordinary circumstance stood in his way and prevented timely filing. *Lawrence v. Florida*, —— U.S. ——, ——, 127 S.Ct. 1079, 1085, 166 L.Ed.2d 924 (2007); *Johnson v. Quarterman*, 483 F.3d at 286; *In re Wilson*, 442 F.3d at 875.

■ Petitioner has alleged no facts showing that he is entitled to the benefits of the doctrine of equitable tolling during the period from March 9, 2005 until March 13, 2006. While petitioner argues he should not be punished for failing to discover the existence of Mr. Huel prior to March 9, 2005,[41] petitioner offers absolute-

---

41. Petitioner's Response to Respondent's An- swer, filed May 30, 2007, docket entry no. 68,

ly no rational justification for petitioner's failure to timely submit his third state habeas application (premised on Mr. Huel's hearsay affidavit) until March 13, 2006. The record now before this Court establishes petitioner utterly failed to diligently pursue state habeas remedies on his *Brady* claim *after* petitioner alleges he first became aware of the information contained in Mr. Huel's hearsay affidavit on March 9, 2005. Even if this Court were to turn a blind eye to the reality that petitioner necessarily knew all of the hearsay information contained in Mr. Huel's affidavit at the time petitioner filed his second state habeas corpus application, petitioner has alleged no facts showing he exercised due diligence to exhaust available state habeas remedies on his *Brady* claim between March 9, 2005 and March 13, 2006.

Accordingly, petitioner's *Brady* claim herein is barred by the AEDPA's one-year statute of limitations.

### E. *No Merits*

Moreover, petitioner's *Brady* claim is without arguable merit.

■ Because no state court has ever reviewed the "merits" of petitioner's *Brady* claim herein, any analysis by this Court of that same claim must be undertaken *de novo*. *See Rompilla v. Beard*, 545 U.S. 374, 390, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005)(holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

■ As this Court has noted on many occasions, few constitutional principles are more firmly established by Supreme Court precedent than the rule that " 'the sup-pression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' " *Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256, 1272, 157 L.Ed.2d 1166 (2004); *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963); *Gutierrez v. Dretke*, 392 F.Supp.2d 802, 850 (W.D.Tex.2005), *Certificate of Appealability denied*, 201 Fed.Appx. 196 (5th Cir.2006), *cert. denied*, — U.S. ——, 127 S.Ct. 1297, 167 L.Ed.2d 112 (2007). The Supreme Court has consistently held the prosecution's duty to disclose evidence material to either guilt or punishment, i.e., the rule announced in *Brady v. Maryland*, applies even when there has been no request by the accused. *Banks v. Dretke*, 540 U.S. at 690, 124 S.Ct. at 1272; *Strickler v. Greene*, 527 U.S. 263, 280, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999); *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976). This duty also applies to impeachment evidence. *Strickler v. Greene*, 527 U.S. at 280, 119 S.Ct. at 1948; *United States v. Bagley*, 473 U.S. 667, 676 & 685, 105 S.Ct. 3375, 3380 & 3385, 87 L.Ed.2d 481 (1985).

■ Significantly for petitioner's case, the rule in *Brady* encompasses evidence known only to police investigators and not personally known by the prosecutor. *Strickler v. Greene*, 527 U.S. at 280–81, 119 S.Ct. at 1948; *Kyles v. Whitley*, 514 U.S. 419, 438, 115 S.Ct. 1555, 1568, 131 L.Ed.2d 490 (1995). "[T]he individual prosecutor has a duty to learn of any favorable evidence *known to the others acting on the government's behalf* in this case, including the police." *Strickler v. Greene*, 527 U.S. at 281, 119 S.Ct. at 1948 (emphasis added);

at pp. 3–6.

*Kyles v. Whitley,* 514 U.S. at 437, 115 S.Ct. at 1567.

■ Under clearly established Supreme Court precedent, there are three elements to a *Brady* claim: (1) the evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be "material," i.e., prejudice must have ensued from its non disclosure. *Banks v. Dretke,* 540 U.S. at 691, 124 S.Ct. at 1272; *Strickler v. Greene,* 527 U.S. at 281–82, 119 S.Ct. at 1948. Evidence is "material" under *Brady* where there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different. *Banks v. Dretke,* 540 U.S. at 698–99, 124 S.Ct. at 1276.

■ The fundamental problem with petitioner's *Brady* claim herein is the fact that all of the hearsay within hearsay information contained in Mr. Huel's affidavit was necessarily within the personal knowledge of petitioner at all times relevant to petitioner's trials. Mr. Huel claims that unidentified persons within his employ interviewed unidentified persons who stated (1) Ernest Bedford, Patrick Clark, and Samuel Boyd verbally and physically threatened petitioner on January 20, 1994 only hours before petitioner fatally shot Boyd and Clark and (2) at the time petitioner fatally shot Clark and Boyd, petitioner was engaged in a pitched gun battle with Bedford, Clark, and Boyd. Petitioner offers no explanation, rational or otherwise, as to how either of these facts could be true and yet petitioner remain unaware of them. If, as Mr. Huel asserts, unidentified witnesses told Huel's employees that Bedford, Clark and Boyd verbally and physically threatened petitioner hours before the fatal shooting and, at the time of the fatal shootings, petitioner was merely returning gun fire directed at him by Bedford, Boyd, and Clark, then petitioner (who does not allege he was suffering from any mental, emotional, or physical disability at either time) necessarily was aware of those facts at the time they occurred.

Petitioner alleges no facts showing that any external force or any mental, emotional, or physical impairment prevented him from accurately perceiving or comprehending either the threats Bedford, Clark, and Boyd allegedly directed toward petitioner hours before the fatal shootings or the gun fire the same three individuals allegedly directed to petitioner as he was firing into Clark and Boyd's vehicle. Petitioner alleges no facts showing that any mental, emotional, or physical disability prevented him from relating this information to his trial counsel.

Barring some mental, emotional, or physical impairment which prevents a criminal defendant from effectively communicating with his trial counsel, it is legally impossible for the prosecution to "withhold" or "suppress" information for *Brady* purposes when the same information is within the defendant's personal knowledge. *See Castillo v. Johnson,* 141 F.3d 218, 223 (5th Cir.1998) ("Under *Brady,* the prosecution has no obligation to produce evidence or information already known to the defendant, or that could be obtained through the defendant's exercise of diligence."), *cert. denied,* 524 U.S. 979, 119 S.Ct. 28, 141 L.Ed.2d 788 (1998); *Brown v. Cain,* 104 F.3d 744, 750 (5th Cir.1997)("The prosecution had no obligation under *Brady* to produce for Brown evidence or information already known to him, or that he could have obtained from other sources by exercising reasonable diligence."), *cert. denied,* 520 U.S. 1195, 117 S.Ct. 1489, 137 L.Ed.2d 699 (1997).

For the foregoing reasons, petitioner's *Brady* claim is without arguable merit.

### F. Conclusions

Petitioner procedurally defaulted on his *Brady* claim by failing to present same to the state courts until finally including same in petitioner's third state habeas corpus application. Because petitioner waited more than a year after the date Mr. Huel executed his hearsay-within-hearsay affidavit to submit same to the state courts as part of petitioner's third state habeas corpus application, petitioner's *Brady* claim is barred by the AEDPA's one-year statute of limitations. Finally, petitioner's *Brady* claim is both without merit and without legal foundation.

### IV. *Actual Innocence Claim*

### A. *The Claim*

Petitioner argues the allegedly "newly discovered" information contained in Mr. Huel's hearsay within hearsay affidavit establishes petitioner's "actual innocence," i.e., establishes petitioner acted in self-defense when he returned Boyd and Clark's gun fire.[42]

### B. *State Court Disposition*

Petitioner has never presented his "actual innocence" claim for relief to any state court as a stand-alone point of error or ground for habeas corpus relief.

### C. *Procedural Default*

██ For the same reasons set forth in Section III.C. above, petitioner procedurally defaulted on his "actual innocence" claim by failing to present the state courts with that claim until he filed his third state habeas application, which the Texas Court of Criminal Appeals dismissed under Texas writ-abuse principles. However, respondent did not point out this obvious fact and this Court is precluded from noting *sua sponte* petitioner's procedural default no matter how egregious and overt that default. *See Prieto v. Quarterman*, 456

F.3d at 518–19 (holding this Court abused its discretion in *sua sponte* dismissing as procedurally defaulted an unexhausted claim). Therefore, this Court must address the merits of this otherwise procedurally defaulted claim.

### D. *No Merits*

Because no state court has ever addressed the merits of petitioner's "actual innocence" claim, this Court's review of same is *de novo*. *See Rompilla v. Beard*, 545 U.S. 374, 390, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005)(holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same); *Wright v. Quarterman*, 470 F.3d 581, 591 (5th Cir.2006) (holding claims which had not been presented to state court but nonetheless were *not* procedurally defaulted were entitled to *de novo* federal habeas review), *cert. denied*, —— U.S. ——, 127 S.Ct. 2996, 168 L.Ed.2d 707 (2007).

In *Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), the United States Supreme Court unequivocally declared that claims of "actual innocence" based on newly discovered evidence do *not* constitute an independent ground for granting federal habeas corpus relief. *Herrera v. Collins*, 506 U.S. at 400–01, 113 S.Ct. at 860–61. However, in *Herrera*, the Supreme Court also reaffirmed that a state prisoner who supplements his federal habeas claims with "a colorable showing of actual innocence" can thereby circumvent procedural barriers to obtaining federal habeas review on the merits for his constitutional claims. *Herrera v. Collins*, 506 U.S. at 404, 113 S.Ct. at 862.

---

**42.** Amended Petition, at pp. 12–13.

The Supreme Court's holding in *Herrera* precludes petitioner's argument that the new evidence he presented for the first time during his *third* state habeas corpus proceeding, i.e., Mr. Huel's hearsay-within-hearsay affidavit, independently warrants federal habeas corpus relief. Under *Herrera*, even new evidence establishing a state prisoner's actual innocence beyond any doubt does not independently authorize federal habeas corpus relief. *Herrera v. Collins*, 506 U.S. at 400–02, 113 S.Ct. at 860–61; *Parr v. Quarterman*, 472 F.3d 245, 252 (5th Cir.2006), *cert. denied*, —— U.S. ——, 127 S.Ct. 2974, 168 L.Ed.2d 707 (2007); *Foster v. Quarterman*, 466 F.3d 359, 367 (5th Cir.2006), *cert. denied*, —— U.S. ——, 127 S.Ct. 2099, 167 L.Ed.2d 817 (2007); *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir.2000), *cert. denied*, 532 U.S. 915, 121 S.Ct. 1250, 149 L.Ed.2d 156 (2001).

However, the foreclosure of petitioner's frontal assault upon his conviction does *not* end this Court's examination of petitioner's actual innocence claim. The Supreme Court has held that a showing of "actual innocence" opens the door to federal habeas review of procedurally defaulted claims and claims that would otherwise be barred by abuse-of-the-writ principles. *Schlup v. Delo*, 513 U.S. 298, 326–27, 115 S.Ct. 851, 867, 130 L.Ed.2d 808 (1995); *Herrera v. Collins*, 506 U.S. at 404, 113 S.Ct. at 862; *Parr v. Quarterman*, 472 F.3d at 252.

In *Schlup v. Delo*, the Supreme Court explained that a petitioner seeking to surmount a procedural default through a showing of "actual innocence" must establish it is more likely than not that, in light of the new evidence, no juror, acting reasonably, would have voted to find the petitioner guilty beyond a reasonable doubt. *Schlup v. Delo*, 513 U.S. at 327, 115 S.Ct. at 867; *Wright v. Quarterman*, 470 F.3d at 590; *Foster v. Quarterman*, 466 F.3d at 367. The Supreme Court has more re-

cently reaffirmed the vitality of this standard of review. *See House v. Bell*, 547 U.S. 518, 538, 126 S.Ct. 2064, 2077, 165 L.Ed.2d 1 (2006) ("A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.").

Thus, even though petitioner may not seek federal habeas corpus relief premised exclusively on a showing that new evidence establishes his "actual innocence," he may assert such an argument as a means of circumventing his procedural default on any other constitutional claim he presents to this Court. *House v. Bell*, 547 U.S. at 535–38, 126 S.Ct. at 2076–77; *Parr v. Quarterman*, 472 F.3d at 252; *Wright v. Quarterman*, 470 F.3d at 590–92.

The Supreme Court's explanation of what it meant by the term "actual innocence" is more helpful to understanding how a federal habeas court must evaluate such a claim than the standard itself:

The meaning of actual innocence as formulated by *Sawyer*, and *Carrier* does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty. It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

We note finally that the *Carrier* standard requires a petitioner to show that it is more likely than not that "no reasonable juror" would have convicted him. The word "reasonable" in that formulation is not without meaning. It must be presumed that a reasonable juror would consider fairly all of the evidence presented. It must also be presumed that such a juror would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt.

*Schlup v. Delo*, 513 U.S. at 329, 115 S.Ct. at 868 (footnote omitted).

The Supreme Court took great care in *Schlup* to distinguish the standard it applied in that case from the evidentiary sufficiency test it announced in *Jackson v. Virginia:*

> Though the *Carrier* standard requires a substantial showing, it is by no means equivalent to the standard of *Jackson v. Virginia.* The *Jackson* standard, which focuses on whether any rational juror could have convicted, looks to whether there is sufficient evidence which, if credited, could support conviction. The *Jackson* standard thus differs in at least two important ways from the *Carrier* standard. First, under *Jackson,* the assessment of the credibility of witnesses is generally beyond the scope of review. In contrast, under the gateway standard we describe today, the newly presented evidence may indeed call into question the credibility of the witnesses presented at trial. In such a case, the habeas court may have to make some credibility assessments. Second, and more fundamentally, the focus of the inquiry is different under *Jackson* than under *Carrier.* Under *Jackson,* the use of the word "could" focuses the inquiry on the power of the trier of fact to reach its conclusion. Under *Carrier,* the use of the word "would" focuses the inquiry on the likely behavior of the trier of fact.

> Indeed, our adoption of the phrase "more likely than not" reflects this distinction. Under *Jackson,* the question whether the trier of fact has the power to make a finding of guilt requires a binary response: Either the trier of fact has power as a matter of law or it does not. Under *Carrier,* in contrast, the habeas court must consider what reasonable triers of fact are likely to do. Under this probabilistic inquiry, it makes sense to have a probabilistic standard such as "more likely than not." Thus, though under *Jackson* the mere existence of sufficient evidence to convict would be determinative of petitioner's claim, that is not true under *Carrier.*

*Schlup v. Delo*, 513 U.S. at 330, 115 S.Ct. at 868–69 (citations and footnote omitted).

■ Thus, a federal habeas corpus petitioner's showing of actual innocence is not insufficient solely because the trial record contained sufficient evidence to support the jury's verdict. *Schlup v. Delo,* 513 U.S. at 331, 115 S.Ct. at 869.

■ Petitioner's argument that Mr. Huel's hearsay within-hearsay-affidavit satisfies the "actual innocence" standard has no arguable merit. Petitioner's claim of actual innocence is premised upon the theories that (1) Bedford, Clark, and Boyd threatened petitioner shortly before the fatal shooting and (2) petitioner was merely returning their gun fire when he shot into Clark and Boyd's vehicle. If true, petitioner was necessarily aware of all these facts prior to his trials. Thus, the basis of his actual innocence claim could hardly be said to be "newly discovered" evidence. *See In re Brown,* 457 F.3d 392, 395–96 (5th Cir.2006) (holding a petitioner was "acutely aware" at the time of his trial of the factual basis for his subsequent assertion that he falsely confessed during his trial to fatally shooting the victim, i.e., because he had been threatened by others

involved in the offense, and, therefore, such an assertion did not constitute "newly discovered" evidence within the meaning of *Schlup* ). As the Supreme Court recently emphasized, the threshold for a showing of "actual innocence" is "extraordinarily high." *House v. Bell,* 547 U.S. at 554–55, 126 S.Ct. at 2086–87. Petitioner's allegations memorialized in Mr. Huel's hearsay-within-hearsay affidavit do not even begin to approach that standard.

## V. Exclusion of Evidence of Boyd's Record and Reputation

### A. The Claim

In his third claim for federal habeas relief, petitioner argues the state trial court erred as a matter of state evidentiary rules and violated petitioner's federal constitutional rights when it denied petitioner the opportunity to introduce evidence of Samuel Boyd's criminal record and reputation for violence.[43]

### B. State Court Disposition

#### 1. Trial Court Proceedings

During the guilt-innocence phase of petitioner's second capital trial, petitioner's defense counsel called Barbara Boyd to testify. When the prosecution objected, the trial judge informed defense counsel during a bench conference that Samuel Boyd's criminal record could not be introduced through Ms. Boyd.[44] Defense counsel advised the trial court he did not intend to introduce Defendant's Exhibit No. 3, a computer printout containing Samuel Boyd's criminal record, but did intend to ask Mr. Boyd whether she had heard about Samuel Boyd's convictions.[45] The trial judge sustained the prosecution's rel-

evance objection thereto and granted the prosecution's oral motion *in limine* regarding the criminal records of both victims.[46] The trial court received Defendant's Exhibit No. 3 for bill of exceptions purposes.[47] The defense promptly rested.[48] Petitioner's trial counsel never subsequently called Barbara Boyd to testify nor proffered what her testimony would have been had she testified regarding her personal knowledge of Samuel Boyd's criminal record and reputation for violence.

#### 2. Direct Appeal

In his fourteenth point of error on direct appeal, petitioner argued, as a matter of purely state-law, the trial court erred when it excluded evidence of Boyd's criminal history and reputation for violence. The Texas Court of Criminal Appeals held petitioner had failed to properly preserve this point of error by failing to make an offer of proof regarding the contents of the testimony of Barbara Boyd, through whom petitioner claimed he would have presented evidence of Samuel Boyd's criminal record and reputation for violence. *Moore v. State,* No. 73,526 (Tex.Crim.App. January 9, 2002), slip op. at p. 10.

#### 3. State Habeas Corpus Proceeding

Petitioner raised a similar argument in his first through third claims for state habeas corpus relief contained in his second state habeas corpus application but added a "federal gloss" in the final paragraph of the relevant portion of that state habeas application by suggesting the state trial court's erroneous ruling on state evidentiary principles also offended the Four-

---

43. Amended Petition, at pp. 13–18.

44. S.F. Trial, Volume 15, testimony of Barbara Boyd, at pp. 38–40.

45. *Id.,* at pp. 40–41.

46. *Id.,* at pp. 41–44.

47. *Id.,* at p. 44.

48. *Id.,* at p. 45.

teenth Amendment's Due Process Clause.[49] The state habeas trial court concluded (1) petitioner's complaints about the erroneous exclusion of the evidence in question were precluded by the Texas Court of Criminal Appeals' ruling on petitioner's direct appeal, (2) petitioner had failed to present any argument to support his federal constitutional claim, (3) petitioner failed to properly preserve any complaint about the exclusion of the evidence in question by failing to make a record regarding precisely what the testimony of Barbara Boyd on the subject in question would have been, and (4) the evidence in question was properly excluded on relevance grounds because, unlike petitioner's first trial, there was no evidence of self-defense raised by the evidence at petitioner's second trial (more specifically by virtue of the fact petitioner's eyewitness at his second trial, Robert Mays, admitted he had left the scene several minutes before petitioner shot into Clark and Boyd's vehicle and he never saw petitioner do so).[50] The Texas Court of Criminal Appeals adopted the foregoing conclusions. *Ex parte Moore*, No. 40,046–02 (Tex.Crim. App. May 14, 2003), slip op. at p. 2.

### C. *Procedural Default*

Respondent correctly argues petitioner failed to "fairly present" the *federal* constitutional component of this ground for federal habeas relief to the state courts.[51]

 Before seeking federal habeas corpus relief, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' *federal* rights. *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S.Ct. 1347,

1349, 158 L.Ed.2d 64 (2004); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 119 S.Ct. 1728, 1731, 144 L.Ed.2d 1 (1999); *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995); *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); 28 U.S.C. § 2254(b)(1). To provide the State with this necessary "opportunity," the prisoner must "fairly present" his claim to the appropriate state court in a manner that alerts that court to the federal nature of the claim. *See Baldwin v. Reese*, 541 U.S. at 29–32, 124 S.Ct. at 1349–51 (rejecting the argument that a petitioner "fairly presents" a federal claim, despite failing to give any indication in his appellate brief of the federal nature of the claim through reference to any federal source of law, when the state appellate court could have discerned the federal nature of the claim through review of the lower state court opinion); *O'Sullivan v. Boerckel*, 526 U.S. at 844–45, 119 S.Ct. at 1732–33 (holding comity requires that a state prisoner present the state courts with the first opportunity to review a federal claim by invoking one complete round of that State's established appellate review process); *Gray v. Netherland*, 518 U.S. 152, 162–63, 116 S.Ct. 2074, 2081, 135 L.Ed.2d 457 (1996) (holding that, for purposes of exhausting state remedies, a claim for *federal* relief must include reference to a specific constitutional guarantee, as well as a statement of facts that entitle the petitioner to relief and rejecting the contention that the exhaustion requirement is satisfied by presenting the state courts only with the facts necessary to state a claim for relief). The exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve

---

**49.** Second State Habeas Transcript, Volume I of II, at pp. 5–10.

**50.** Second State Habeas Transcript, Volume II of II, at pp. 325–29.

**51.** Respondent's Answer and Motion for Summary Judgment, filed August 14, 2004, docket entry no. 30/31 (henceforth "Motion for Summary Judgment"), at pp. 19–24.

federal constitutional claims before those claims are presented to the federal courts and, thereby, to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings. *Carey v. Saffold*, 536 U.S. 214, 220, 122 S.Ct. 2134, 2138, 153 L.Ed.2d 260 (2002); *Duncan v. Walker*, 533 U.S. 167, 179, 121 S.Ct. 2120, 2128, 150 L.Ed.2d 251 (2001); *O'Sullivan v. Boerckel*, 526 U.S. at 845, 119 S.Ct. at 1732; *Rose v. Lundy*, 455 U.S. 509, 518–19, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982).

The exhaustion doctrine requires that the petitioner present his *federal* claim in a manner reasonably designed to afford the State courts a meaningful opportunity to address same. The Supreme Court has succinctly explained the rationale behind the exhaustion requirement:

> Exhaustion means more than notice. In requiring exhaustion of a federal claim in state court, Congress meant that exhaustion be serious and meaningful.

> The purpose of exhaustion is not to create a procedural hurdle on the path to federal habeas court, but to channel claims into an appropriate forum, where meritorious claims may be vindicated and unfounded litigation obviated before resort to federal court. Comity concerns dictate that the requirement of exhaustion is not satisfied by the mere statement of a federal claim in state court. Just as the State must afford the petitioner a full and fair hearing on his federal claim, so must the petitioner afford the State a full and fair opportunity to address and resolve the claim on the merits.

*Keeney v. Tamayo–Reyes*, 504 U.S. 1, 10, 112 S.Ct. 1715, 1720, 118 L.Ed.2d 318 (1992).

■ The exhaustion requirement is satisfied when the substance of the *federal* habeas claim has been "fairly presented" to the highest state court, i.e., the petitioner presents his claims before the state courts in a procedurally proper manner according to the rules of the state courts. *Baldwin v. Reese*, 541 U.S. at 29–32, 124 S.Ct. at 1349–51 (holding a petitioner failed to "fairly present" a claim of ineffective assistance by his state appellate counsel merely by labeling the performance of said counsel "ineffective," without accompanying that label with either a reference to *federal* law or a citation to an opinion applying *federal* law to such a claim); *Moore v. Cain*, 298 F.3d 361, 364 (5th Cir.2002), *cert. denied*, 537 U.S. 1236, 123 S.Ct. 1360, 155 L.Ed.2d 202 (2003). However, the petitioner need not spell out each syllable of the claim before the state court for the claim to have been "fairly presented" and thereby fulfill the exhaustion requirement. *Riley v. Cockrell*, 339 F.3d 308, 318 (5th Cir.2003), *cert. denied*, 543 U.S. 1056, 125 S.Ct. 866, 160 L.Ed.2d 781 (2005); *Fisher v. Texas*, 169 F.3d 295, 303 (5th Cir.1999).

■ The exhaustion requirement is *not* met if the petitioner presents new legal theories or factual claims in his federal habeas petition. *Anderson v. Harless*, 459 U.S. 4, 6–7, 103 S.Ct. 276, 277–78, 74 L.Ed.2d 3 (1982); *Riley v. Cockrell*, 339 F.3d at 318 ("It is not enough that the facts applicable to the federal claims were all before the' State court, or that the petitioner made a similar state-law based claim. The federal claim must be the 'substantial equivalent' of the claim brought before the State court."); *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001)("where petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement"); *Finley v. Johnson*, 243 F.3d 215, 219 (5th Cir.2001). Likewise, to have "fairly presented" his *federal*

claim, the petitioner must have reasonably alerted the state courts to the *federal* nature of his claim. *Baldwin v. Reese*, 541 U.S. at 29–32, 124 S.Ct. at 1349–51 (holding a petitioner failed to "fairly present" a claim of ineffective assistance by his state appellate counsel merely by labeling the performance of said counsel "ineffective," without accompanying that label with either a reference to *federal* law or a citation to an opinion applying *federal* law to such a claim).

 Petitioner's second state habeas application failed to "fairly present" the state habeas court with the same federal due process arguments petitioner presents to this Court. Petitioner's second state habeas corpus application included a group of claims which were accompanied by a lengthy, purely state-law, argument. Petitioner added a cryptic assertion in the final paragraph of that passage arguing in conclusory fashion, without any citation to federal case law, the state trial court's evidentiary ruling also violated the Fourteenth Amendment's Due Process Clause.

A fleeting reference to the federal constitution, tacked onto the end of a lengthy, purely state-law evidentiary argument, does not sufficiently alert and afford a state court the opportunity to address an alleged violation of federal rights. Moreover, to hold that vague references to such expansive concepts as due process and fair trial fairly present, and therefore exhaust, federal claims is to eviscerate the exhaustion requirement.

*Wilder v. Cockrell*, 274 F.3d at 260.

Petitioner's cryptic reference to the Fourteenth Amendment in his second state habeas corpus application did not "fairly present" the Texas Court of criminal Appeals with the same federal due process arguments petitioner presents to this Court. *Wilder v. Cockrell*, 274 F.3d at 260. Thus, respondent correctly argues

petitioner has failed to exhaust available state remedies on the federal aspect of petitioner's third claim for federal habeas relief in this cause. Thus, for the reasons set forth at length in Section III.C. above, petitioner has procedurally defaulted on the unexhausted federal aspect of his third claim.

D. *Complaints of State Law Violations Furnish No Basis for Federal Habeas Relief*

 Insofar as petitioner argues the state trial court erroneously applied the Texas Rules of Evidence in excluding the testimony of Barbara Boyd regarding Samuel Boyd's criminal record and reputation for violence, petitioner's arguments do not furnish a basis for federal habeas corpus relief. Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented. *See Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991)(holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990)(recognizing that federal habeas relief will not issue for errors of state law); *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 874, 79 L.Ed.2d 29 (1984) (holding a federal court may not issue the writ on the basis of a perceived error of state law).

In the course of reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does *not* sit as a super-state appellate court. *Estelle v. McGuire*, 502 U.S. at 67–68, 112 S.Ct. at 480; *Lewis v. Jeffers*, 497 U.S. at 780, 110 S.Ct. at 3102; *Pulley v. Harris*, 465 U.S. at 41, 104 S.Ct. at 874.

When a federal district court reviews a state prisoner's habeas petition pursuant to 28 U.S.C. § 2254 it must decide whether the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." The court does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter.*

*Coleman v. Thompson,* 501 U.S. at 730, 111 S.Ct. at 2554.

■ A federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling violates a specific federal constitutional right or is so egregious it renders the petitioner's trial fundamentally unfair. *Brown v. Dretke,* 419 F.3d 365, 376 (5th Cir.2005), *cert. denied,* 546 U.S. 1217, 126 S.Ct. 1434, 164 L.Ed.2d 137 (2006); *Wilkerson v. Cain,* 233 F.3d 886, 890 (5th Cir.2000); *Johnson v. Puckett,* 176 F.3d 809, 820 (5th Cir.1999).

Thus, the question before this Court is not whether the state trial court properly applied state evidentiary rules but, rather, whether petitioner's federal constitutional rights were violated by the state trial court's exclusion of Barbara Boyd's un-proffered testimony regarding her personal knowledge of the criminal history and reputation for violence of her brother-in-law Samuel Boyd. *See Bigby v. Dretke,* 402 F.3d 551, 563 (5th Cir.2005)(holding federal habeas review of a state court's evidentiary ruling focuses exclusively on whether the ruling violated the federal Constitution), *cert. denied,* 546 U.S. 900, 126 S.Ct. 239, 163 L.Ed.2d 221 (2005).

### E. No Federal Constitutional Violation

Alternatively, insofar as petitioner's second state habeas corpus application did "fairly present" the state courts with petitioner's *federal* constitutional challenge to

the exclusion of either Defendant's Exhibit no. 3 and Barbara Boyd's un-proffered testimony regarding Samuel Boyd's criminal record and reputation for violence (and the state habeas court's denial of relief constituted a decision *on the merits* of same), petitioner is not entitled to federal habeas relief under the AEDPA.

The state habeas trial court concluded, in part, the state trial court properly excluded the evidence of Samuel Boyd's criminal record and reputation for violence actually proffered by petitioner because (1) the evidence in question would only have been relevant to an issue of self-defense, (2) the evidence admitted during petitioner's second trial did not support a theory of self-defense because petitioner's eyewitness Robert Mays admitted he left the scene five-to-ten minutes before petitioner shot into Clark and Boyd's vehicle, and (3), therefore, Samuel Boyd's reputation and criminal record were irrelevant to any issue at petitioner's trial.[52] This Court's independent review of the record from petitioner's second trial and second state habeas corpus proceeding disclosed absolutely no evidence suggesting petitioner possessed any personal knowledge at the time of the fatal shootings regarding either Boyd's criminal history or Boyd's reputation for violence.

■ The state habeas court's conclusions that (1) petitioner's evidence at his second trial did not raise an issue of self-defense under applicable Texas law and (2) the trial court properly applied state evidentiary rules in excluding the un-proffered testimony of Barbara Boyd bind this Court. *See Bradshaw v. Richey,* 546 U.S. 74, 76, 126 S.Ct. 602, 604, 163 L.Ed.2d 407 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal

---

**52.** Second State Habeas Transcript, Volume II of II, at pp. 327–29.

of the challenged conviction, binds a federal court sitting in habeas corpus."); *Amador v. Quarterman*, 458 F.3d at 412 (holding a federal habeas court must defer to a state court's interpretation of state law); *Fuhrman v. Dretke*, 442 F.3d 893, 901 (5th Cir.2006)(holding the same).

■ A federal court may grant habeas relief based on an *erroneous* state court evidentiary ruling only if the ruling also violates a specific federal constitutional right or renders the petitioner's trial fundamentally unfair. *Kittelson v. Dretke*, 426 F.3d 306, 320 (5th Cir.2005); *Brown v. Dretke*, 419 F.3d at 376; *Pemberton v. Collins*, 991 F.2d 1218, 1226 (5th Cir.1993), *cert. denied*, 510 U.S. 1025, 114 S.Ct. 637, 126 L.Ed.2d 596 (1993). The challenged evidence must be a crucial, critical, or highly significant factor in the context of the entire case. *Givens v. Cockrell*, 265 F.3d 306, 308 (5th Cir.2001); *Wilkerson v. Cain*, 233 F.3d 886, 890 (5th Cir.2000); *Johnson v. Puckett*, 176 F.3d 809, 820 (5th Cir.1999); *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir.1998), *cert. denied*, 526 U.S. 1118, 119 S.Ct. 1768, 143 L.Ed.2d 798 (1999); *Green v. Johnson*, 160 F.3d 1029, 1047 (5th Cir.1998), *cert. denied*, 525 U.S. 1174, 119 S.Ct. 1107, 143 L.Ed.2d 106 (1999). The test to determine whether a trial error makes a trial fundamentally unfair is whether there is a reasonable probability that the verdict might have been different had the trial been properly conducted. *Guidroz v. Lynaugh*, 852 F.2d 832, 835 (5th Cir.1988); *Rogers v. Lynaugh*, 848 F.2d 606, 609 (5th Cir.1988).

■ Petitioner failed to present his second jury and his second state habeas court with any evidence showing (1) he had any knowledge at the time of the fatal shootings of Samuel Boyd's criminal record or reputation for violence or (2) Barbara Boyd possessed any personal knowl-edge regarding either Samuel Boyd's criminal record or reputation for violence at the time of petitioner's second trial. Even assuming that petitioner could have shown through the un-proffered testimony of Barbara Boyd that Samuel Boyd had an extensive criminal record and a reputation for violence, petitioner has neither alleged any facts nor furnished any state or federal court with evidence showing that, as of the date petitioner fatally shot Boyd and Clark, petitioner was aware of Samuel Boyd's criminal record or reputation for violence. Robert Mays' testimony at petitioner's second trial was disjointed, internally inconsistent, and self-contradictory.[53]

Under such circumstances, the exclusion of evidence concerning Samuel Boyd's reputation for violence and criminal record did not render petitioner's trial fundamentally unfair. *See Johnson v. Puckett*, 176 F.3d at 821 (holding the failure to admit evidence amounts to a due process violation only when the omitted evidence is a crucial, critical, highly significant factor in the context of the entire trial). The excluded evidence was neither crucial, critical, nor a highly significant factor in the context of petitioner's capital trial. Even if the evidence in question had been admitted, absent some proof petitioner was aware of Boyd's reputation and criminal record at the time he fired into Clark's and Boyd's vehicle, there is not even a remote possibility, much less a reasonable probability, the outcome of the guilt-innocence phase of petitioner's trial would have been different.

### F. Conclusions

In conclusion, petitioner has failed to establish the state trial court's exclusion of petitioner's evidence regarding Samuel Boyd's criminal record and reputation for violence violated state law. Likewise, given the absence of any evidence showing

---

**53.** *See* Section I.D.1.b. above, *i.e.,* notes 14– 18, *supra,* and accompanying text.

petitioner was aware of same at the time he fired the fatal shots, the exclusion of the evidence in question did not render petitioner's trial fundamentally unfair. Thus, the state habeas court's rejection on the merits of petitioner's *federal* constitutional challenge to the exclusion of evidence of Samuel Boyd's criminal record and reputation for violence was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's second trial and second state habeas corpus proceeding.

## VI. *Denial of Requests for Mistrial*

### A. *The Claims*

In his sixth claim herein, petitioner argues his constitutional rights to due process and the presumption of innocence were violated when two prosecution witness mentioned his previous trial and the state trial court denied petitioner's requests for mistrial.[54]

### B. *State Court Disposition*

#### 1. *Patterson's Testimony*

During the guilt-innocence phase of petitioner's second trial, San Antonio Police Detective Steven Patterson testified in pertinent as follows on cross-examination by petitioner's counsel:

Q. Now, you have no idea what Officer Glenn testified to in front of this jury about what the scene looked like when he arrived, do you? Because you were outside and you were under the Rule; is that right?

A. Yes, sir.

Q. So then whatever he told the jury about what the scene was like when he arrived, you have no idea what he told them, correct?

A. Other than what I've heard over the past five years.

Q. But as far as today?

A. No, sir.

Q. And you are aware, are you not, that officer Glenn has never testified in any court proceeding or anything involving this case?

A. I wouldn't—I wasn't sure if he testified in the last trial or not.

Q. Now, do you know an Officer Reyes, probationary Officer Reyes, who was there that night?

A. I just—I couldn't pick him out today. I haven't seen him probably since then, a person since the last trial.

MR. MORAN: And, Your Honor, may we approach the bench?[55]

Thereafter, a bench conference, followed by a hearing, took place outside the jury's presence. Petitioner's trial counsel argued Patterson's mentions of petitioner's earlier trial warranted a mistrial while the prosecution argued an instruction directing the jury to disregard Patterson's last response should be sufficient to cure any harm arising from the references to a prior trial.[56] Ultimately, the trial court denied petitioner's motions for mistrial and instructed the jury as follows:

Ladies and gentlemen of the jury, I ask you not to consider, for any purpose whatsoever, any reference or remark that you may have heard concerning a prior hearing in this case. It has absolutely nothing to do with this case. You are to concern yourself with the evidence in this case and only in this case

---

54. Amended Petition, at pp. 26–29.

55. S.F. Trial, Volume 13, testimony of Steven Patterson, at pp. 76–77.

56. *Id.,* at pp. 77–83.

and arrive at at [sic] fair and impartial verdict based strictly on the evidence that you hear here.[57]

### 2. Hicks' Testimony

During the punishment phase of petitioner's capital trial, Fabian Dominguez State Jail Classification Chief Mark Hicks testified in pertinent part as follows:

Q. And then I think you had mentioned something about the gangs and prostitution and all this kind of stuff and everything. And actually, the records that are contained in those exhibits, that have already been introduced, show that on several different occasions, Mr. Moore has been evaluated, as far as sexual orientation, and has always been found to be appropriate by the sociologist who interviewed him, hasn't he?

A. As far as I know, yes, sir.

Q. Now, this—well, this exhibit here, number—if I have it. Did you help in putting this exhibit together?

A. Yes, sir, I did, at the last trial.

MR. MORAN: May we approach the bench? [58]

Once the jury was excused a hearing occurred during which petitioner's trial counsel elicited testimony from Mr. Hicks acknowledging he had been instructed by petitioner's counsel not to mention petitioner's first trial and admitting his reference to same had been a mistake.[59] The trial judge overruled petitioner's motions for mistrial and, at the prosecution's urging, instructed the jury as follows:

Ladies and gentlemen of the jury, I would ask you not to consider for any purpose whatsoever the matter concerning any previous hearing or any previous proceedings in this case.

You're to concern yourself with the facts of this case, the testimony of this case and only that testimony. So disregard any mention that you may have heard concerning any previous hearing or any previous proceedings involving this case.[60]

### 3. Direct Appeal

Petitioner complained in his twelfth and thirteenth points of error on direct appeal about the trial court's denials of his requests for mistrial. The Texas Court of Criminal Appeals rejected petitioner's complaints about the relevant portion of Patterson's testimony, noted Patterson's remarks were "passing and vague references" which did not inform the jury of the outcome of petitioner's earlier trial, and concluded Patterson's remarks were not so inflammatory as to overcome the trial court's prompt curative instruction. *Moore v. State*, No. 73,526 (Tex.Crim.App. January 9, 2002), slip op. at pp. 8–9. The Texas Court of Criminal Appeals likewise rejected petitioner's complaints about the denial of mistrial following Hicks' remark, noting Hick's comment had been "fleeting" and had occurred during the punishment phase of trial, and concluding any potential prejudice arising from same was cured was by the trial court's instruction. *Id.*, at p. 9.

### 4. State Habeas Corpus Proceeding

Petitioner re-urged these same complaints in a trio of claims he asserted in his second state habeas corpus application.[61]

---

**57.** S.F. Trial, Volume 13, testimony of Steven Patterson, at pp. 83–84.

**58.** S.F. Trial, Volume 17, testimony of Mark C. Hicks, at pp. 86–87.

**59.** *Id.*, at pp. 87–89.

**60.** *Id.*, at pp. 90–91.

**61.** Second State Habeas Transcript, Volume I of II, at pp. 18–20. As petitioner had done in his appellant's brief in his second direct appeal, and as the Texas Court of Criminal Appeals had done in its opinion on petitioner's second direct appeal, petitioner's second state habeas corpus application erroneously referred to Detective Patterson as "Peterson."

The state habeas trial court rejected these claims on the merits, concluding (1) petitioner's claims were precluded by the Texas Court of criminal Appeals' rejection of the same arguments on direct appeal, (2) petitioner's objections to Patterson's remarks were not timely, (3) the presumption of innocence no longer applied at the time of Hicks' remark, (4) none of the remarks in question informed the jury of the outcome of petitioner's previous trial, and (5) the curative instructions to disregard the offending remarks were adequate to eliminate any harm to petitioner.[62] The Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions when it denied petitioner state habeas relief. *Ex parte Moore*, App. No. 40,046–02 (Tex.Crim.App. May 14, 2003).

### C. No Merits

In support of his third claim herein, petitioner cites a pair of cases dealing with mid-trial publicity, i.e., *United States v. Aragon*, 962 F.2d 439 (5th Cir.1992), and *United States v. Faulkner*, 17 F.3d 745 (5th Cir.1994), both of which dealt with the issue of mid-trial publicity on a criminal jury and neither of which addressed the mere mention of a prior trial by a witness during trial. More specifically, in *Aragon*, the Fifth Circuit held, in its supervisory capacity, that a trial judge abused his discretion by failing to make any inquiry as to whether jurors had read an article detailing the criminal histories of the defendants which appeared in a local newspaper the same morning testimony began in a high-profile drug-trafficking trial. *United States v. Aragon*, 962 F.2d at 441. In *Faulkner*, the Fifth Circuit held a trial judge probably should have inquired whether jurors had seen a television news report on the trial alleging a prior trial had resulted in a mistrial due to jury tampering but held the trial judge had not abused his discretion in failing to make such an inquiry in part because the trial judge repeatedly gave very explicit, emphatic instructions to the jury before and after the date of the airing of the news report to disregard all such reports and the trial judge gave a very specific instruction to the jury correcting the erroneous report of jury tampering. *United States v. Faulkner*, 17 F.3d at 763–65. Even more significantly, in both *Aragon* and *Faulkner* the Fifth Circuit functioned as the supervisor of subordinate federal District Courts and did not purport to apply "clearly established" federal constitutional principles when it weighed the potentially prejudicial mid-trial publicity in those cases against the defendants' right to a fair trial.

In contrast to the highly prejudicial information disclosed by the mid-trial publicity in *Aragon*, the cryptic testimony of Patterson and Hicks about which petitioner complains revealed to the jury only the fact that those witnesses had been involved in an earlier trial. Their comments about "the last trial" were so devoid of specificity it would have been far from clear to a reasonable person whether petitioner was even been a party to the earlier trial to which Patterson and Hicks referred.[63] Furthermore, the state trial judge prompt-

---

**62.** Second State Habeas Transcript, Volume II of II, at pp. 348–50.

**63.** This is not a frivolous suggestion. Rational jurors might well have speculated from Patterson's and Hicks' comments that they were referring to a trial involving others, possibly including Ivory Sheffield, who were involved in the shooting. Given the petitioner's trial counsel's cross-examination of Angela Wilson, it is equally possible jurors could have speculated Patterson and Hicks were referring to a trial involving charges other than capital murder, such as drug-trafficking. In any event, there was absolutely nothing in either Patterson's or Hicks' comments about a prior trial which necessarily informed the jury the *petitioner* had previously been tried and convicted of capital murder.

ly instructed the jury on both occasions to disregard all comments about previous proceedings and to decide petitioner's case based solely on the evidence presented at petitioner's trial. Ordinarily, proper jury instructions can suffice to prevent any possibility of prejudice. *See Zafiro v. United States,* 506 U.S. 534, 540–41, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993)(recognizing juries are presumed to follow their instructions). Petitioner failed to present the state appellate court and state habeas court with any evidence showing the trial court's prompt curative instructions were insufficient to cure any potential prejudice arising from Patterson's or Hicks' cryptic references to "the last trial."

Petitioner has identified no "clearly established" federal constitutional principle violated by the Texas Court of Criminal Appeals' rejection on the merits of petitioner's complaints about the denials of his requests for mistrial. This Court's independent examination of applicable Supreme Court precedent has revealed no authority mandating a new trial for a criminal defendant whenever a trial witness mentions a prior trial under circumstances suggesting that trial may have involved the same defendant then-currently being tried for a criminal offense. As explained above, Patterson's and Hicks' comments were so vague, their potential prejudicial effect was minimal, at best. Like the curative instructions given in *Faulkner,* petitioner's trial judge's instructions to the jury to disregard the comments in question were prompt, specific, and reasonably designed to eliminate any potentially prejudicial impact cased by Patterson's and Hicks' comments.

### D. *Conclusions*

The Texas Court of Criminal Appeals' rejections on the merits (both on direct appeal and during petitioner's state habeas

corpus proceeding) of petitioner's complaints about the trial court's denials of his requests for mistrial were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor unreasonable determinations of the facts in light of the evidence presented in the petitioner's second trial, second direct appeal, and second state habeas corpus proceeding.

## VII. *Ineffective Assistance Claims*

### A. *The Claims*

In his fourth, fifth, and seventh through twelfth claims herein, petitioner argues his trial counsel rendered ineffective assistance by (1) failing to make a proffer of petitioner's personal knowledge of prior bad acts by Samuel Boyd, (2) introducing evidence of petitioner's drug trafficking, (3) failing to interview potential witnesses Josie Wilford, Darlene Hopkins, and Edmond Davis prior to trial, (4) failing to request jury instructions on the lesser-included offense of murder and on "sudden passion," (5) failing to request a jury instruction at the guilt-innocence phase of trial on the "beyond reasonable doubt" burden of proof applicable to evidence of extraneous offenses, (6) failing to determine if Robert Perry Smith's fingerprints were on the murder weapon, and (7) virtue of the cumulative effect of said counsel's deficient performance.[64]

### B. *The Federal Constitutional Standard of Review*

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington,*

---

**64.** Amended Petition, at pp. 18–26, 29–37.

466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland,* i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith,* 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Williams v. Taylor,* 529 U.S. 362, 390–91, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington,* 466 U.S. at 687–91, 104 S.Ct. at 2064–66. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith,* 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington,* 466 U.S. at 690, 104 S.Ct. at 2066.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.* In evaluating prejudice, a federal habeas court must re-weigh the evidence in aggravation against the totality of available mitigating evidence. *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542.

In evaluating petitioner's complaints about the performance of his counsel under the AEDPA, the issue before this Court is whether the Texas Court of Criminal Appeals could reasonably have concluded petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell,* 343 F.3d 440, 444 (5th Cir.2003), *cert. denied,* 540 U.S. 1154, 124 S.Ct. 1156, 157 L.Ed.2d 1050 (2004). In making this determination, this Court must consider the underlying *Strickland* standard. *Id.* In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test, this Court's review of the unadjudicated prong is *de novo. See Rompilla v. Beard,* 545 U.S. 374, 390, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005)(holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice);

*Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

### C. Burden on Petitioner to Overcome Presumption of Reasonableness

A habeas petition has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence. *Montoya v. Johnson,* 226 F.3d 399, 408 (5th Cir.2000), *cert. denied,* 532 U.S. 1067, 121 S.Ct. 2220, 150 L.Ed.2d 212 (2001).

As explained above, under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone,* 535 U.S. at 698, 122 S.Ct. at 1852; *Strickland v. Washington,* 466 U.S. at 690, 104 S.Ct. at 2066; *Scheanette v. Quarterman,* 482 F.3d 815, 820 (5th Cir.2007); *Sonnier v. Quarterman,* 476 F.3d 349, 356 (5th Cir.2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 374, 169 L.Ed.2d 259 (2007); *Amador v. Quarterman,* 458 F.3d at 410; *Gonzales v. Quarterman,* 458 F.3d 384, 390 (5th Cir.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 1909, 167 L.Ed.2d 568 (2007).

■■■ Furthermore, under the AEDPA, in order to obtain federal habeas relief on an ineffective assistance claim rejected on the merits by a state court, the petitioner must do more than convince the federal court the state court applied *Strickland* incorrectly—the petitioner must show the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner. *Bell v. Cone,* 535 U.S. at 699, 122 S.Ct. at 1852.

■■■ The fundamental analytical problem with petitioner's complaints of ineffective assistance in this cause is the fact petitioner failed to present the state habeas court with any evidence, other than that contained in the petitioner's trial and ap-

pellate records, addressing the objective reasonableness of petitioner's trial counsels' strategic and tactical decision-making. As was explained in Section I.F. above, during the evidentiary hearing held in petitioner's state habeas corpus proceeding, petitioner presented the state habeas court with no evidence regarding the factual and legal underpinnings for his trial counsels' strategic and tactical decisions. Thus, petitioner made no sincere effort to overcome the presumption of reasonableness afforded his trial counsels' decisions under *Strickland.* Absent some showing that a counsel's subjective decision-making was *objectively* unreasonable in view of the information and evidence available to said counsel, it is virtually impossible for a habeas corpus petitioner to overcome the presumption of reasonableness afforded his counsel's strategic and tactical decisions under *Strickland. See Gutierrez v. Dretke,* 392 F.Supp.2d at 875–76 (recognizing the burden on a habeas petitioner asserting a *Wiggins* claim includes demonstrating that, in light of the potentially mitigating evidence available at the time of trial, his trial counsel's efforts to investigate, develop, and present potentially mitigating evidence were objectively unreasonable).

Petitioner's state habeas counsel made no effort during the evidentiary hearing held in petitioner's state habeas corpus proceeding to inquire of petitioner's trial counsel either (1) precisely what steps petitioner's trial counsel took to investigate (a) the facts of petitioner's offense in search of witnesses who could have testified Boyd and Clark were armed or (b) petitioner's background in search of potentially mitigating evidence, (2) whether petitioner's trial counsels' pretrial investigation revealed to them any potential exculpatory evidence or any potentially mitigating evidence, (3) why, if petitioner's trial counsel were aware of this additional

exculpatory or mitigating evidence, said counsel chose not to present such evidence to petitioner's jury, or (4) why, if petitioner's trial counsel were unaware of any additional, potentially exculpatory or mitigating evidence, said counsel chose not to investigate any further than they did. In failing to do so, petitioner's state habeas counsel all but abandoned petitioner's extra-record ineffective assistance claims. *See Neal v. Puckett,* 286 F.3d 230, 237 (5th Cir.2002)(recognizing that, in evaluating the performance of trial counsel against a claim that said counsel failed to investigate and present mitigating evidence, the relevant inquiry focuses on what counsel did to prepare for sentencing, what mitigating evidence counsel accumulated, what additional leads counsel had, and the results said counsel might reasonably have expected from those leads), *cert. denied,* 537 U.S. 1104, 123 S.Ct. 963, 154 L.Ed.2d 772 (2003).

It is absolutely essential that a habeas petitioner asserting a claim of ineffective assistance by his trial counsel arising from deficient performance not manifested on the face of the trial or appellate record develop and present the state habeas court with evidence regarding the objective unreasonableness of his trial counsel's performance *in light of the circumstances as they existed at the time of the petitioner's trial.* This necessarily requires inquiry into the quality of said trial counsel's subjective thought processes and the objective reasonableness of same. More specifically, this means a habeas petitioner must place each of the attorneys who represented the petitioner at trial under oath and inquire into precisely what information helpful to petitioner said counsel knew at the time of petitioner's trial, the steps said counsel took to obtain additional information which might have helped petitioner's cause at trial, and the reasons why said counsel chose not to investigate the case against the petitioner or

the petitioner's background further than they did so.

These are the essential inquiries necessary to support a claim that a trial counsel's alleged failure to adequately investigate, develop, and present exculpatory or mitigating evidence in a capital murder trial was "objectively unreasonable." *See Wiggins v. Smith,* 539 U.S. at 521–22, 123 S.Ct. at 2535 *(quoting Strickland v. Washington,* 466 U.S. at 690–91, 104 S.Ct. at 2066):

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Assuming that the existence of additional, potentially exculpatory or mitigating, evidence was discernable through the exercise of due diligence at the time of a petitioner's trial, a state habeas petitioner who has been furnished with an opportunity to interrogate his former trial counsel on these subjects during an evidentiary hearing and who fails to do so, practically by definition, fails to exercise due diligence in pursuit of such an ineffective assistance claim.

Likewise, while petitioner presented the state habeas court with a number of "non-record" ineffective assistance claims, i.e., claims asserting his counsel failed to pres-

ent exculpatory or mitigating that was available at the time of petitioner's capital trial, petitioner failed to present the state habeas court with any evidence showing that, in fact, any of the allegedly exculpatory or mitigating evidence was actually available at the time of petitioner's second trial. Petitioner has offered this Court no rational explanation for his state habeas counsel's failure to interrogate either of petitioner's trial counsel concerning said trial counsels' alleged failure to adequately investigate, develop, and present the new, purportedly exculpatory and mitigating, evidence to petitioner's jury. Nor has petitioner furnished this Court with any rational explanation for his state habeas counsel's failure to interview and present as witnesses during petitioner's state habeas hearing any of testimony from any of the new witnesses identified in petitioner's state habeas corpus pleadings and, now, in petitioner's federal habeas corpus pleadings, i.e., Josie Wilford, Darlene Hopkins, and Edmond Davis. Such an absence in the record now before this Court undermines petitioner's complaints about his trial counsels' failure to present those same witnesses' testimony during petitioner's second trial. *See Anderson v. Collins,* 18 F.3d 1208, 1221 (5th Cir.1994)(holding absent a specific, affirmative showing of precisely what evidence or testimony was rendered unavailable due to a trial counsel's failure to investigate, develop, and present same, i.e., a showing of exactly what the missing evidence or testimony would have been, a court cannot even begin to apply the *Strickland* analysis because it is very difficult to determine whether the defendant was prejudiced by any such deficiencies in counsel's performance).

Complaints of uncalled witnesses are disfavored because presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative. *See Coble v. Quarterman,* 496 F.3d 430, 436 (5th Cir.2007) (complaints regarding uncalled witnesses address a matter of trial strategy and are speculative in nature); *Miller v. Dretke,* 420 F.3d 356, 362 (5th Cir.2005) (such complaints necessarily involve matters of trial strategy); *Graves v. Cockrell,* 351 F.3d 143, 156 (5th Cir.2003) (such complaints impinge on matters of trial strategy and are speculative in nature); *Evans v. Cockrell,* 285 F.3d 370, 377 (5th Cir. 2002)(such complaints are speculative in nature). Thus, the burden was on petitioner during his state habeas corpus proceeding to allege and prove specific facts which showed his trial counsels' failure to pursue and present the potentially exculpatory or mitigating evidence fell outside the wide range of presumptively reasonable professional performance.

With the foregoing principles in mind, this Court now turns to the AEDPA review of each of petitioner's claims of ineffective assistance by his trial counsel.

### D. *Failure to Make Proffer Regarding Bad Acts by Boyd*

#### 1. *The Claim*

■ In his fourth claim in his amended petition, petitioner argues his trial counsel rendered ineffective assistance by failing to make a proffer to the trial court that petitioner possessed personal knowledge of specific acts of violence committed by Boyd.[65]

#### 2. *State Court Disposition*

Petitioner urged a similar claim in his fourth claim for state habeas corpus relief.[66] However, as explained above, peti-

---

**65.** Amended Petition, at pp. 18–23.

**66.** Second State Habeas Transcript, Volume I of II, at pp. 10–15.

tioner offered no. evidence supporting this claim during petitioner's state habeas corpus hearing. The state habeas trial court found petitioner had failed to present any evidence (through testimony or affidavits) showing (1) petitioner possessed personal knowledge of any bad acts allegedly committed by Samuel Boyd or (2) there was any evidence available at the time of petitioner's trial through which petitioner's trial counsel could have proven petitioner was personally aware that Boyd had committed any bad acts.[67] Accordingly, the state habeas trial court concluded petitioner had failed to sustain his burden of showing his trial counsel was ineffective.[68] The Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions. *Ex parte Moore*, App. No. 40,046–02 (Tex.Crim.App. May 14, 2003).

### 3. *AEDPA Review*

The state habeas court concluded, *as a matter of Texas law*, evidence of a murder victim's violent character is admissible to show the defendant reasonably believed force was necessary to protect himself from the deceased *but only* if there is evidence showing the defendant was aware of the victim's violent character.[69] The state habeas court's conclusions regarding the nature and application of state substantive law bind this Court in this federal habeas corpus proceeding. *See Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S.Ct. 602, 604, 163 L.Ed.2d 407 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Amador v. Quarterman*, 458 F.3d at 412 (holding a federal habeas court must defer to a state court's inter-

pretation of state law); *Fuhrman v. Dretke*, 442 F.3d 893, 901 (5th Cir.2006)(holding the same); *Young v. Dretke*, 356 F.3d 616, 628 (5th Cir.2004) ("In our role as a federal habeas court, we cannot review the correctness of the state habeas court's interpretation of state law."); *Johnson v. Cain*, 215 F.3d 489, 494 (5th Cir.2000)(holding a federal habeas court may not review a state court's interpretation of its own law).

The petitioner failed to present the state habeas court with any evidence showing that petitioner was personally aware, at the time of the fatal shootings, of any violent acts committed by Samuel Boyd. Petitioner also failed to present the state habeas court with any evidence showing there was any evidence available to petitioner's trial counsel at the time of petitioner's trial establishing petitioner possessed personal knowledge of any bad acts by Samuel Boyd. Petitioner's trial counsel cannot be faulted for failing to do the impossible.

According to the state habeas court, applicable Texas law rendered any evidence of Boyd's record for violent conduct inadmissible at petitioner's trial. Therefore, petitioner cannot demonstrate prejudice under the *Strickland* standard. The state habeas court reasonably concluded petitioner had failed to satisfy either prong of *Strickland*.

### 4. *Conclusion*

The state habeas court's rejection on the merits of petitioner's ineffective assistance claim arising from petitioner's trial counsel's failure to make a proffer of evidence regarding petitioner's personal knowledge of Boyd's violent bad acts was neither

---

**67.** Second State Habeas Transcript, Volume II of II, at pp. 333–34.

**68.** *Id.*

**69.** Second State Habeas Transcript, Volume II of II, at pp. 333–34, *citing Mozon v. State*, 991 S.W.2d 841, 845 (Tex.Crim.App.1999); *Thompson v. State*, 659 S.W.2d 649, 653 (Tex. Crim.App.1983).

contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in petitioner's state habeas corpus proceeding.

### E. *Introducing Evidence of Petitioner's Drug–Trafficking*

#### 1. *The Claim*

In his fifth claim in his amended petition, petitioner argues his trial counsel rendered ineffective assistance by eliciting testimony during the cross-examination of Angela Wallace suggesting petitioner was a drug-trafficker.[70]

#### 2. *State Court Disposition*

During cross-examination at the guilt-innocence phase of petitioner's trial, petitioner's trial counsel and Angela Wallace engaged in the following exchange:

Q. And in your outspokenness, is it kind of typical of you, or whatever, to ask people, oh, you know, what kind of drugs they sell and stuff like that? Is that just part of your normal conversation?

A. Sometimes, because he actually looked like a drug dealer, also.

Q. So sometimes you just have to ask people what kind of drugs they sell and how much; is that right?

A. I asked a variety of questions, sir.

Q. A variety?

A. Yes, sir.

Q. You told him he was full of shit.

A. Yes, sir.

Q. And then you asked him what he sold?

A. I sure did.

Q. Ounces of Halves; is that right?

A. Uh-huh, I surely did.

Q. Now, whose idea was it to bring up drugs that night?

A. I don't know whose idea it was, but that's what I asked him.

Q. Well, now if you're the one that asked him that, then why wouldn't you know whose idea that was?

A. Because I cannot answer that, sir.

Q. Why not?

A. Because I can't.

Q. So, then, you're telling this jury that you don't know why you asked him that?

A. That was just—just a question, just to see what he would say.

Q. So you're telling this jury, then, you asked him if he was married, he said no, you told him he was full of shit, and then you asked him if he sold ounces of halves, just to find out what he would say; is that right?

A. Yes, sir.

Q. And he told you that he only sold keys; is that right?

A. Yes, that's his response.

Q. So you brought up drugs—

A. No.

Q. —and buying drugs and all that, right?

A. No.

Q. And then he told you that?

A. No—that's incorrect. I made that one statement, and he said he sold keys, and that was the end of it. Buying drugs and all that, that's totally irrelevant.

Q. If you didn't bring it up first, did he bring it up first?

A. Asking a question and making an intent to purchase is two different things, sir.

Q. Well, now if—

---

**70.** Amended Petition, at pp. 23–26.

A. I can ask anybody anything. They have the right to answer or not answer.

Q. Well, were you working as an undercover narcotic officer that night or something or what?

A. No, sir.

Q. What is your explanation for walking into a bar? Why don't you look at this jury, over here, and try to explain to them, right now, under oath, in this courtroom.

A. Yes, sir, I'm listening.

Q. I mean, can you think of anything that's more important than a capital murder trial? I mean, that's pretty serious, isn't it?

A. For me, I can think of something that's more important to me.

Q. What?

A. My son and my life, but that doesn't have anything to do with this case. The point is, that he sat there and murdered those two boys. That's the bottom line.

Q. You weren't working as an undercover police officer that night or anything, were you?

A. I responded to that question. I told you no.

Q. You went into a club, where you didn't know anybody; is that right? Is that right?

A. Excuse me?

Q. It's a simple question.

A. You can go to the store and I don't know anybody.

Q. Did you go into the club—or into a club that night, where you didn't know anybody, yes or no?

A. Yes or no answer.

Q. Did you—did you walk into that club that night, into a club at Houston Street and Rio grande, when you're from Houston? Did you walk in the front door of that club that night, where you didn't know anybody?

A. I knew Fruity (sic).[71]

Petitioner presented the state habeas court with an argument in his seventh claim for state habeas relief that his trial counsel's cross-examination of Ms. Wallace in the manner quoted above constituted ineffective assistance.[72] Petitioner called neither of his trial counsel to testify during his state habeas corpus hearing regarding the reasons why they made the strategic decision to attack Angela Wallace's credibility by suggesting during cross-examination that she was at the Wheels of Joy Club the night of the murders to purchase drugs and then eliciting testimony from her concerning a discussion she had with petitioner regarding the volume of cocaine he routinely sold.

The state habeas trial court speculated petitioner's trial counsel apparently was attempting to attack Ms. Wallace's credibility by showing she was lying about why she was inside the Wheels of Joy Club on the evening of the murders and that her presence there was for a nefarious purpose.[73] The state habeas trial court concluded further that petitioner had failed to furnish his trial counsel an opportunity to explain his actions before being condemned as incompetent and, as a result, petitioner had failed to establish his trial counsel's performance was deficient.[74] The Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions. *Ex parte Moore*, App. No. 40,046–02 (Tex.Crim.App. May 14, 2003).

71. S.F. Trial, Volume 13, testimony of Angela Wallace, at pp. 221–25.

72. Second State Habeas Transcript, Volume I of II, at pp. 15–18.

73. Second State Habeas Transcript, Volume II of II, at pp. 338–39.

74. *Id.*, at p. 339.

### 3. AEDPA Review

#### a. Arguably Deficient Performance

The state habeas court concluded petitioner had failed to overcome the presumption of reasonableness afforded a trial counsel's strategic decisions. Petitioner offered the state habeas court no evidence establishing *why* his trial counsel chose to pursue such an obviously double-edged cross-examination strategy. Moreover, petitioner's trial counsel undoubtedly had the benefit of reviewing the record from petitioner's first trial, including the direct trial testimony of Angela Wallace and her cross-examination. Petitioner presented the state habeas court with no evidence showing the reasoning underlying his second trial counsels' approach to the cross-examination of Angela Wallace was objectively unreasonable in view of the information available to said counsel at the time of petitioner's second trial.

Even if this Court were inclined to agree with petitioner's argument that the relevant portion of his trial counsel's cross-examination of Angela Wallace probably did petitioner more harm than good, that is not the standard of review available under the AEDPA. *See Bell v. Cone*, 535 U.S. at 699, 122 S.Ct. at 1852 (holding a federal habeas petition must show the state court applied *Strickland* in an objectively unreasonable manner). The state habeas court's conclusion that petitioner failed to overcome the presumption of reasonableness regarding his trial counsels' strategy for cross-examining Angela Wallace, while perhaps not consistent with this Court's independent view of proper trial strategy, was nonetheless well within the realm of objectively reasonable decision-making.

#### b. No Prejudice

■ The state habeas court did not address the prejudice prong of *Strickland* in its analysis of petitioner's complaints about his trial counsels' cross-examination of Angela Wallace. In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test, this Court's review of the un-adjudicated prong is *de novo*. *See Rompilla v. Beard*, 545 U.S. 374, 390, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005)(holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same). Therefore, this Court's examination of *Strickland* prejudice in connection with this claim is *de novo*.

■ Angela Wallace furnished the prosecution with a lucid, compelling, account of petitioner's fatal shootings of Boyd and Clark which ruled out any assertion petitioner was acting in self-defense at the time he fired multiple times into Boyd and Clark's vehicle. Absent a successful challenge to Wallace's credibility, the evidence of petitioner's guilt was extremely strong. Petitioner has suggested no other potentially viable strategies for cross-examining Wallace. This Court independently concludes that, even if petitioner's trial counsel had chosen a less harmful approach to their cross-examination of Wallace, there is no reasonable probability the outcome of either phase of petitioner's capital trial would have been different.

### 4. Conclusions

The state habeas court's conclusion that petitioner's complaints about his trial counsel's cross-examination of Angela Wallace fail to satisfy the deficient performance prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the

United States, nor based on an unreasonable determination of the facts in light of the evidence presented in petitioner's second state habeas corpus proceeding.

This Court independently concludes after a *de novo* review that petitioner's complaints about his trial counsels' cross-examination of Angela Wallace do not satisfy the *prejudice* prong of the *Strickland* test.

### F. *Failure to Investigate and Interview Self-Defense Witnesses*

#### 1. *The Claim*

In his eighth claim in his amended petition, petitioner argues his trial counsel rendered ineffective assistance by failing to interview potential witnesses Josie Wilford, Darlene Hopkins, and Edmond Davis prior to trial.[75]

#### 2. *State Court Disposition*

Petitioner presented the state habeas court with complaints about his trial counsels' failures to interview Wilford, Hopkins, and Davis in a claim of ineffective assistance in which petitioner complained with virtually no specific factual support that his trial counsel had engaged in myriad acts and omissions amounting to ineffective assistance.[76] During the evidentiary hearing held in petitioner's state habeas corpus proceeding, petitioner presented the state habeas court with no fact-specific allegations and no evidence supporting any of these assertions of ineffective assistance. The state habeas trial court found petitioner had presented no evidence showing either Wilford, Hopkins, or Davis (1) were available to be called to testify at petitioner's second trial, (2) possessed personal knowledge of any matter relevant to the charges against petitioner, or (3) could

have furnished any admissible testimony at petitioner's second trial.[77] Accordingly, the state habeas trial court concluded this aspect of petitioner's multi-faceted ineffective assistance claim failed to satisfy either prong of *Strickland*.[78] The Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions. *Ex parte Moore*, App. No. 40,046–02 (Tex. Crim.App. May 14, 2003).

#### 3. *AEDPA Review*

#### a. *No Deficient Performance*

▉ Petitioner offered the state habeas court absolutely no fact-specific allegations, much less any evidence, showing that petitioner's trial counsel had any reason to believe that interviewing either Wilford, Hopkins, or Davis prior to petitioner's second trial would yield beneficial information or evidence. Absent some showing that reasonable defense counsel would have interviewed any of these three persons *based on the information then available to said counsel*, the failure to interview these witnesses was not objectively unreasonable. Trial counsel are not required to engage in unending investigations and interviews of potential witnesses; absent some circumstances which suggest a particular person might possess personal knowledge about relevant facts or be aware of information which could prove beneficial to the defense, the failure to interview that person is not objectively unreasonable. *See Smith v. Collins*, 977 F.2d 951, 960 (5th Cir.1992) ("The defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources."), *cert. denied*, 510 U.S. 829, 114

---

**75.** Amended Petition, at pp. 31–33.

**76.** Second State Habeas Transcript, Volume I of II, at pp. 20–22.

**77.** Second State Habeas Transcript, Volume II of II, at pp. 344–45.

**78.** *Id.*, at p. 346.

S.Ct. 97, 126 L.Ed.2d 64 (1993). Petitioner failed to present the state habeas court with any evidence showing that a reasonable trial counsel would have believed, prior to petitioner's second trial, that interviewing either Wilford, Hopkins, or Davis would produce helpful information or beneficial evidence.

### b. *No Prejudice*

Likewise, absent some showing that an uncalled witness actually possessed personal knowledge beneficial to the defense, the failure to interview that person does not even begin to approach the standard for prejudice under *Strickland.* *See Anderson v. Collins,* 18 F.3d at 1221 (absent a specific, affirmative showing of precisely what evidence or testimony was rendered unavailable due to a trial counsel's failure to investigate, develop, and present same, i.e., a showing of exactly what the missing evidence or testimony would have been, a court cannot even begin to apply the *Strickland* analysis because it is very difficult to determine whether the defendant was prejudiced by any such deficiencies in counsel's performance). Complaints of uncalled witnesses are disfavored because presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative. *See Coble v. Quarterman,* 496 F.3d at 436 (complaints regarding uncalled witnesses address a matter of trial strategy and are speculative in nature); *Miller v. Dretke,* 420 F.3d at 362 (such complaints necessarily involve matters of trial strategy); *Graves v. Cockrell,* 351 F.3d at 156 (such complaints impinge on matters of trial strategy and are speculative in nature); *Evans v. Cockrell,* 285 F.3d at 377 (such complaints are speculative in nature). Petitioner failed to present the state habeas court with any evidence showing that either Wilford, Hopkins, or Davis could have furnished any helpful information or beneficial testimony had petitioner's trial counsel interviewed any of them prior to petitioner's second trial. Thus, petitioner utterly failed to present the state habeas court with any evidence showing he was actually prejudiced within the meaning of *Strickland* by his trial counsels' failure to interview either Wilford, Hopkins, or Davis.

### 4. *Conclusions*

The state habeas court's conclusions that petitioner's complaints about his trial counsel's failures to interview Wilford, Hopkins, and Davis failed to satisfy either prong of *Strickland* were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in petitioner's second state habeas corpus proceeding.

### G. *Failure to Check Fingerprints on the Murder Weapon*

#### 1. *The Claim*

In his twelfth claim in his amended petition, petitioner argues his trial counsel rendered ineffective assistance by failing to investigate and determine whether the fingerprints of Robert Perry Smith were on the murder weapon.[79]

#### 2. *State Court Disposition*

Petitioner presented the state habeas court with a complaint about his trial counsel's failure to check the murder weapon for Robert Perry Smith's fingerprints in a claim of ineffective assistance in which petitioner complained with virtually no specific factual support that his trial counsel

---

**79.** Amended Petition, at pp. 36–37.

had engaged in myriad acts and omissions amounting to ineffective assistance.[80] During the evidentiary hearing held in petitioner's state habeas corpus proceeding, petitioner presented the state habeas court with no fact-specific allegations and no evidence supporting any of these assertions of ineffective assistance. The state habeas trial court found petitioner had presented no evidence suggesting Robert Perry Smith's fingerprints were actually on the murder weapon and concluded there was no evidence showing that, but for evidence of Smith's fingerprints on the murder weapon, the jury would have rendered a different verdict.[81] Thus, the state habeas trial court concluded petitioner's complaint about his trial counsel's failure to check the murder weapon for Smith's fingerprints failed to satisfy either prong of *Strickland.*[82] The Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions. *Ex parte Moore,* App. No. 40,046–02 (Tex.Crim.App. May 14, 2003).

### 3. *AEDPA Review*

#### a. *No Deficient Performance*

■ The petitioner failed to present the state habeas court with any fact-specific allegations, much less any evidence, showing (1) precisely who Robert Perry Smith was, (2) the connection, if any, between Smith and the murder weapon, (3) any information existed at the time of peti-

tioner's second trial (and was available to petitioner's trial counsel) which would have alerted petitioner's trial counsel to the potential benefits of checking the murder weapon for Smith's fingerprints, or (4) the presence of Smith's fingerprints on the murder weapon would have been beneficial to petitioner with regard to any issue presented during either phase of petitioner's capital trial.[83] Absent some showing that petitioner's trial counsel had reason to believe (1) there was some benefit to be derived from having the murder weapon examined for Smith's fingerprints and (2) establishing the presence of Smith's fingerprints on the murder weapon would somehow benefit petitioner, there was nothing objectively unreasonable in the failure of petitioner's trial counsel to undertake such an investigation. Petitioner presented the state habeas court with no evidence showing, prior to petitioner's second trial, his trial counsel had any reason to believe any benefit would be derived from undertaking such an examination of the murder weapon. Thus, there was nothing objectively unreasonable about said counsels' failure to do so.

#### b. *No Prejudice*

Petitioner utterly failed to present the state habeas court with any evidence showing either (1) Smith's fingerprints were actually on the murder weapon (2) that fact, once established, would have proven

---

**80.** Second State Habeas Transcript, Volume I of II, at pp. 20–22.

**81.** Second State Habeas Transcript, Volume II of II, at p. 346.

**82.** *Id.*

**83.** In fact, petitioner's pleadings in this Court are equally bereft of any fact-specific allegations answering any of these questions. Instead, petitioner asserts cryptically that "[t]he importance of Robert Perry Smith's fingerprints on the murder weapon is self-evident."

Amended Petition, at p. 36. After reviewing the records from petitioner's second trial, petitioner's second direct appeal, all three of petitioner's state habeas corpus proceedings, and the pleadings in this cause, this Court concludes the relevance of Smith's fingerprints on the murder weapon is anything but "self-evident." Petitioner offered neither the state habeas court nor this Court any fact-specific allegations showing how the presence of Smith's fingerprints on the murder weapon, which was not recovered by police until days after the fatal shootings, would have proved beneficial to petitioner.

beneficial to petitioner at his second trial, or (3) Smith's relationship to petitioner, the victims, or any other aspect of the capital murder case against petitioner. Thus, there was no evidence before the state habeas court showing a reasonable probability that, but for the failure of petitioner's trial counsel to check the murder weapon for Smith's fingerprints, the outcome of either phase of petitioner's capital trial would have been different.

### 4. Conclusions

The state habeas court's conclusions that petitioner's complaints about his trial counsel's failure to examine the murder weapon for Smith's fingerprints failed to satisfy either prong of *Strickland* were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in petitioner's second state habeas corpus proceeding.

### H. *Failure to Request Lesser–Included Offense Instructions*

#### 1. *The Claims*

In his ninth and tenth claims in his amended petition, petitioner argues his trial counsel rendered ineffective assistance by failing to request lesser-included offense instructions on murder and "sudden passion" at the guilt-innocence phase of petitioner's trial.[84]

#### 2. *State Court Disposition*

Petitioner presented the state habeas court with a pair of similar complaints about his trial counsel's failure to request a lesser-included offense instruction on murder and a "sudden passion charge" at the guilt-innocence phase of trial as part of a conclusory ineffective assistance claim alleging myriad alleged deficient acts and omissions by his trial counsel.[85] During the evidentiary hearing held in petitioner's state habeas corpus proceeding, petitioner presented the state habeas court with no fact-specific allegations and no evidence supporting any of these assertions of ineffective assistance. The state habeas trial court found (1) petitioner specifically instructed his trial counsel on the record not to request lesser-included offense instructions and (2) despite the efforts of petitioner's trial counsel to convince petitioner otherwise, petitioner steadfastly refused to permit said counsel to request instructions on lesser-included offenses.[86] The state habeas trial court concluded these complaints satisfied neither prong of *Strickland*.[87] The Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions. *Ex parte Moore*, App. No. 40,046–02 (Tex.Crim.App. May 14, 2003).

#### 3. *AEDPA Review*

##### a. *No Deficient Performance*

Both at the close of the prosecution's case and during the charge conference at the guilt-innocence phase of trial, petitioner expressly advised the trial court that, despite his own trial counsel's advice to the contrary, petitioner did *not* want the trial court to include any instructions on lesser-included offenses in the trial court's guilt-innocence phase jury instructions.[88]

---

**84.** Amended Petition, at pp. 33–35.

**85.** Second State Habeas Transcript, Volume I of II, at pp. 20–22.

**86.** Second State Habeas Transcript, Volume II of II, at pp. 340–41.

**87.** *Id.*, at p. 346.

**88.** S.F. Trial, Volume 14, at pp. 103–04; Volume 15, at p. 48.

■ Petitioner presented the state habeas court with no evidence showing it was objectively unreasonable for petitioner's trial counsel to acquiesce to petitioner's self-defeating demands that no lesser-included offense instructions be submitted at the guilt-innocence phase of petitioner's second trial. In a long line of opinions, the Fifth Circuit has repeatedly held that a trial counsel is not ethically required to ignore a client's insistence upon a particular trial strategy, even if that strategy is self-defeating. *See, e.g., Wood v. Quarterman,* 491 F.3d 196, 203 (5th Cir.2007)("Neither the Supreme Court nor this court has ever held that a lawyer provides ineffective assistance by complying with the client's clear and unambiguous instructions to not present evidence."); *Nixon v. Epps,* 405 F.3d 318, 325–26 (5th Cir.2005)(holding the defendant cannot block his trial counsel from attempting one line of defense at trial and then argue on appeal that counsel was ineffective for failing to introduce evidence supporting that defense), *cert. denied,* 546 U.S. 1016, 126 S.Ct. 650, 163 L.Ed.2d 528 (2005); *Roberts v. Dretke,* 381 F.3d 491, 499–500 (5th Cir. 2004) (trial counsel did not render deficient performance by acquiescing to defendant's self-destructive instructions not to present mental health expert testimony in mitigation at punishment phase of capital trial), *cert. denied,* 544 U.S. 963, 125 S.Ct. 1726, 161 L.Ed.2d 606 (2005); *Roberts v. Dretke,* 356 F.3d 632, 638 (5th Cir.2004) (where a defendant forbids his trial counsel from interviewing family members, the defendant may not thereafter complain of ineffective assistance arising from the failure to discover mitigating evidence known to those same family members), *cert. denied,* 544 U.S. 963, 125 S.Ct. 1726, 161 L.Ed.2d 606 (2005); *Dowthitt v. Johnson,* 230 F.3d 733, 748 (5th Cir.2000)(holding trial counsel may not be held ineffective for honoring his client's wishes that his family members not be interviewed or called to testify

at trial so long as the client made an informed decision), *cert. denied,* 532 U.S. 915, 121 S.Ct. 1250, 149 L.Ed.2d 156 (2001); *Amos v. Scott,* 61 F.3d 333, 348–49 (5th Cir.1995)(holding no deficient performance or prejudice arose from trial counsel's failure to present a witness at the punishment phase of trial where the defendant strongly opposed having any witnesses testify on his behalf during the punishment phase and the defendant acknowledged same during a colloquy on the record in open court), *cert. denied,* 516 U.S. 1005, 116 S.Ct. 557, 133 L.Ed.2d 458 (1995); *Autry v. McKaskle,* 727 F.2d 358, 360–63 (5th Cir.1984)(holding a defendant's knowing decisions regarding trial strategy ethically bind defense counsel, even if the defendant chooses not to fight the death sentence at the punishment phase of a capital trial), *cert. denied,* 465 U.S. 1085, 104 S.Ct. 1458, 79 L.Ed.2d 906 (1984).

There was nothing objectively unreasonable in the decision by petitioner's trial counsel to acquiesce to petitioner's demand that no lesser-included offense instructions be submitted at the guilt-innocence phase of petitioner's second capital trial.

### b. *No Prejudice*

Following petitioner's first capital trial, the Texas Court of Criminal Appeals held petitioner was entitled to jury instructions on the lesser-included offenses of murder and voluntary manslaughter because the testimony of Tyron Parks during petitioner's first trial raised a legitimate issue of self-defense and sudden passion with regard to petitioner's fatal shooting of Clark (who was operating the white car). *Moore v. State,* 969 S.W.2d at 11–13. However, at petitioner's second trial, Parks did not testify and petitioner offered no other evidence establishing that Clark or Boyd were menacing petitioner at the time petitioner fired into their vehicle or that peti-

tioner acted under the influence of "sudden passion," as defined by applicable state law, at the time petitioner fired the fatal shots. As explained above, at petitioner's second trial Robert Mays admitted he had fled the scene and been gone for five-to-ten minutes when he heard the gunshots he assumed resulted from petitioner firing into the white vehicle. Unlike Parks' testimony at petitioner's first trial, Mays' testimony at petitioner's second trial did not raise "sudden passion" or support a finding that petitioner had acted in self-defense at the time he shot Clark. Accordingly, the state habeas court held, *as a matter of state law*, that while the state trial court included an instruction on self-defense in the petitioner's guilt-innocence phase jury charge, no evidence raised self-defense at petitioner's second trial.[89] This determination is binding on this Court in this federal habeas corpus proceeding. *Bradshaw v. Richey*, 546 U.S. at 76, 126 S.Ct. at 604; *Amador v. Quarterman*, 458 F.3d at 412; *Fuhrman v. Dretke*, 442 F.3d at 901; *Young v. Dretke*, 356 F.3d at 628; *Johnson v. Cain*, 215 F.3d at 494.

■ The testimony of Angela Wallace at petitioner's second trial describing petitioner's fatal shooting of Clark and Boyd was virtually uncontested. Petitioner's only guilt-innocence phase eyewitness at petitioner's second trial, Robert Mays, placed himself several blocks away from the crime scene at the time petitioner fired the fatal shots. Thus, under applicable state law, petitioner was not entitled to lesser-included offense instructions on murder or voluntary manslaughter at his second capital trial. Moreover, given the clarity of Angela Wallace's testimony (and its consistency with the forensic evidence), there is no reasonable probability that, but for the failure of petitioner's trial counsel to ignore petitioner's demands and request

lesser-included offense instructions on murder and sudden passion, the outcome of the guilt-innocence phase of petitioner's second capital trial would have been different.

### 4. *Conclusions* ·

The state habeas court's conclusions that petitioner's complaints about his trial counsel's failures to request jury instructions on the lesser-included offenses of murder and voluntary manslaughter at the guilt-innocence phase of petitioner's second trial failed to satisfy either prong of *Strickland* were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in petitioner's second trial and second state habeas corpus proceeding.

### I. *Failure to Request "Beyond Reasonable Doubt" Instruction at Guilt–Innocence Phase on Evidence of Extraneous Offenses*

#### 1. *The Claim*

In his eleventh claim in his amended petition, petitioner argues that his trial counsel rendered ineffective assistance by failing to request a "beyond reasonable doubt" jury instruction on any extraneous offenses at the guilt-innocence phase of trial.[90]

#### 2. *State Court Disposition*

Petitioner presented the state habeas court with a similar complaint about his trial counsel's failure to request a "beyond reasonable doubt" jury instructions addressing extraneous offenses at the guilt-innocence phase of trial as part of a con-

---

**89.** Second State Habeas Transcript, Volume II of II, at pp. 327–29.

**90.** Amended Petition, at pp. 35–36.

clusory ineffective assistance claim alleging myriad alleged deficient acts and omissions by his trial counsel.[91] During the evidentiary hearing held in petitioner's state habeas corpus proceeding, petitioner presented the state habeas court with no fact-specific allegations and no evidence supporting any of these assertions of ineffective assistance. The state habeas trial court found petitioner had failed to either (1) identify any specific extraneous offense evidence introduced during the guilt-innocence phase of trial which required such an instruction or (2) introduce any evidence showing precisely *why* his trial counsel failed to request the type of instruction in question with regard to the evidence petitioner's own trial counsel elicited showing petitioner was a drug-trafficker.[92] The state habeas trial court also noted the only evidence of extraneous misconduct introduced during the guilt-innocence phase of trial was elicited from Angela Wallace by petitioner's own trial counsel.[93] The state habeas trial court concluded this complaint failed to satisfy either prong of *Strickland*.[94] The Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions. *Ex parte Moore*, App. No. 40,046–02 (Tex.Crim.App. May 14, 2003).

### 3. *AEDPA Review*

#### a. *No Deficient Performance*

The state habeas court reasonably concluded petitioner had failed to overcome the presumption of reasonableness afforded petitioner's trial counsels' strategic decisions (1) to elicit testimony from Angela Wallace concerning petitioner's admissions he was a drug-trafficker and (2) not to request a limiting jury instructions direct-

ing the jury to consider such testimony only if it concluded beyond a reasonable doubt that petitioner's statements to Angela Wallace regarding his drug-trafficking were accurate. Petitioner made no effort during his state habeas corpus proceeding to challenge his own trial counsels' strategic decision-making by Interrogating said counsel regarding the objective circumstances surrounding their strategic decisions during petitioner's second trial. Moreover, the state habeas court reasonably concluded "it would be somewhat incongruous" for petitioner's trial counsel to request the jury be precluded from considering evidence which petitioner himself had introduced unless the jury first determined the factual matters contained in that evidence were established beyond a reasonable doubt.

■■■ This Court independently concludes there was nothing objectively unreasonable in the failure of petitioner's trial counsel to request a "beyond reasonable doubt" jury instruction applicable to testimony elicited by petitioner's own counsel during the guilt-innocence phase of petitioner's second trial. As explained in Section VII.E.3.a. above, the decision by petitioner's trial counsel to elicit testimony from Angela Wallace which tended to show petitioner was a drug-trafficker was, on its face, arguably objectively unreasonable. However, petitioner offered the state habeas court no evidence sufficient to overcome the presumption of reasonableness afforded petitioner's trial counsels' strategic decision on how best to cross-examine the prosecution's principal witness. Thus, the state habeas court's conclusion that petitioner's complaint about his trial counsel's cross-examination of Angela Wallace

---

**91.** Second State Habeas Transcript, Volume I of II, at pp. 20–22.

**92.** Second State Habeas Transcript, Volume II of II, at pp. 341–43.

**93.** *Id.*, at p. 341.

**94.** *Id.*, at p. 346.

failed to satisfy the deficient performance prong of *Strickland* was itself objectively reasonable, even if this court might have reached a different result on the merits of that aspect of petitioner's ineffective assistance complaint.

The same rationale compels a similar result with regard to petitioner's complaint about his trial counsels' failure to request a "beyond reasonable doubt" jury instruction on extraneous offenses at the guilt-innocence phase of petitioner's second capital trial. Petitioner's trial counsel apparently hoped the testimony they elicited from Angela Wallace during her cross-examination would reduce her credibility in the eyes of the jury. Under such circumstances, it is nonsensical to suggest petitioner's trial counsel should have sought to limit the impact of that same testimony through an instruction directing the jury to disregard same unless it was convinced beyond a reasonable doubt of the accuracy of the comments about petitioner being a drug-trafficker.[95]

The bottom line is that petitioner made no genuine effort to challenge his trial counsels' reasons for not requesting a limiting jury instructions regarding extraneous offense evidence presented during the guilt-innocence phase of trial. Absent any evidence showing *why* petitioner's trial counsel made that choice, the state habeas court reasonably concluded petitioner had failed to overcome the presumption of reasonableness afforded strategic decisions under *Strickland.*

### b. *No Prejudice*

While petitioner attempts to rely on Section 3(a)(1) of Article 37.07, Texas Code of Criminal Procedure, in support of this claim of ineffective assistance, by its own terms that statutory section applies only to a *sentencing* proceeding, not to the guilt-innocence phase of a criminal trial:

Regardless of the plea and whether the punishment be assessed by the judge or the jury, evidence may be offered by the state and the defendant *as to any matter the court deems relevant to sentencing,* including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rule 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act. A court may consider *as a factor in mitigating punishment* the conduct of a defendant while participating in a program under Chapter 17 as a condition of release on bail. Additionally, notwithstanding Rule 609(d), Texas Rules of Evidence, and subject to Subsection (h), evidence may be offered by the state and defendant of an adjudication of delinquency based on a violation by the defendant of a penal law of the grade of: (A) a felony; or (B) a misdemeanor punishable by confinement in jail.[96]

Likewise, all of the authorities cited by petitioner in his amended federal habeas corpus petition in support of this aspect of

---

**95.** Significantly, petitioner has *not* argued in this or any other court that his trial counsel should have requested an instruction directing the jury to limit its consideration of Angela Wallace's testimony on cross-examination to the issue of her credibility.

**96.** Article 37.07, § 3(a)(1), Tex.Code-Crim.Proc.Ann. (Vernon 2006). At all times relevant to petitioner's offense and multiple trials, section 3(a)(1) of article 37.07 addressed the admission of evidence at the sentencing phase of a criminal trial.

his ineffective assistance claims address the propriety of evidentiary rulings made during the *punishment or sentencing* phase of a Texas criminal trial.

 Texas law is well-settled that, when the *prosecution* seeks to introduce evidence of extraneous bad acts by the defendant during the *guilt-innocence* phase of a criminal trial, and the trial court makes a determination that the evidence is admissible for one of the limited purposes admission of such evidence is authorized under Texas law, the defendant is entitled upon request to a jury instruction informing the jury not to consider the extraneous act evidence unless they believe beyond a reasonable doubt the defendant committed that act. *Ex parte Varelas*, 45 S.W.3d 627, 631 (Tex.Crim.App.2001); *George v. State*, 890 S.W.2d 73, 76 (Tex.Crim.App.1994); *Harrell v. State*, 884 S.W.2d 154, 157–58 (Tex.Crim.App.1994). However, petitioner has cited no Texas authority, and this Court's independent research has disclosed none, specifically addressing the propriety of a "beyond reasonable doubt" jury instruction on evidence of extraneous offenses *where the defendant himself introduced the extraneous offense evidence in question during the guilt-innocence phase of a Texas criminal trial.*

Furthermore, it is thus far from clear whether petitioner would have been entitled to such an instruction under applicable Texas law had his trial counsel made a timely request for same. After all, the most that can be said for this "extraneous offense" evidence is that Angela Wallace claimed the petitioner *told her* he was a drug trafficker. There was no other evidence introduced during the guilt-innocence phase of petitioner's second capital trial establishing that petitioner had ever actually engaged in drug-trafficking. At the risk of stating the obvious, it is not a criminal offense for someone to *claim* to be a drug-trafficker.

Assuming for purposes of argument that petitioner would nonetheless have been entitled to a "beyond reasonable doubt" jury instruction on the very testimony petitioner elicited from Angela Wallace, i.e., her statements on cross-examination indicating the petitioner told her on the night of the fatal shootings that he sold kilos of narcotics rather than mere ounces of same, there is no reasonable probability that, but for the absence of such a jury instruction, the jury's verdict at the guilt-innocence phase of petitioner's capital trial would have been different. Angela Wallace's testimony at the guilt-innocence phase of petitioner's second capital trial was not bolstered significantly by the fact she alleged the petitioner admitted to being a drug-trafficker. Petitioner was *not* charged with having committed a murder during the course of a drug deal. Rather, petitioner was charged with having fatally shot two people during the same criminal transaction. Whether petitioner attempted to "impress" Ms. Wallace by boasting about being a drug-trafficker is irrelevant to the question of whether petitioner fired multiple times from behind into the passenger compartment of the vehicle in which the unarmed Clark and Boyd were seated.

### 4. *Conclusions*

The state habeas court's conclusions that petitioner's complaint about his trial counsel's failure to request a "beyond reasonable doubt" jury instruction on evidence of extraneous offenses at the guilt-innocence phase of petitioner's second trial failed to satisfy either prong of *Strickland* were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in petitioner's second trial and second state habeas corpus proceeding.

### J. *"Cumulative Error" Ineffective Assistance*

#### 1. *The Claim*

Petitioner argues in his seventh claim in his amended petition that his Sixth Amendment right to the effective assistance of counsel was violated by virtue of the "cumulation of errors" by his trial counsel.[97]

#### 2. *State Court Disposition*

Petitioner has not presented his "cumulative error" ineffective assistance claim to the state courts, either on direct appeal or in any of his three state habeas corpus applications.

#### 3. *Procedural Default on Unexhausted Claim*

Respondent correctly points out that petitioner has procedurally defaulted on this currently unexhausted "cumulative error" ineffective assistance claim. Petitioner has failed to exhaust available state remedies on his "cumulative error" ineffective assistance claim herein. For the same reasons set forth at length in section V.C. above, because petitioner's "cumulative error" ineffective assistance claim would meet the same fate as those claims contained in petitioner's third state habeas application if petitioner were to attempt to exhaust available state habeas remedies on same at this juncture, petitioner has procedurally defaulted on his currently-unexhausted "cumulative error" ineffective assistance claim. *See Coleman v. Thompson*, 501 U.S. at 735 n. 1, 111 S.Ct. at 2557 n. 1 (procedurally default occurs whenever a petitioner's unexhausted claim would be barred from subsequent state review under applicable state writ-abuse principles); *Coleman v. Quarterman*, 456 F.3d at 542 ("Texas's abuse of the writ doctrine is a valid state procedural bar foreclosing fed-eral habeas review."); *Aguilar v. Dretke*, 428 F.3d at 533 ("This court has consistently held that Texas' abuse-of-writ rule is ordinarily an 'adequate and independent' procedural ground on which to base a procedural default ruling."); *Matchett v. Dretke*, 380 F.3d at 848 ("Texas' abuse-of-the-writ rule is ordinarily an 'adequate and independent' procedural ground on which to base a procedural default ruling."); *Busby v. Dretke*, 359 F.3d at 724 ("the Texas abuse of the writ doctrine is an adequate ground for considering a claim procedurally defaulted.").

#### 4. *No Merits*

Because petitioner has never presented his "cumulative error" ineffective assistance claims to any state court, this Court's review of same is necessarily *de novo*. *See Rompilla v. Beard*, 545 U.S. at 390, 125 S.Ct. at 2467 (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

 Federal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors so infected the entire trial that the resulting conviction violates due process. *Spence v. Johnson*, 80 F.3d 989, 1000–01 (5th Cir.1996) (quoting, *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir.1992), *cert. denied*, 508 U.S. 960, 113 S.Ct. 2928, 124 L.Ed.2d 679 (1993)), *cert. denied*, 519 U.S. 1012, 117

---

**97.** Amended Petition, at pp. 29–30.

S.Ct. 519, 136 L.Ed.2d 407 (1996). The cumulative error doctrine provides relief only when the *constitutional* errors committed in the state trial court so fatally infected the trial that they violated the trial's fundamental fairness. *Jackson v. Johnson,* 194 F.3d 641, 655 n. 59 (5th Cir.1999), *cert. denied,* 529 U.S. 1027, 120 S.Ct. 1437, 146 L.Ed.2d 326 (2000).

Moreover, in order to satisfy the cumulative error rule in the Fifth Circuit, a federal habeas petitioner must show that (1) errors occurred during the petitioner's state trial court proceeding, (2) the errors are not procedurally barred, (3) the errors rise to the level of constitutional deprivations, and (4) the record as a whole reveals that an unfair trial resulted from those errors. *Westley v. Johnson,* 83 F.3d 714, 726 (5th Cir.1996), *cert. denied,* 520 U.S. 1140, 117 S.Ct. 1290, 137 L.Ed.2d 365 (1997). As this Court's discussion of the many details of petitioner's trial set forth at great length above makes clear, none of the alleged deficiencies in the performance of petitioner's trial counsel identified by petitioner herein rise to the level of a violation of petitioner's constitutional rights. The record of petitioner's trial, as a whole, reveals that proceeding was *not* unfair in any constitutional sense because of the performance of petitioner's trial counsel. Petitioner attempts to cumulate multiple assertions of ineffective assistance by his trial counsel. His effort is in vain because this Court has independently determined that, without exception, these complaints do not satisfy the prejudice prong of *Strickland,* either individually or when viewed collectively.

As explained above, arguably petitioner's trial counsel rendered deficient performance by (1) eliciting damaging testimony from Angela Wallace on cross-examination suggesting petitioner had told Wallace that he was a drug-trafficker and (2) failing to request a jury instruction directing the jury to disregard all evidence suggesting petitioner was a drug-trafficker unless the jury determined beyond a reasonable doubt that petitioner had actually engaged in drug-trafficking. However, neither of these arguable deficiencies in the performance of petitioner's trial counsel "prejudiced" petitioner within the meaning of *Strickland.*

5. *Conclusions*

Petitioner procedurally defaulted on his currently unexhausted "cumulative error" ineffective assistance claim herein.

Moreover, because none of petitioner's assertions of ineffective assistance satisfy the prejudice prong of *Strickland,* calculating the "cumulative" effect of petitioner's ineffective assistance claims herein amounts to finding the sum of a series of zeros and does not warrant federal habeas relief. *See Coble v. Quarterman* 496 F.3d at 440 (holding federal habeas relief is only available for cumulative errors that are of a constitutional dimension and, because none of the petitioner's ineffective assistance claims satisfied both prongs of *Strickland,* the petitioner had not presented any errors of constitutional dimension); *Leal v. Dretke,* 428 F.3d 543, 552–53 (5th Cir.2005)(holding the cumulative errors of trial counsel did not warrant a certificate of appealability where none of the errors satisfied the prejudice prong of *Strickland* ), *cert. denied,* 547 U.S. 1073, 126 S.Ct. 1771, 164 L.Ed.2d 522 (2006); *Livingston v. Johnson,* 107 F.3d 297, 309 (5th Cir.1997)(cumulative error analysis is only appropriate where errors are of a constitutional dimension), *cert. denied,* 522 U.S. 880, 118 S.Ct. 204, 139 L.Ed.2d 141 (1997); *Derden v. McNeel,* 978 F.2d 1453, 1454 (5th Cir.1992), *cert. denied,* 508 U.S. 960, 113 S.Ct. 2928, 124 L.Ed.2d 679 (1993)(holding the same); *Cordova v.*

*Johnson,* 993 F.Supp. 473, 543 (W.D.Tex. 1998)("a petitioner who attempts to cumulate trial court errors that do not rise to the federal constitutional dimension has presented nothing to cumulate."), *certificate of appealability denied,* 157 F.3d 380 (5th Cir.1998), *cert. denied,* 525 U.S. 1131, 119 S.Ct. 922, 142 L.Ed.2d 971 (1999).

## VIII. *Defects in State Habeas Corpus Proceedings*

### A. *The Claims*

Petitioner argues in his thirteenth and fourteenth claims in his amended federal habeas petition that the Texas habeas corpus statute (1) has been retroactively applied in an arbitrary and capricious fashion in violation of equal protection and *ex post facto* principles because a separate statute (Tex.CodeCrim.Proc Article 11.071) applicable to criminal defendants convicted of capital murder and sentenced to death which statute has been applied retroactively while amendments to the more generic Texas habeas corpus statute (Article 11.07) apply prospectively only and (2) violates due process principles because its state abuse-of-the-writ provisions have been applied retroactively to certain litigants, thereby improperly limiting their "fundamental right" to pursue state habeas corpus remedies in successive state habeas applications.[98]

### B. *State Court Disposition*

Petitioner presented a pair of similar claims to the state habeas court in his second state habeas corpus application.[99] The state habeas trial court rejected both claims on the merits, concluding that even if petitioner's constitutional claims had any merit, petitioner's arguments did not warrant state habeas relief because they did not attack the underlying validity of peti-

tioner's conviction or sentence.[100] The Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions. *Ex parte Moore,* App. No. 40,046–02 (Tex.Crim.App. May 14, 2003).

### C. *AEDPA Review*

Petitioner has identified no Supreme Court precedent, no Fifth Circuit precedent, and no precedent from this Court holding that a procedural defect (even of a constitutional dimension) occurring during a state habeas corpus proceeding gives rise to a claim for federal habeas corpus relief. This Court's independent review of applicable case law located no such authority.

▪ The reason for the dearth of Fifth Circuit and federal District Court case law supporting petitioner's thirteenth and fourteenth claims herein is the fact few principles have been more consistently applied in this Circuit than the well-settled rule that complaints about alleged constitutional violations occurring during the course of state habeas corpus proceedings do not give rise to a legal basis for federal habeas corpus relief. *See Brown v. Dretke,* 419 F.3d 365, 378 (5th Cir.2005)("alleged infirmities in state habeas proceedings are not grounds for federal habeas relief"), *cert. denied,* 546 U.S. 1217, 126 S.Ct. 1434, 164 L.Ed.2d 137 (2006); *Moore v. Dretke,* 369 F.3d 844, 846 (5th Cir.2004)("It is axiomatic that 'infirmities in state habeas proceedings do not constitute grounds for federal habeas relief.' This is because 'an attack on the state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself.'" (*citation omitted* )); *Henderson v. Cockrell,* 333 F.3d 592, 606 (5th Cir.2003) ("It is well-

---

**98.** Amended Petition, at pp. 37–47.

**99.** Second State Habeas Transcript, Volume I of II, at pp. 36–50.

**100.** Second State Habeas Transcript, Volume II of II, at pp. 353–54.

settled that 'infirmities in state habeas proceedings do not constitute grounds for federal habeas relief.' "), *cert. denied*, 540 U.S. 1163, 124 S.Ct. 1170, 157 L.Ed.2d 1208 (2004); *Rudd v. Johnson*, 256 F.3d 317, 319–20 (5th Cir.2001)("A long line of cases from our circuit dictates that 'infirmities in state habeas proceedings do not constitute grounds for relief in federal court.' That is because an attack on the state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself." (*citations omitted* )), *cert. denied*, 534 U.S. 1001, 122 S.Ct. 477, 151 L.Ed.2d 391 (2001); *Beazley v. Johnson*, 242 F.3d 248, 271 (5th Cir.2001)("infirmities in state habeas proceedings do *not* constitute grounds for relief in federal court"), *cert. denied*, 534 U.S. 945, 122 S.Ct. 329, 151 L.Ed.2d 243 (2001).

 There was absolutely nothing objectively unreasonable in the state habeas court's refusal to grant habeas corpus relief based upon petitioner's challenges to the allegedly retroactive application of the Texas state habeas corpus statute. Those challenges addressed not the validity of petitioner's underlying conviction or sentence but, rather, a state proceeding entirely separate and distinct from petitioner's criminal trial and direct appeal.

D. *Teague Foreclosure*

 Furthermore, respondent correctly points out the non-retroactivity principle announced in *Teague v. Lane*, 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989). Under the holding in *Teague*, federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review. *Caspari v. Bohlen*, 510 U.S. 383, 389–90, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994). A "new rule" for *Teague* purposes is one which was not dictated by precedent existing at the time

the defendant's conviction became final. *See O'Dell v. Netherland*, 521 U.S. 151, 156, 117 S.Ct. 1969, 1973, 138 L.Ed.2d 351 (1997)(holding a "new rule" either "breaks new ground," "imposes a new obligation on the States or the Federal Government," or was not "dictated by precedent existing at the time the defendant's conviction became final"). Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Id.*

 The holding in *Teague* is applied in three steps: first, the court must determine when the petitioner's conviction became final; second, the court must survey the legal landscape as it then existed and determine whether a state court considering the petitioner's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution; and third, if the rule advocated by the petitioner is a new rule, the court must determine whether the rule falls within one of the two narrow exceptions to the non-retroactivity principle. *Caspari v. Bohlen*, 510 U.S. at 390, 114 S.Ct. at 953.

 The only two exceptions to the *Teague* non-retroactivity doctrine are reserved for (1) new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense and (2) "watershed" rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding, i.e., a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty. *O'Dell v. Netherland*, 521 U.S. at 157, 117 S.Ct. at

1973. A conviction becomes final for *Teague* purposes when either the United States Supreme Court denies a certiorari petition on the defendant's direct appeal or the time period for filing a certiorari petition expires. *Caspari v. Bohlen,* 510 U.S. at 390, 114 S.Ct. at 953. Petitioner's conviction became final for *Teague* purposes not later than April 10, 2002, i.e., the ninety-first day after the Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence on direct appeal and the date the deadline for the filing of petitioner's petition for writ of certiorari with the United States Supreme Court expired. *Beard v. Banks,* 542 U.S. 406, 411–12, 124 S.Ct. 2504, 2510, 159 L.Ed.2d 494 (2004)(recognizing a state criminal conviction ordinarily becomes final for *Teague* purposes when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for writ of certiorari has elapsed or a timely filed petition for certiorari has been denied); *Caspari v. Bohlen,* 510 U.S. at 390, 114 S.Ct. at 953 ("A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied."); 21 U.S.C. § 2101(d)(the deadline for filing a certiorari petition from a state criminal conviction shall be established by Supreme Court rule); Sup.Ct. Rule 13.1 (setting the deadline for the filing of a certiorari petition at 90 days from the date of the state court judgment for which review is sought). *Teague* remains applicable after the passage of the AEDPA. *See Horn v. Banks,* 536 U.S. 266, 268–72, 122 S.Ct. 2147, 2148–51, 153 L.Ed.2d 301 (2002) (applying *Teague* in an AEDPA context); *Robertson v. Cockrell,* 325 F.3d 243, 255 (5th Cir.2003)(recognizing the continued vitality of the Teague non-retroactivity doctrine under the AED-

PA), *cert. denied,* 539 U.S. 979, 124 S.Ct. 28, 156 L.Ed.2d 691 (2003).

As of the date petitioner's conviction and sentence became final for *Teague* purposes no federal court had ever held that a criminal defendant is entitled to federal habeas corpus relief based on alleged constitutional errors committed during a previous state habeas corpus proceeding. Nor was such a holding arguably discernable based on any then-existing Supreme Court precedent. Thus, petitioner's thirteenth and fourteenth claims herein are foreclosed by the non-retroactivity doctrine of *Teague.* The new rule proposed by petitioner herein falls within neither of the recognized exceptions to the *Teague* doctrine. Even assuming that a federal court might one day rule that defects in a state habeas corpus proceeding can excuse a procedural default, there is no rational basis for setting aside an otherwise final state criminal conviction or sentence based upon alleged errors which occurred in a proceeding wholly separate and distinct from the petitioner's trial and direct appeal.

E. *Conclusions*

The state habeas court's denials on the merits of petitioner's claims arising from the allegedly unconstitutional application of the Texas state habeas corpus statute were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in petitioner's second trial and second state habeas corpus proceeding.

Furthermore, the arguments presented in petitioner's thirteenth and fourteenth claims herein are foreclosed by the non-retroactivity doctrine of *Teague v. Lane.*

## IX. *Due Process Challenge to Texas' Statutory Definition of Capital Murder and Capital Sentencing Scheme*

### A. *The Claim*

 Petitioner argues rather cryptically in his fifteenth claim in his amended petition that the Texas statutory definition of capital murder and the Texas capital sentencing scheme collectively fail to satisfy constitutional due process principles by failing to adequately "give effect to the individual circumstances." [101]

### B. *State Court Disposition*

Petitioner presented an equally ambiguous claim to the state habeas court.[102] The state habeas trial court rejected this claim on the merits, (1) finding petitioner had presented no evidence showing the Texas statutes in question either (a) permitted the imposition of the death sentence in a discriminatory manner or (b) failed to "give effect to individual circumstances," and (2) concluding the Texas capital sentencing scheme (particularly the mitigation special issue) permits a capital sentencing jury to adequately consider all circumstances relevant to a petitioner's offense, character and background, and personal moral culpability.[103] The Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions. *Ex parte Moore*, App. No. 40,046–02 (Tex. Crim.App. May 14, 2003).

### C. *AEDPA Review*

 The fundamental analytical problem with this claim is the fact petitioner has consistently failed to allege any specific facts showing precisely *how* the Texas capital sentencing scheme either permits the imposition of the death penalty in a discriminatory manner or "fails to give effect to the individual circumstances." Petitioner also alleges no specific facts identifying any potentially mitigating evidence admitted during his second capital trial which he claims his capital sentencing jury was unable to adequately consider. Conclusory assertions do not raise a constitutional issue in a habeas proceeding. *Murphy v. Dretke*, 416 F.3d 427, 437 (5th Cir.2005), *cert. denied*, 546 U.S. 1098, 126 S.Ct. 1028, 163 L.Ed.2d 868 (2006); *Collier v. Cockrell*, 300 F.3d 577, 587 (5th Cir. 2002), *cert. denied*, 537 U.S. 1084, 123 S.Ct. 690, 154 L.Ed.2d 586 (2002); *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir.1983).

 The constitutional standard for evaluating the efficacy of punishment-phase jury instructions and special issues is well-settled: "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Abdul–Kabir v. Quarterman*, ── U.S. ──, ──, 127 S.Ct. 1654, 1674, 167 L.Ed.2d 585 (2007); *Ayers v. Belmontes*, ── U.S. ──, ──, 127 S.Ct. 469, 474, 166 L.Ed.2d 334 (2006); *Johnson v. Texas*, 509 U.S. 350, 367, 113 S.Ct. 2658, 2669, 125 L.Ed.2d 290 (1993); *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990). "Although the reasonable likelihood standard does not require that the defendant prove that it was more likely than not that the jury was prevented from giving effect to the evidence, the standard requires more than a mere possibility of such a bar." *Johnson v. Texas*, 509 U.S. at 367, 113 S.Ct. at 2669; *Boyde v. California*, 494 U.S. at 380, 110 S.Ct. at 1198. In evaluating the instructions, courts do not engage in a technical parsing of the relevant lan-

---

**101.** Amended Petition, at p. 48.

**102.** Second State Habeas Transcript, Volume I of II, at pp. 58–59.

**103.** Second State Habeas Transcript, Volume II of II, at pp. 356–57.

guage but instead approach the instructions the same way the jury would—with a "commonsense understanding of the instructions in the light of all that has taken place at the trial." *Johnson v. Texas,* 509 U.S. at 368, 113 S.Ct. at 2669; *Boyde v. California,* 494 U.S. at 381, 110 S.Ct. at 1198.

Because petitioner presented the state habeas court (and presents this Court) with no fact-specific allegations or evidence identifying any specific mitigating evidence which he claims his capital sentencing jury was unable to adequately consider, his fifteenth claim herein amounts to little more than a facial attack on the validity of the Texas capital sentencing scheme. However, even *before* the Texas Legislature amended the Texas capital sentencing scheme to direct capital sentencing juries to consider all of the evidence before it relating to a defendant's offense, character and background, and personal moral culpability, the Supreme Court had repeatedly upheld the constitutionality of the Texas capital sentencing scheme against claims the scheme failed to adequately permit a capital sentencing jury to consider all relevant mitigating evidence. *See Johnson v. Texas,* 509 U.S. 350, 368–69, 113 S.Ct. 2658, 2669–70, 125 L.Ed.2d 290 (1993)(holding the future dangerousness special issue furnished an adequate mechanism for allowing a capital sentencing jury to give mitigating effect to evidence of the defendant's youth); *Graham v. Collins,* 506 U.S. 461, 474–77, 113 S.Ct. 892, 902–03, 122 L.Ed.2d 260 (1993)(holding *Teague* foreclosed any construction of the Texas capital sentencing scheme suggesting it was inadequate to permit a capital sentencing jury's consideration of a capital defendant's youth, family background, and positive character traits); *Franklin v. Lynaugh,* 487 U.S. 164, 177–80, 108 S.Ct. 2320, 2329–30, 101 L.Ed.2d 155 (1988)(holding Texas capital sentencing scheme permitted adequate consideration

of the mitigating effects of the defendant's positive prison disciplinary record); *Jurek v. Texas,* 428 U.S. 262, 273, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929 (1976)(plurality opinion concluding the future dangerousness special issue permits a Texas capital sentencing jury to consider the defendant's criminal record, the defendant's age, and whether the defendant was acting under duress or the detrimental effects of mental or emotional pressure at the time he committed the capital murder).

Likewise, prior to the introduction of the mitigation or *Penry* special issue into the Texas capital sentencing scheme, the Fifth Circuit had repeatedly held the Texas capital sentencing scheme permitted a capital sentencing jury adequate opportunity to consider and give mitigating effect to a wide range of evidence concerning either the circumstances of a capital offense or a capital defendant's character and background. *See Cordova v. Johnson,* 993 F.Supp. 473, 496–98 & nn. 122–25 (W.D.Tex.1998)(listing opinions identifying many types of potentially mitigating evidence which the Fifth Circuit had held could be adequately considered by a Texas capital sentencing jury even without the addition of the mitigation or Penry special issue to the Texas capital sentencing scheme), *appeal denied,* 157 F.3d 380 (5th Cir.1998), *cert. denied,* 525 U.S. 1131, 119 S.Ct. 922, 142 L.Ed.2d 971 (1999).

Petitioner identifies no Supreme Court precedent which casts any doubt on the continued validity of the Texas capital sentencing special issues. Petitioner does not assert there was any evidence introduced during his second capital trial which fell within the scope of the Supreme Court's holdings in either *Penry v. Johnson (Penry II),* 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001), or *Penry v. Lynaugh (Penry I),* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Even if petitioner

were to make such an argument, the state trial court specifically directed petitioner's second capital sentencing jury to consider "all the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the Defendant" in determining whether a sentence of life imprisonment, rather than death, were appropriate for petitioner.[104] No reasonable jury could have construed that instruction as foreclosing its consideration of any of the potentially mitigating evidence presented during petitioner's second capital trial. Accordingly, petitioner's challenge to the validity of the Texas capital sentencing scheme is without arguable support in the record now before this Court, regardless of whether that challenge is viewed as a facial challenge or an "as applied" challenge.

Petitioner has identified no properly admitted, potentially mitigating, evidence which he claims his second capital sentencing jury was precluded from adequately considering pursuant to the punishment-phase special issues submitted to his second capital sentencing jury. Nor has petitioner identified any specific defects in the punishment-phase jury charge or special issues submitted during his second capital trial. There is no arguable merit to petitioner's fifteenth claim for relief herein.

### D. *Teague Foreclosure*

██ Respondent correctly points out petitioner's fifteenth claim herein is foreclosed by the *Teague* non-retroactivity doctrine. At the time petitioner's conviction and sentence became final for *Teague* purposes, no federal court had held the Texas capital sentencing scheme under which petitioner was tried, convicted, and sentenced during his second capital trial to be constitutionally deficient on its face or

applied to facts even remotely similar to petitioner's case. Nor has any federal court since then held the current Texas capital sentencing scheme unconstitutional for failure to furnish the capital sentencing jury with adequate means to consider the mitigating effects of evidence of a defendant's capital offense and the defendant's background and character similar to that presented during petitioner's second capital trial.

### E. *Conclusion*

The state habeas court's rejection on the merits of petitioner's cryptic complaints in his fifteenth claim herein was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in petitioner's second trial and second state habeas corpus proceeding.

Petitioner's fifteenth claim herein is also foreclosed by the Supreme Court's holding in *Teague v. Lane.*

## XI. *Vague Capital Sentencing Special Issues*

### A. *The Claims*

In his sixteenth and seventeenth claims in his amended petition, petitioner argues the trial court failed to adequately define several key terms employed in the capital sentencing special issues (i.e., "probability," "criminal acts of violence," "continuing threat to society," "personal moral culpability," "moral blameworthiness," and "mitigating circumstances") and the resulting vagueness in the special issues violated equal protection, due process, and Eighth Amendment principles.[105]

---

**104.** Trial Transcript, Volume IV of IV, at p. 453.

**105.** Amended Petition, at pp. 48–56.

## B. *State Court Disposition*

Petitioner presented the state habeas court with similar claims in his second state habeas corpus application.[106] The state habeas trial court (1) found the term "mitigating circumstances" was, in fact, clearly defined by petitioner's punishment-phase jury instructions, (2) concluded petitioner waived all of these complaints by failing to object to the lack of definitions of these terms in his punishment-phase jury instructions, (3) concluded the terms "probability," "criminal acts of violence," "continuing threat to society," need not be defined further, and (4) concluded the terms "personal moral culpability," and "moral blameworthiness" could be understood in their ordinary sense and did not require further definition.[107] The Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions. *Ex parte Moore*, App. No. 40,-046-02 (Tex.Crim.App. May 14, 2003).

## C. *Procedural Default*

■ Respondent correctly points out that petitioner procedurally defaulted on his complaints about the lack of definitions in his punishment-phase jury charge by failing to make any objection thereto at the time of petitioner's second trial.

As this Court has explained previously, procedural default occurs where (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, or (2) the petitioner fails to exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred. *Coleman v. Thompson*,

501 U.S. at 735 n. 1, 111 S.Ct. at 2557 n. 1. During the charge conference at the punishment phase of petitioner's second capital trial, petitioner voiced no objections to the lack of definitions concerning any of the terms in question; instead, petitioner's only request was for an additional instruction directing the jury to determine the "reasoned moral response" to petitioner's offense during its deliberations.[108] The state habeas trial court found petitioner failed to timely object to the lack of definitions of the terms in question in petitioner's punishment-phase jury instructions and concluded petitioner thereby waived any complaint about same.[109] The Texas Court of Criminal Appeals adopted those findings and conclusions. *Ex parte Moore*, App. No. 40,046-02 (Tex.Crim.App. May 14, 2003).

The Fifth Circuit has repeatedly held a procedural default premised upon a federal habeas corpus petitioner's failure to comply with the Texas contemporaneous objection rule constitutes an adequate and independent barrier to federal habeas review of a claim. *See Scheanette v. Quarterman*, 482 F.3d at 823 ("We have recognized a federal petitioner's failure to comply with the Texas contemporaneous objection rule as an adequate and independent state procedural barrier to federal habeas review."); *Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir.2007) ("Where a prisoner procedurally defaults his federal claim in the state habeas court, federal habeas review is barred unless he can demonstrate cause and prejudice."), *cert. denied*, —— U.S. ——, 128 S.Ct. 34, ——, 168 L.Ed.2d 810 (2007); *Parr v. Quarterman*, 472 F.3d at 253 (holding the Texas contemporaneous objection rule is strictly or regularly ap-

---

**106.** Second State Habeas Transcript, Volume I of II, at pp. 59–68.

**107.** Second State Habeas Transcript, Volume II of II, at pp. 358–59.

**108.** S.F. Trial, volume 18, at pp. 64–65.

**109.** Second State Habeas Transcript, Volume II of II, at p. 358.

plied evenhandedly to the vast majority of similar claims and is, therefore, an adequate procedural bar); *Wright v. Quarterman,* 470 F.3d at 586–89 (holding a Texas petitioner's hearsay objection was inadequate under the Texas contemporaneous objection rule to preserve a Confrontation Clause objection to the admission of evidence); *Cardenas v. Dretke,* 405 F.3d 244, 249 (5th Cir.2005)(holding a Teas petitioner's failure to contemporaneously object to a venire member's exclusion barred federal habeas review of a *Batson* claim), *cert. denied,* ── U.S. ──, 126 S.Ct. 2986, 165 L.Ed.2d 987 (2006); *Rowell v. Dretke,* 398 F.3d 370, 375–75 (5th Cir.2005)(holding a defendant's failure to timely object to alleged errors in a jury charge determined by a Texas appellate court to be a violation of the Texas contemporaneous objection rule barred federal habeas relief of the alleged erroneous jury charge under the procedural default doctrine), *cert. denied,* 546 U.S. 848, 126 S.Ct. 103, 163 L.Ed.2d 117 (2005).

The Fifth Circuit has also recognized the efficacy of the Texas contemporaneous objection rule as a barrier to federal habeas review was "firmly established" for federal procedural default purposes long before the date petitioner filed his brief on direct appeal. *See Hogue v. Johnson,* 131 F.3d 466, 487 (5th Cir.1997)(holding the Texas contemporaneous objection rule was already well established 35 years ago and recognized as an adequate state procedural barrier to federal habeas review at least twenty years ago), *cert. denied,* 523 U.S. 1014, 118 S.Ct. 1297, 140 L.Ed.2d 334 (1998); *Rogers v. Scott,* 70 F.3d 340, 342 (5th Cir.1995)(recognizing the Texas contemporaneous objection rule foreclosed federal habeas review), *cert. denied,* 517 U.S. 1235, 116 S.Ct. 1881, 135 L.Ed.2d 176 (1996); *Amos v. Scott,* 61 F.3d at 343–44 (holding Texas appellate courts consistently apply the contemporaneous objection rule in the vast majority of cases and,

thereby, strictly and regularly apply same).

Petitioner's failure to make a timely objection to the lack of definitions of key terms contained in the state trial court's punishment-phase jury instructions bars federal habeas review of petitioner's constitutional challenge to these instructions unless petitioner can satisfy one of the two exceptions to the procedural default doctrine. The fact the state habeas court alternatively concluded petitioner's complaints about the lack of definitions of key terms in his punishment-phase jury charge also lacked substantive merit does not nullify the preclusive effect of the state court's procedural ruling. *See Harris v. Reed,* 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 1044 n. 10, 103 L.Ed.2d 308 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law."); *Hughes v. Dretke,* 412 F.3d 582, 592–93 (5th Cir.2005)(state court's alternate holding on the merits did not circumvent preclusive effect of bar on federal habeas review arising from petitioner's failure to contemporaneously object *on federal constitutional grounds* ), *cert. denied,* 546 U.S. 1177, 126 S.Ct. 1347, 164 L.Ed.2d 60 (2006); *Cardenas v. Dretke,* 405 F.3d at 249 ("The state habeas court's discussion of the merits as an alternative reason for its holding does not nullify its procedural ruling."); *Thacker v. Dretke,* 396 F.3d 607, 614 (5th Cir.2005)(holding procedural bar resulting from petitioner's failure to properly preserve federal constitutional complaint via a contemporaneous objection was not precluded by the state court's alternate holding that constitutional claim lacked merit), *cert. denied,* 546 U.S. 840,

126 S.Ct. 80, 163 L.Ed.2d 100 (2005); *Busby v. Dretke,* 359 F.3d at 718 (holding a state court's alternative ruling on the merits did not undermine the preclusive effect of its procedural default holding on the same claim).

Petitioner has not alleged any facts sufficient to satisfy either exception to the procedural default doctrine. For instance, while petitioner has presented this court with numerous complaints of ineffective assistance by his trial counsel, at no time has petitioner argued his trial counsel's failure to timely object to the lack of definitions in his punishment-phase jury instructions constituted deficient performance by his trial counsel.

Likewise, petitioner has alleged no facts sufficient to establish his "actual innocence" of the death penalty. *See Sawyer v. Whitley,* 505 U.S. 333, 346–48, 112 S.Ct. 2514, 2523, 120 L.Ed.2d 269 (1992)(holding that a showing of "actual innocence" is made in connection with the punishment phase of a capital murder trial when a petitioner shows by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found petitioner eligible for the death penalty under applicable state law). The Supreme Court has explained this "actual innocence" requirement focuses on those elements which render a defendant *eligible* for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. *Sawyer v. Whitley,* 505 U.S. at 347, 112 S.Ct. at 2523. Petitioner has alleged no facts, much less furnished this Court with clear and convincing evidence, establishing that, but for the lack of definitions in his punishment-phase jury instructions, no reasonable juror would have ruled favorably to petitioner on either of the Texas capital sentencing special issues.

Petitioner's failure to contemporaneously object to the lack of definitions of key terms in his punishment-phase jury charge constitutes an impermeable barrier to federal habeas review of the merits of petitioner's sixteenth and seventeenth claims herein.

### D. *No Merits*

Alternatively, petitioner's complaints about allegedly vague terms in his punishment-phase jury charge are legally frivolous.

### 1. *Petitioner's Capital Sentencing Special Issues*

At the punishment phase of petitioner's second capital trial, the trial court directed the jury to answer the following special issues:

> Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant, Frank Moore, would commit criminal acts of violence that would constitute a continuing threat to society?[110]

> State whether, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, there is a sufficient mitigating circumstance or are sufficient mitigating circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.[111]

### 2. *Future Dangerousness Special Issue*

The Fifth Circuit has repeatedly rejected challenges to the first Texas capital

---

**110.** Trial Transcript, Volume IV of IV, at p. 546.

**111.** *Id.,* at p. 547.

sentencing special issue, i.e., the future dangerousness special issue, holding each of the key terms included in this special issue is fully capable of a commonsense, practical, meaning which eliminates the need for lengthy, legalistic, definitions. *See Leal v. Dretke,* 428 F.3d at 553 (listing the many Fifth Circuit opinions rejecting complaints about the failure of Texas courts to define the terms "probability," "criminal acts of violence," and "continuing threat to society" in the first Texas capital sentencing special issue). This Court has likewise rejected similar complaints many times. *See, e.g., Paredes v. Quarterman,* 2007 WL 760230, *21 (W.D.Tex. March 8, 2007)(recognizing the Fifth Circuit has repeatedly rejected challenges premised on the alleged vagueness of the future dangerousness capital sentencing special issue and holding the allegedly vague terms in the mitigation or *Penry* special issue are constitutionally sufficient because (1) Texas is not a weighing jurisdiction, (2) the Eighth Amendment permit granting a capital ‹ sentencing jury unfettered discretion to *withhold* a death sentence once it has determined a defendant is eligible to receive same, and (3) the *Penry* special issue does not preclude the capital sentencing jury's consideration of any relevant mitigating evidence); *Martinez v. Dretke,* 426 F.Supp.2d 403, 530 (W.D.Tex.2006)(holding the Texas capital sentencing special issues need not be accompanied by definitions because the key terms therein are susceptible of a logical, commonsense, interpretation by rational jurors and the Eighth Amendment does not preclude granting a Texas unfettered discretion (in the mitigation special issue) to *withhold* the death penalty so long as the jury is permitted to consider all mitigating evidence before it in so doing); *Salazar v. Dretke,* 393 F.Supp.2d 451, 488–91 (W.D.Tex.2005)(holding the same); *Kimmel v. Dretke,* 2005 WL 1959074, *16–*18 (W.D.Tex. August 16, 2005)(holding the

Texas capital sentencing special issues are not unconstitutionally vague because (1) Texas is not a weighing jurisdiction, (2) the Eighth Amendment permits a capital sentencing jury unfettered discretion to *withhold* a death sentence once it has determined the defendant is eligible to receive same, and (3) the Texas capital sentencing special issues are capable of a commonsense interpretation which permits the jury to consider all relevant mitigating evidence in deciding whether to withhold a death sentence), *certificate of appealability denied,* 199 Fed.Appx. 338 (5th Cir. 2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 2034, 167 L.Ed.2d 773 (2007); *Brown v. Dretke,* 2004 WL 2793266, *7–*9 (W.D.Tex. December 3, 2004)(holding the same), *certificate of appealability denied,* 419 F.3d 365 (5th Cir.2005), *cert. denied,* 546 U.S. 1217, 126 S.Ct. 1434, 164 L.Ed.2d 137 (2006); *Bagwell v. Cockrell,* 2003 WL 22723006, *27–*29 (W.D.Tex. August 19, 2003)(holding the same), *affirmed,* 372 F.3d 748 (5th Cir.2004), *cert. denied,* 543 U.S. 989, 125 S.Ct. 498, 160 L.Ed.2d 374 (2004).

### 3. *Mitigation or Penry Special Issue*

 The fundamental analytical problem with those portions of petitioner's sixteenth and seventeenth claims herein challenging the mitigation capital sentencing special issue is that petitioner misconstrues the true nature of the Texas capital sentencing scheme.

The Supreme Court explained in *Tuilaepa v. California,* 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994), that the Eighth Amendment addresses two different but related aspects of capital sentencing: the eligibility decision and the selection decision. *Tuilaepa,* 512 U.S. at 971, 114 S.Ct. at 2634. The Supreme Court's analysis of those two aspects of capital sentencing provides a comprehensive sys-

tem for analyzing Eighth Amendment claims:

> To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment. To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase. The aggravated circumstance may be contained in the definition of the crime or in a separate sentencing factor (or both). As we have explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague. * * *
>
> We have imposed a separate requirement for the selection decision, where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence. "What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime." That requirement is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime.

*Tuilaepa*, 512 U.S. at 971–73, 114 S.Ct. at 2634–35 (citations omitted).

The Supreme Court clearly held in *Tuilaepa* that States may adopt capital sentencing procedures which rely upon the jury, in its sound judgment, to exercise wide discretion. *Tuilaepa*, 512 U.S. at 974, 114 S.Ct. at 2636. The Supreme Court held further, at the *selection* stage,

States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." *Tuilaepa*, 512 U.S. at 978, 114 S.Ct. at 2638.

In *Loving v. United States*, 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996), the Supreme Court discussed the first part of the *Tuilaepa* analysis, i.e., the eligibility decision, as follows:

> The Eighth Amendment requires, among other things, that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" Some schemes accomplish that narrowing by requiring that the sentencer find at least one aggravating circumstance. The narrowing may also be achieved, however, in the definition of the capital offense, in which circumstance the requirement that the sentencer "find the existence of the aggravating circumstance in addition is no part of the constitutionally required narrowing process."

*Loving*, 517 U.S. at 755, 116 S.Ct. at 1742 (citations omitted).

The Supreme Court subsequently reaffirmed the vitality of the *Tuilaepa* analysis and elaborated on the distinction between the narrowing function or *eligibility* decision and the *selection* phase of a capital sentencing proceeding in *Buchanan v. Angelone*, 522 U.S. 269, 275–77, 118 S.Ct. 757, 761–62, 139 L.Ed.2d 702 (1998).

Insofar as petitioner complains about the alleged vagueness of the terms "personal moral culpability," "moral blameworthiness" employed in the second Texas

capital sentencing special issue, i.e., the mitigation or *Penry* special issue, petitioner's complaints are premised on the faulty notion that a Texas capital sentencing jury's answer to the mitigation or *Penry* special issue is somehow analogous to the verdict delivered by a capital sentencing jury in a weighing jurisdiction. A "weighing jurisdiction" requires a sentencing jury to specifically find that one or more statutory aggravating factors are present and then to weigh those factors against all of the mitigating evidence to determine whether the defendant is eligible to receive the death penalty, i.e., whether the balance favors the imposition of the death penalty. *Williams v. Cain*, 125 F.3d 269, 281–84 (5th Cir.1997). Texas is not a "weighing jurisdiction" for Eighth Amendment purposes. *Hughes v. Johnson*, 191 F.3d 607, 623 (5th Cir.1999), *cert. denied*, 528 U.S. 1145, 120 S.Ct. 1003, 145 L.Ed.2d 945 (2000); *West v. Johnson*, 92 F.3d 1385, 1406 (5th Cir.1996), *cert. denied*, 520 U.S. 1242, 117 S.Ct. 1847, 137 L.Ed.2d 1050 (1997); *Woods v. Johnson*, 75 F.3d 1017, 1033–34 (5th Cir.1996), *cert. denied*, 519 U.S. 854, 117 S.Ct. 150, 136 L.Ed.2d 96 (1996); *Hogue v. Johnson*, 131 F.3d 466, 499 n. 60 (5th Cir.1997), *cert. denied*, 523 U.S. 1014, 118 S.Ct. 1297, 140 L.Ed.2d 334 (1998); *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir.1993), *cert. denied*, 509 U.S. 947, 114 S.Ct. 30, 125 L.Ed.2d 780 (1993); *Salazar v. Dretke*, 393 F.Supp.2d at 488.

Unlike a "weighing jurisdiction," the Texas capital sentencing scheme makes the *eligibility* determination discussed in *Tuilaepa* at the guilt-innocence phase of trial. *Johnson v. Texas*, 509 U.S. at 362, 113 S.Ct. at 2666; *Woods v. Johnson*, 75 F.3d at 1033–34; *Salazar v. Dretke*, 393 F.Supp.2d at 490. The Texas capital sentencing scheme further narrows the category of those eligible for the death penalty by requiring a finding, beyond a reasonable doubt, of future dangerousness. *See Sonnier v. Quarterman*, 476 F.3d at 365–67 (recognizing the Texas capital sentencing scheme, like the one upheld by the Supreme Court in *Kansas v. Marsh*, 548 U.S. 163, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006), performs the constitutionally-required narrowing function through its statutory definition of capital murder and further narrows the category of those eligible for the death penalty by requiring an additional fact finding, beyond a reasonable doubt, that there is a probability the defendant will commit criminal acts of violence that would constitute a continuing threat to society).

Unlike the cases cited for authority in support of petitioner's vagueness claims herein, the Texas capital sentencing scheme under which petitioner was tried, convicted, and sentenced performed the constitutionally-required narrowing function discussed in *Tuilaepa* and *Loving*, i.e., the *eligibility* determination, at the guilt-innocence phase of petitioner's second capital trial. Petitioner's repeated references to "aggravating factors" in the course of his arguments attacking the Texas capital sentencing special issues are utterly *non sequitur*. The mitigation or *Penry* special issue submitted at the punishment phase of a Texas capital trial focused exclusively on the *selection* decision, which the Supreme Court has held may involve a capital sentencing jury exercising unfettered discretion to withhold a death sentence from a defendant otherwise eligible to receive same. *See Buchanan v. Angelone*, 522 U.S. at 276, 118 S.Ct. at 761–62 (at the selection phase of a capital sentencing proceeding, "our decisions suggest that complete jury discretion is constitutionally permissible."); *Tuilaepa v. California*, 512 U.S. at 978–80, 114 S.Ct. at 2638–39 (at the selection phase, the States are not confined to submitting specific propositional questions; a capital sentencer need not be instructed how to weigh any particular fact; and discretion to evaluate and weigh the circumstances relevant to the particu-

lar defendant and the crime he committed is not impermissible).

The current Texas mitigation or Penry capital sentencing special issue conforms to the Supreme Court's holdings in *Buchanan v. Angelone* and *Tuilaepa v. California*, both of which recognized the Eighth Amendment authorizes a state to permit a capital sentencing jury to exercise virtually unfettered discretion at the *selection* phase, i.e., when it determines whether to impose or withhold a death sentence on a criminal defendant whom it has properly determined is eligible to receive same. Under the holdings in *Buchanan* and *Tuilaepa*, the striking breadth of the Texas mitigation capital sentencing issue does *not* require any limiting or constricting definitions. Thus, petitioner's complaints about the absence of definitions for the terms "personal moral culpability," and "moral blameworthiness" are utterly without arguable merit.

### E. *Teague Foreclosure*

Respondent correctly argues petitioner's sixteenth and seventeenth claims herein are foreclosed by the non-retroactivity doctrine of *Teague v. Lane*. At the time petitioner's conviction and sentence became final for *Teague* purposes, no federal court had ever held the Texas capital sentencing scheme's mitigation special issue required explanatory definitions of the terms "personal moral culpability," or "moral blameworthiness." Moreover, such a holding would necessarily require the overruling of the Supreme Court's decisions in *Buchanan v. Angelone* and *Tuilaepa v. California*, *supra*. Nor does the new rule advocated by petitioner in his sixteenth and seventeenth claims herein fall within either of the recognized exceptions to the doctrine of *Teague* foreclosure.

### F. *Conclusions*

Petitioner procedurally defaulted on his complaints about the lack of definitions in his punishment-phase special issues by failing to make any timely objection thereto.

The state habeas court's alternative rejection on the merits of petitioner's complaints about the state trial court's failure to *sua sponte* give petitioner's capital sentencing jury definitions of key in the capital sentencing special issues was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in petitioner's second trial and second state habeas corpus proceeding.

Petitioner's sixteenth and seventeenth claims herein are also foreclosed by the Supreme Court's holding in *Teague v. Lane*.

## XII. *No "Meaningful" State Appellate Review*

### A. *The Claim*

Petitioner argues in his eighteenth claim in his amended petition that the "unstructured" nature of the Texas capital sentencing scheme's mitigation or *Penry* special issue deprived petitioner of meaningful appellate review of the jury's answer thereto.[112]

### B. *State Court Disposition*

Petitioner presented the state habeas court with a similar claim in his second state habeas application.[113] The state habeas trial court rejected this claim on the merits.[114] The Texas Court of Criminal

---

**112.** Amended Petition, at pp. 56–58.

**113.** Second State Habeas Transcript, Volume I of II, at pp. 68–71.

**114.** Second State Habeas Transcript, Volume II of II, at pp. 359–60.

Appeals adopted the state habeas trial court's findings and conclusions. *Ex parte Moore*, App. No. 40,046–02 (Tex.Crim.App. May 14, 2003).

### C. *No Procedural Default*

While respondent accurately points out that petitioner never voiced any timely objection at trial to the Texas capital sentencing scheme similar to the objections contained in petitioner's eighteenth ground herein, the state habeas trial court did not address this apparent ground for procedural default when it rejected petitioner's complaints on the merits. Accordingly, unless this claim is barred by the non-retroactivity doctrine of *Teague*, this Court must turn to the merits of petitioner's complaint.

### D. *Teague Foreclosure*

Respondent correctly argues this claim is foreclosed by the non-retroactivity doctrine of *Teague v. Lane*. At the time petitioner's conviction and sentence became final for *Teague* purposes, no federal court had held the Texas capital sentencing scheme deprived a capital defendant of meaningful appellate review of the jury's answers to the capital sentencing special issues. *See Martinez v. Dretke*, 426 F.Supp.2d at 532 (holding *Teague* foreclosure applicable to this same claim); *Cordova v. Johnson*, 993 F.Supp. at 509 (holding *Teague* foreclosed claims that the Constitution mandated proportionality review of the jury's answers to the Texas capital sentencing scheme's special issues).

### E. *No Merits*

■ Alternatively, petitioner's complaints lack arguable merit.

The Supreme Court has expressly rejected the arguments underlying petitioner's eighteenth claim herein, i.e., that a state appellate court is required to independently re-weigh aggravating and miti-

gating evidence. *See Pulley v. Harris*, 465 U.S. 37, 50–51, 104 S.Ct. 871, 879, 79 L.Ed.2d 29 (1984)("There is thus no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death sentence is imposed and the defendant requests it.").

The Fifth Circuit has repeatedly rejected the same due process and Eighth Amendment arguments petitioner presents herein. *See Woods v. Cockrell*, 307 F.3d 353, 359–60 (5th Cir.2002) (holding Texas Court of Criminal Appeals' refusal to review the sufficiency of the evidence supporting negative answers to the Texas capital sentencing scheme's "mitigation" special issue, i.e., the *Penry* issue, did not violate due process principles); *Johnson v. Cockrell*, 306 F.3d 249, 256 (5th Cir.2002)(denying CoA on claim that Texas Court of Criminal Appeals' refusal to review whether sufficient mitigating evidence existed to support a life sentence violated Eighth Amendment), *cert. denied*, 538 U.S. 926, 123 S.Ct. 1573, 155 L.Ed.2d 319 (2003); *Beazley v. Johnson*, 242 F.3d at 261 (holding petitioner was afforded *meaningful* state appellate review of death sentence when state appellate court reviewed sufficiency of evidence supporting future dangerousness special issue); *Moore v. Johnson*, 225 F.3d 495, 505–07 (5th Cir.2000)(holding Texas Court of Criminal Appeals' refusal to review the sufficiency of the evidence supporting negative answers to the Texas capital sentencing scheme's "mitigation" special issue, i.e., the *Penry* issue, did not violate due process principles), *cert. denied*, 532 U.S. 949, 121 S.Ct. 1420, 149 L.Ed.2d 360 (2001); *Hughes v. Johnson*, 191 F.3d at 621–23 (holding no Eighth Amendment violation resulted from Texas Court of Criminal Appeals' refusal to engage in proportionality review of capital sentencing jury's answer to mitigation special is-

sue because Texas is a non-weighing juris-diction).

Finally, this Court has repeatedly rejected the Eighth Amendment component of this same claim as foreclosed by the Supreme Court's holding in *Tuilaepa*. *Martinez v. Dretke*, 426 F.Supp.2d at 530–32; *Brown v. Dretke*, 2004 WL 2793266, *9–*10; *Bagwell v. Cockrell*, 2003 WL 22723006, *27–*30; *Cordova v. Johnson*, 993 F.Supp. at 509 ("Insofar as proportionality analysis is constitutionally necessary with regard to the Texas capital sentencing scheme, that analysis is incorporated in the 'eligibility decision' described in *Tuilaepa* and *Buchanan* and is accomplished in the Texas capital sentencing scheme at the guilt-innocence phase of a trial because the Texas capital murder statute itself performs the constitutionally-mandated narrowing function.").

Petitioner made no effort to present the state appellate court with any points of error on direct appeal challenging the sufficiency of the evidence supporting the jury's answers to either of the capital sentencing issues at his second trial. Petitioner has not identified any institutional impediment to his fairly presenting the state appellate court with insufficient evidence points of error addressing his second sentencing jury's answers to the Texas capital sentencing special issues. No "clearly established" Supreme Court precedent mandates state appellate review of a Texas capital sentencing jury's answer to the mitigation special issue.

### F. *Conclusions*

Petitioner's eighteenth claim herein is foreclosed by *Teague*. Moreover, clearly established Fifth Circuit precedent rejects these same arguments.

The state habeas court's rejection on the merits of petitioner's complaint that he was denied "meaningful" state appellate review of his second jury's answers to the Texas capital sentencing special issues was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in petitioner's second trial and second state habeas corpus proceeding.

## XIII. *Denial of Proportionality Review*

### A. *The Claim*

Petitioner argues in his nineteenth claim in his amended petition that, because the Texas capital sentencing statute is silent as to the burden of proof on the mitigation or *Penry* special issue, due process and Eighth Amendment principles mandate meaningful proportionality review of his death sentence.[115]

### B. *State Court Disposition*

Petitioner presented a similar claim in his second state habeas corpus application.[116] The state habeas trial court (1) found petitioner had failed to timely object on this ground at trial, (2) concluded petitioner waived any complaint about same, and (3) alternatively rejected this claim on the merits.[117] The Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions. *Ex parte Moore*, App. No. 40,046–02 (Tex.Crim.App. May 14, 2003).

### C. *Procedural Default*

Respondent correctly points out the state habeas court concluded the petition-

---

115. Amended Petition, at pp. 58–59.

116. Second State Habeas Transcript, Volume I of II, at pp. 71–74.

117. Second State Habeas Transcript, Volume II of II, at p. 360.

er's failure to timely object to this alleged deficiency in Texas capital sentencing special issues and state system of appellate review constituted a waiver of same. Petitioner's failure to comply with the Texas contemporaneous objection rule constitutes an insurmountable barrier to federal habeas review of the merits of petitioner's nineteenth claim herein. *See Coleman v. Thompson,* 501 U.S. at 735 n. 1, 111 S.Ct. at 2557 n. 1 (procedural default occurs where (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, or (2) the petitioner fails to exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred); *Scheanette v. Quarterman,* 482 F.3d at 823 ("We have recognized a federal petitioner's failure to comply with the Texas contemporaneous objection rule as an adequate and independent state procedural barrier to federal habeas review."); *Turner v. Quarterman,* 481 F.3d at 301 ("Where a prisoner procedurally defaults his federal claim in the state habeas court, federal habeas review is barred unless he can demonstrate cause and prejudice."); *Parr v. Quarterman,* 472 F.3d at 253 (holding the Texas contemporaneous objection rule is strictly or regularly applied evenhandedly to the vast majority of similar claims and is, therefore, an adequate procedural bar). Petitioner has alleged no facts suggesting his nineteenth claim herein falls within either of the recognized exceptions to the federal procedural default doctrine.

### D. *Teague Foreclosure*

Respondent also correctly argues the new rule urged in petitioner's nineteenth claim herein is foreclosed by the non-retroactivity doctrine of *Teague v. Lane.* At the time petitioner's conviction and sentence became final for *Teague* purposes, no federal court had held a state prisoner possessed a constitutional right to state appellate proportionality review of a death sentence. *See Martinez v. Dretke,* 426 F.Supp.2d at 532 (holding *Teague* foreclosure applicable to this same claim); *Cordova v. Johnson,* 993 F.Supp. at 509 (holding *Teague* foreclosed claims that the Constitution mandated proportionality review of the jury's answers to the Texas capital sentencing scheme's special issues).

### E. *No Merits*

As was explained in Section XII.E. above, the legal arguments underlying petitioner's nineteenth claim herein are foreclosed by applicable Supreme Court and Fifth Circuit precedent. *See Pulley v. Harris,* 465 U.S. at 50–51, 104 S.Ct. at 879 ("There is thus no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death sentence is imposed and the defendant requests it."); *Woods v. Cockrell,* 307 F.3d at 359–60 (holding Texas Court of Criminal Appeals' refusal to review the sufficiency of the evidence supporting negative answers to the Texas capital sentencing scheme's "mitigation" special issue, i.e., the *Penry* issue, did not violate due process principles); *Johnson v. Cockrell,* 306 F.3d at 256 (denying CoA on claim that Texas Court of Criminal Appeals' refusal to review whether sufficient mitigating evidence existed to support a life sentence violated Eighth Amendment); *Moore v. Johnson,* 225 F.3d at 505–07 (holding the Texas Court of Criminal Appeals' refusal to review the sufficiency of the evidence supporting negative answers to the Texas capital sentencing scheme's "mitigation" special issue, i.e., the *Penry* issue, did not violate due process principles).

Furthermore, this Court has consistently rejected the exact same argument.

*Martinez v. Dretke,* 426 F.Supp.2d at 530–32; *Brown v. Dretke,* 2004 WL 2793266, *9–*10; *Bagwell v. Cockrell,* 2003 WL 22723006, *27–*30; *Cordova v. Johnson,* 993 F.Supp. at 508 ("Petitioner's proposed rule would stand the principle of individualized sentencing on its head.").

### F. *Conclusions*

The legal arguments underlying petitioner's nineteenth claim herein are procedurally defaulted by virtue of petitioner's failure to timely present the same claims to the state trial court. This claim is also foreclosed by the *Teague v. Lane* non-retroactivity doctrine.

The state habeas court's rejection on the merits of petitioner's complaint that he was denied state appellate proportionality review of his capital sentence was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in petitioner's second trial and second state habeas corpus proceeding.

### XIV. *No Hung Jury Instruction*

### A. *The Claim*

Petitioner argues in his twentieth claim in his amended petition that the failure of the Texas capital sentencing scheme to inform the jury of the effect of a single hold-out juror violates Eighth and Fourteenth Amendment principles.[118]

### B. *State Court Disposition*

Petitioner presented this same claim to the state habeas court.[119] The state habeas trial court (1) found petitioner had failed to object to his punishment-phase jury instructions on this ground, (2) concluded petitioner had, therefore, waived this argument, and (3) alternatively rejected this claim on the merits.[120] The Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions. *Ex parte Moore,* App. No. 40,-046-02 (Tex.Crim.App. May 14, 2003).

### C. *Procedural Default*

Respondent correctly argues petitioner's failure to timely object to this alleged defect in his punishment-phase jury instructions constitutes an adequate and independent barrier to federal habeas review of this claim. *See Coleman v. Thompson,* 501 U.S. at 735 n. 1, 111 S.Ct. at 2557 n. 1 (procedural default occurs where (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, or (2) the petitioner fails to exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred); *Scheanette v. Quarterman,* 482 F.3d at 823 ("We have recognized a federal petitioner's failure to comply with the Texas contemporaneous objection rule as an adequate and independent state procedural barrier to federal habeas review."). Petitioner has alleged no facts sufficient to bring this claim within either recognized exception to the federal procedural default doctrine.

### D. *Teague Foreclosure*

Respondent also correctly argues this claim is foreclosed by the *Teague* non-retroactivity doctrine. *Alexander v. John-*

---

**118.** Amended Petition, at pp. 59–60.

**119.** Second State Habeas Transcript, Volume I of II, at pp. 77–78.

**120.** Second State Habeas Transcript, Volume II of II, at pp. 362–63.

son, 211 F.3d 895, 897–98 (5th Cir.2000); Webb v. Collins, 2 F.3d 93, 95 (5th Cir. 1993).

### E. No Merits

 This constitutional complaint possesses no arguable merit.

The Supreme Court has implicitly rejected petitioner's arguments underlying this claim. See Jones v. United States 527 U.S. 373, 382, 119 S.Ct. 2090, 2099, 144 L.Ed.2d 370 (1999)(holding the Eighth Amendment does not require a capital sentencing jury be instructed as to the effect of a "breakdown in the deliberative process," because (1) the refusal to give such an instruction does not affirmatively mislead the jury regarding the effect of its verdict and (2) such an instruction might well undermine the strong governmental interest in having the jury express the conscience of the community on the ultimate question of life or death).

On numerous occasions, the Fifth Circuit has expressly rejected the legal premise underlying petitioner's nineteenth claim herein, i.e., the argument a Texas capital murder defendant is constitutionally entitled to have his punishment-phase jury instructed regarding the consequences of a hung jury or a single holdout juror. See, e.g., Hughes v. Dretke, 412 F.3d 582, 593–94 (5th Cir.2005)(holding the same arguments underlying petitioner's nineteenth claim herein were so legally insubstantial as to be unworthy of a certificate of appealability), cert. denied, 546 U.S. 1177, 126 S.Ct. 1347, 164 L.Ed.2d 60 (2006); Alexander v. Johnson, 211 F.3d 895, 897–98 (5th Cir.2000)(holding the Teague v. Lane non-retroactivity doctrine precluded applying such a rule in a federal habeas context); Davis v. Scott, 51 F.3d 457, 466–67 (5th Cir.1995)(holding the same), cert. denied, 516 U.S. 992, 116 S.Ct. 525, 133 L.Ed.2d 432 (1995); Jacobs v. Scott, 31 F.3d 1319, 1328–29 (5th Cir.1994)(rejecting application of the Supreme Court's holding in Mills v. Maryland to a Texas capital sentencing proceeding), cert. denied, 513 U.S. 1067, 115 S.Ct. 711, 130 L.Ed.2d 618 (1995).

Finally, this Court has repeatedly rejected this same claim. See Blanton v. Quarterman, 489 F.Supp.2d 621, 644–45 (W.D.Tex.2007)(rejecting complaint that a Texas capital sentencing jury must be instructed on the effect of a single hold-out juror); Martinez v. Dretke, 426 F.Supp.2d 403, 534–36 (W.D.Tex.2006)(relying on the Supreme Court's holding in Jones v. United States to reject the same arguments raised by petitioner herein premised on the Supreme Court's holdings in Mills v. Maryland and Caldwell v. Mississippi ); Kimmel v. Dretke, 2005 WL 1959074, at *19–*21(holding the same); Amador v. Dretke, 2005 WL 827092, *23–*24 (W.D.Tex. April 11, 2005)(holding the same), affirmed, 458 F.3d 397 (5th Cir. 2006), cert. denied, —— U.S. ——, 127 S.Ct. 2129, 167 L.Ed.2d 866 (2007); Brown v. Dretke, 2004 WL 2793266, *13–*14 (W.D.Tex. December 3, 2004)(holding the same), CoA denied, 419 F.3d 365 (5th Cir. 2005), cert. denied, 546 U.S. 1217, 126 S.Ct. 1434, 164 L.Ed.2d 137 (2006).

Simply put, no federal court has ever held a Texas capital defendant has a constitutional right to a punishment-phase jury instruction advising his capital sentencing jury of the effect of hung jury or a single hold-out juror.

### F. Conclusions

Petitioner procedurally defaulted on this claim by failing to make any timely objection at trial to the alleged defect in his punishment-phase jury charge. Likewise, petitioner's proposed new rule is barred by the holding in Teague v. Lane.

The state habeas court's alternative rejection on the merits of petitioner's com-

plaint about the failure of his punishment-phase jury charge to inform the jury regarding the effect of a single hold-out juror was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in petitioner's second trial and second state habeas corpus proceeding.

## XV. *"Open–Ended Discretion" in Penry Special Issue*

### A. *The Claim*

Petitioner argues in his penultimate claim in his amended petition herein that the Texas capital sentencing scheme's mitigation or *Penry* special issue is constitutionally deficient because it permits a capital sentencing jury to exercise the type of "open-ended discretion" condemned in *Furman v. Georgia.*[121]

### B. *State Court Disposition*

Petitioner presented an abridged version of this same argument to the state habeas court.[122] The state habeas trial court (1) found petitioner had not raised this same objection to his punishment-phase jury instructions at trial, (2) concluded petitioner thereby waived this complaint, and (3) alternatively concluded this claim lacked merit.[123] The Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions. *Ex parte Moore,* App. No. 40,046–02 (Tex. Crim.App. May 14, 2003).

### C. *This Court Must Disregard Petitioner's Procedural Default*

Inexplicably, respondent has failed to argue in his pleadings in this Court that petitioner's failure to timely object to this alleged defect in petitioner's punishment-phase jury instructions constitutes an independent and adequate barrier to federal habeas review of this claim.[124] This Court is precluded from noting petitioner's default *sua sponte. See Prieto v. Quarterman,* 456 F.3d 511, 518–19 (5th Cir.2006)(holding this Court abused its discretion in *sua sponte* dismissing as procedurally defaulted an unexhausted claim). Therefore, unless *Teague v. Lane* forecloses this claim, this Court must address the merits of this otherwise procedurally defaulted claim.

### D. *Teague Foreclosure*

Respondent correctly points out the new rule advocated by petitioner in his twenty-first claim herein is foreclosed by the non-retroactivity doctrine of *Teague v. Lane.* At the time petitioner's conviction and sentence became final for *Teague* purposes, no federal court had ever held the Texas capital sentencing scheme's *Penry* special issue constitutionally deficient because it permitted the capital sentencing jury to exercise "open-ended discretion."

### E. *No Merits*

██ Moreover, this claim is foreclosed by well-settled Supreme Court precedent.

As explained above, the current Texas mitigation or *Penry* capital sentencing special issue conforms to the Supreme Court's

---

**121.** Amended Petition, at pp. 60–65.

**122.** Second State Habeas Transcript, Volume I of II, at pp. 78–79.

**123.** Second State Habeas Transcript, Volume II of II, at p. 363.

**124.** Respondent's Answer and Motion for Summary Judgment, filed August 17, 2004, docket entry nos. 30 & 31, at pp. 83–86.

holdings in *Buchanan v. Angelone* and *Tuilaepa v. California*, both of which recognized the Eighth Amendment authorizes a state to permit a capital sentencing jury to exercise virtually unfettered discretion at the *selection* phase, i.e., when it determines whether to impose or withhold a death sentence on a criminal defendant whom it has properly determined is eligible to receive same.

The Supreme Court held in *Tuilaepa* that States may adopt capital sentencing procedures which rely upon the jury, in its sound judgment, to exercise wide discretion. *Tuilaepa v. California*, 512 U.S. at 974, 114 S.Ct. at 2636. The Supreme Court held further, at the selection stage, States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." *Tuilaepa v. California*, 512 U.S. at 978, 114 S.Ct. at 2638. The mitigation or *Penry* special issue submitted at the punishment phase of a Texas capital trial focuses exclusively on the *selection* decision, which the Supreme Court has held may involve a capital sentencing jury exercising unfettered discretion to withhold a death sentence from a defendant otherwise eligible to receive same. *See Buchanan v. Angelone*, 522 U.S. at 276, 118 S.Ct. at 761–62 (at the selection phase of a capital sentencing proceeding, "our decisions suggest that complete jury discretion is constitutionally permissible."); *Tuilaepa v. California*, 512 U.S. at 978–80, 114 S.Ct. at 2638–39 (at the selection phase, the States are not confined to submitting specific propositional questions; a capital sentencer need not be instructed how to weigh any particular fact; and discretion to evaluate and weigh the circumstances relevant to the particular defendant and the crime he committed is not impermissible).

The virtually unfettered discretion exercised by a Texas capital sentencing jury to withhold the death penalty from defendants who have been determined eligible to receive same is fully consistent with the Eighth Amendment principles set forth in *Tuilaepa* and *Buchanan*. *See Turner v. Quarterman*, 481 F.3d at 299 (holding *Tuilaepa* permits capital sentencing juries to exercise "unbridled discretion"); *Martinez v. Dretke*, 426 F.Supp.2d at 537 (holding the same); *Salazar v. Dretke*, 393 F.Supp.2d at 488–91 (holding the same).

### F. *Conclusions*

Petitioner's penultimate claim herein is foreclosed by the non-retroactivity doctrine of *Teague v. Lane*.

The state habeas court's alternative rejection on the merits of petitioner's complaint about the "open-ended discretion" exercised by Texas capital sentencing juries was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in petitioner's second trial and second state habeas corpus proceeding.

### XVI. *Apprendi Claim*

### A. *The Claim*

In his final claim in his amended petition, petitioner argues the Texas capital sentencing scheme's *Penry* or mitigation special issue is constitutionally defective pursuant to the Supreme Court's holding in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), because it fails to assign a burden of proof beyond a reasonable doubt to the prosecution to disprove the existence of sufficient

mitigating circumstances to warrant a life sentence.[125]

## B. State Court Disposition

Petitioner presented the state habeas court with the same argument.[126] The state habeas trial court denied relief on the merits.[127] The Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions. *Ex parte Moore*, App. No. 40,046–02 (Tex.Crim.App. May 14, 2003).

## C. No Merits

In *Apprendi v. New Jersey*, the Supreme Court struck down on due process and jury trial grounds a state scheme which permitted a trial judge to make a factual finding based on a preponderance of the evidence regarding the defendant's motive or intent underlying a criminal offense and, based on such a finding, increase the maximum end of the applicable sentencing range for the offense by a factor of one hundred percent. *Apprendi*, 530 U.S. at 497, 120 S.Ct. at 2366. The Supreme Court's opinion in *Apprendi* emphasized it was merely extending to the state courts the same principles discussed in Justice Stevens' and Justice Scalia's concurring opinions in *Jones v. United States*, 526 U.S. 227, 252–53, 119 S.Ct. 1215, 1228–29, 143 L.Ed.2d 311 (1999): other than the fact of a prior conviction,

any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2362–63. Put more simply, the Supreme Court held (1) it was unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal is exposed and (2) all such findings must be established beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2363.

Two years later, in *Ring v. Arizona*, the Supreme Court applied the holding and its reasoning in *Apprendi* to strike down a death sentence in a case in which the jury had declined to find the defendant guilty of pre-meditated murder during the guilt-innocence phase of a capital trial (instead finding the defendant guilty only of felony murder) but a trial judge subsequently concluded the defendant should be sentenced to death based upon *factual* determinations that (1) the offense was committed in expectation of receiving something of pecuniary value (i.e., the fatal shooting of an armored van guard during a robbery) and (2) the foregoing aggravating factor out-weighed the lone mitigating factor favoring a life sentence (i.e., the defendant's minimal criminal record).[128] *Ring*, 536 U.S. at 609, 122 S.Ct. at 2443. The

---

**125.** Amended Petition, at pp. 65–79. Curiously, petitioner does not cite the Supreme Court's opinion in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), in support of his *Apprendi* claim. However, this court will address the application of the principles announced in *Ring* in the course of disposing of petitioner's *Apprendi* claim herein.

**126.** Second State Habeas Transcript, Volume I of II, at pp. 93–113.

**127.** Second State Habeas Transcript, Volume II of II, at pp. 366–67.

**128.** In point of fact, the Arizona trial judge found a second aggravating factor applied in Ring's case, i.e., Ring's comments after the fatal shooting in which he chastised his co-conspirators for their failure to praise Ring's marksmanship rendered his offense "especially heinous, cruel, or depraved." The Arizona Supreme Court later held there was insufficient evidence to support the trial judge's finding of depravity but nonetheless re-weighed the remaining aggravating factor against the lone mitigating factor and affirmed Ring's death sentence. *Ring v. Arizona*, 536 U.S. at 595–96, 122 S.Ct. at 2435–36.

Supreme Court emphasized, as it had in *Apprendi*, the dispositive question "is not one of form, but of effect": "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at 602, 122 S.Ct. at 2439. "A defendant may not be exposed to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Ring*, 536 U.S. at 602, 122 S.Ct. at 2439–40, *quoting Apprendi*, 530 U.S. at 483, 120 S.Ct. at 2359. Because Ring would not have been subject to the death penalty but for the trial judge's factual determination as to the existence of an aggravating factor, the Supreme Court declared Ring's death sentence violated the right to trial by jury protected by the Sixth Amendment. *Ring*, 536 U.S. at 609, 122 S.Ct. at 2443.

Petitioner argues the same constitutional principles applied in *Apprendi* require that the Texas capital sentencing scheme's *Penry* special issue be re-written to assign the prosecution the burden of "proving" beyond a reasonable doubt the absence of sufficient mitigating circumstances to warrant a life sentence. This argument misconstrues the role of the *Penry* special issue in the Texas capital sentencing scheme, which fulfills the *selection* function identified in *Tuilaepa*, not the *eligibility* decision addressed in *Ring*.

The Supreme Court held in *Tuilaepa* that, at the *selection* stage of a capital sentencing proceeding, States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the cir-

cumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." *Tuilaepa*, 512 U.S. at 978, 114 S.Ct. at 2638.

In contrast, in *Loving v. United States*, 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996), the Supreme Court discussed the first part of the *Tuilaepa* analysis, i.e., the *eligibility* decision, as follows:

The Eighth Amendment requires, among other things, that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" Some schemes accomplish that narrowing by requiring that the sentencer find at least one aggravating circumstance. The narrowing may also be achieved, however, in the definition of the capital offense, in which circumstance the requirement that the sentencer "find the existence of the aggravating circumstance in addition is no part of the constitutionally required narrowing process."

*Loving*, 517 U.S. at 755, 116 S.Ct. at 1742 (citations omitted).[129]

The Arizona capital sentencing scheme the Supreme Court addressed in *Ring* relied upon a trial judge's factual findings of "aggravating" factors and directed the trial judge to weigh those aggravating factors against any mitigating factors found to apply to the defendant. Thus the Arizona trial judge's factual findings in *Ring* were part of the constitutionally-mandated eligibility determination, i.e., the narrowing function. Likewise, the factual finding

---

**129.** The supreme Court subsequently elaborated on the distinction between the narrowing function or eligibility decision and the selection phase of a capital sentencing pro-

ceeding in *Buchanan v. Angelone*, 522 U.S. 269, 275–77, 118 S.Ct. 757, 761–62, 139 L.Ed.2d 702 (1998).

made by the New Jersey trial judge in *Apprendi* was a procedural prerequisite to enhancing the defendant's non-capital sentence.

In contrast, the Texas capital sentencing scheme under which petitioner was tried, convicted, and sentenced performed the constitutionally-required narrowing function discussed in *Tuilaepa* and *Loving* at the guilt-innocence phase of petitioner's trial and further narrowed the category of those eligible for the death penalty by requiring a finding, beyond a reasonable doubt, of future dangerousness. *See Sonnier v. Quarterman*, 476 F.3d 349, 365–67 (5th Cir.2007)(recognizing the Texas capital sentencing scheme, like the one upheld by the Supreme Court in *Kansas v. Marsh*, 548 U.S. 163, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006), performs the constitutionally-required narrowing function through its statutory definition of capital murder and further narrows the category of those eligible for the death penalty by requiring an additional fact finding, beyond a reasonable doubt, that there is a probability the defendant will commit criminal acts of violence that would constitute a continuing threat to society), *cert. denied* —— U.S. ——, 128 S.Ct. 374, 169 L.Ed.2d 259.

Unlike Arizona's weighing scheme, the Texas capital sentencing scheme performs the constitutionally-mandated narrowing function, i.e., the process of making the "eligibility decision," at the guilt-innocence phase of a capital trial by virtue of the manner with which Texas defines the offense of capital, murder in Section 19.03 of the Texas Penal Code. *See Johnson v. Texas*, 509 U.S. at 362, 113 S.Ct. at 2666 (holding that its previous opinions upholding the Texas capital sentencing scheme found no constitutional deficiency in the means used to narrow the group of offenders subject to capital punishment because the statute itself adopted different classifi-cations of murder for that purpose); *Lowenfield v. Phelps*, 484 U.S. 231, 243–47, 108 S.Ct. 546, 554–55, 98 L.Ed.2d 568 (1988)(comparing the Louisiana and Texas capital murder schemes and noting they each narrow those eligible for the death penalty through narrow statutory definitions of capital murder); *Jurek v. Texas*, 428 U.S. 262, 268–75, 96 S.Ct. 2950, 2955–57, 49 L.Ed.2d 929 (1976)(*plurality opinion* recognizing the Texas capital sentencing scheme narrows the category of murders for which a death sentence may be imposed and this serves the same purpose as the requirements of other statutory schemes which require proof of aggravating circumstances to justify the imposition of the death penalty).

The Texas capital sentencing scheme under which petitioner was convicted and sentenced involved a significantly different approach to capital sentencing than the Arizona scheme involved in *Ring* and the New Jersey sentencing enhancement scheme involved in *Apprendi*. By virtue of (1) its guilt-innocence phase determination *beyond a reasonable doubt* that the petitioner committed *capital* murder, as defined by applicable Texas law, and (2) its factual finding of future dangerousness, also made *beyond a reasonable doubt*, petitioner's jury found *beyond a reasonable doubt* the petitioner was *eligible* to receive the death penalty. *Sonnier v. Quarterman*, 476 F.3d at 365–67. In contrast, *Ring*'s jury made no analogous factual findings. Instead, *Ring*'s Arizona jury found beyond a reasonable doubt only that Ring was guilty of "felony murder," a wholly separate offense from the offense of capital murder as defined under Texas law.

The petitioner's first capital sentencing special issue, i.e., the future dangerousness issue, included a "beyond a reasonable doubt" burden of proof squarely placed on the prosecution. Petitioner's jury's factual

finding on the future dangerousness special issue was an essential part of the procedural process under Texas law for determining whether the petitioner was *eligible* to receive the death penalty.

In contrast, the *Penry* or "mitigation" special issue employed at the punishment phase of petitioner's capital trial was designed to address the second aspect of capital sentencing discussed in *Tuilaepa,* i.e., the constitutional requirement that the jury be given an opportunity "to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Kansas v. Marsh,* 548 U.S. at ——, 126 S.Ct. at 2524–25; *Sonnier v. Quarterman,* 476 F.3d at 365. "The use of mitigation evidence is a product of the requirement of individualized sentencing." *Kansas v. Marsh,* 548 U.S. at ——, 126 S.Ct. at 2525.

The Supreme Court has distinguished the constitutional requirements of the *eligibility* decision, i.e., the narrowing function, and the *selection* decision, i.e., the individualized assessment of mitigating circumstances, holding the latter requires only that the sentencing jury be given broad range to consider all relevant mitigating evidence but leaving to the States wide discretion on how to channel the sentencing jury's balancing of mitigating and aggravating factors. *See Kansas v. Marsh,* 548 U.S. at ——, 126 S.Ct. at 2525 (holding, in connection with the *selection* phase of a capital sentencing proceeding, the Constitution mandates only that (1) the defendant has a right to present the sentencing authority with information relevant to the sentencing decision and (2) the sentencing authority is obligated to consider that information in determining the appropriate sentence); *Tuilaepa,* 512 U.S. at 978, 114 S.Ct. at 2638 (holding, at the *selection* stage, States are not confined to submitting to the jury specific proposition-

al questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment.").

At the *selection* phase of a capital trial, the Supreme Court has left to the States the decision whether to channel a sentencing jury's weighing of mitigating evidence or grant the jury unfettered discretion to consider all relevant mitigating evidence and weigh same in any manner the jury deems reasonable. *See Kansas v. Marsh,* 548 U.S. 163, 126 S.Ct. at 2525, 165 L.Ed.2d 429 ("So long as a state system satisfies these requirements, our precedents establish that a State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed."). Likewise, the Supreme Court has not yet imposed a particular burden of proof requirement with regard to a capital sentencing jury's consideration of mitigating evidence when such consideration occurs exclusively within the *selection* process.

> "[D]iscretion to evaluate and weigh the circumstances relevant to the particular defendant and the crime he committed" is not impermissible in the capital sentencing process. "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, ... the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." Indeed, the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has been found that the defendant is a member of the class made eligible for that penalty."

*Tuilaepa,* 512 U.S. at 979, 114 S.Ct. at 2639 (citations omitted).

"[T]here is no constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.' " *Johnson v. Texas,* 509 U.S. at 362, 113 S.Ct. at 2666 (*quoting Boyde v. California,* 494 U.S. at 377, 110 S.Ct. at 1196). "We have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." *Kansas v. Marsh,* 548 U.S. at ——, 126 S.Ct. at 2525.

As explained above, the "eligibility" decision required by the Constitution is satisfied under Texas law by the jury's findings "beyond a reasonable doubt" that (1) the defendant is guilty of capital murder as defined under Section 19.03 of the Texas Penal Code and (2) there is a probability the defendant will commit criminal acts of violence that would constitute a continuing threat to society. *Sonnier v. Quarterman,* 476 F.3d at 365–67. This is all the Constitution requires to satisfy the concerns discussed by the Supreme Court in *Apprendi* and *Ring.*

■■■ Consistent with the Supreme Court's holdings in *Kansas v. Marsh, Tuilaepa v. California,* and *Johnson v. Texas,* a Texas capital sentencing jury may be granted "unfettered discretion" regarding how it should weigh the mitigating evidence, if any, relevant to a particular defendant's background and character against the aggravating circumstances of the defendant's offense and the defendant's demonstrated propensity for future dangerousness. Thus, the Texas Legislature's decision *not* to assign a particular burden of proof on either party in connection with the Texas capital sentencing scheme's *Penry* or mitigation special issue falls well within the broad range of discretionary authority a State may exercise in connection with the *selection* phase of a capital trial.[130]

Neither the New Jersey trial judge's post-trial factual finding of racial animus in *Apprendi* nor the Arizona trial judge's affirmative factual finding in *Ring* regarding the existence of an aggravating factor served the same constitutionally-mandated purpose as the jury's negative answer to the Penry special issue at petitioner's Texas capital murder trial. The Arizona trial judge's factual findings were designed to satisfy the "eligibility" requirement discussed in *Tuilaepa.* In jurisdictions such as Texas (where the "eligibility" decision discussed in *Tuilaepa* is made at the guilt-innocence phase of a capital trial) the factual issues before the jury at the punishment phase of a capital trial address only the "selection" decision identified by the Supreme Court in *Tuilaepa.* Even if Texas' future dangerousness special issue could be construed as falling within the scope of the constitutionally-mandated *eligibility* decision, Texas law clearly places the burden of proving same beyond a reasonable doubt on the prosecution. There was no constitutional requirement for the imposition of a similar burden of proof in

---

**130.** Another member of this Court has suggested it can be argued the absence of a burden of proof standard in the *Penry* or mitigation special issue could be reasonably expected to ensure to the benefit of defendants because a shrewd defense counsel could argue the absence of an instruction mandating a particular burden of proof permits the capital sentencing jury to answer the *Penry* special issue *affirmatively,* i.e., in a manner favorable to the defendant, if the jury concludes there is only a scintilla of evidence supporting an affirmative finding on that special issue. *Avila v. Quarterman,* 499 F.Supp.2d 713, 738 n. 65 (W.D.Tex.2007).

connection with the *Penry* or mitigation special issue.

Thus, the procedural requirements applicable to the *eligibility* decision in weighing jurisdictions such as Arizona (where specific findings of aggravating factors are made during a separate post-conviction proceeding and then weighed against any "mitigating" factors also found by the sentencing authority) are inapplicable to a Texas capital sentencing jury's *selection* decision, i.e., its determination as to whether the mitigating evidence in a particular case warrants a sentence of less than death for a criminal defendant who has already been convicted beyond a reasonable doubt of capital murder and already determined beyond a reasonable doubt to pose a risk of future dangerousness. *See Turner v. Quarterman,* 481 F.3d at 300 ("*Ring* is inapposite to any discussion of the constitutional requirements of the selection phase."); *Scheanette v. Quarterman,* 482 F.3d at 828 ("a finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death."); *Sonnier v. Quarterman,* 476 F.3d at 363–67 (holding the deletion of the former special issue inquiring into whether the defendant acted "deliberately" in connection with the capital murder from the Texas capital sentencing scheme did not render same vulnerable to attack on Eighth Amendment grounds); *Granados v. Quarterman,* 455 F.3d 529, 537 (5th Cir.2006) (distinguishing *Ring* and *Apprendi* on the ground a jury's affirmative answer to the Texas capital sentencing scheme's *Penry* or "mitigation" special issue reduces a sentence from death rather than increasing it to death, as was the case with the factual findings made by the trial judges in *Apprendi* and *Ring* ), *cert. denied,* —— U.S. ——, 127 S.Ct. 732, 166 L.Ed.2d 568 (2006); *Rowell v. Dretke,* 398 F.3d at 379 ("No Supreme Court or Circuit

precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof.").

### D. *Conclusion*

The state habeas court's rejection on the merits. of petitioner's *Apprendi* claim was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in petitioner's second trial and second state habeas corpus proceeding.

### XVII. *Request for Evidentiary Hearing*

Petitioner has requested an evidentiary hearing in this cause.[131] However, the AEDPA limits the circumstances in which a habeas corpus petitioner may obtain an evidentiary hearing in federal court, imposing a significant burden on petitioners who fail to diligently develop the factual bases for their claims in state court. *See Williams v. Taylor,* 529 U.S. 420, 433–34, 120 S.Ct. 1479, 1489, 146 L.Ed.2d 435 (2000) (prisoners who are at fault for the deficiency in the state court record must satisfy a heightened standard to obtain an evidentiary hearing); 28 U.S.C. § 2254(e)(2). "Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Williams v. Taylor,* 529 U.S. at 437, 120 S.Ct. at 1491. Under the AEDPA, if a petitioner failed to develop the factual basis of a claim in state court, he is entitled to a federal evidentiary hearing only if: (1) the claim relies on either (a) a new rule of constitutional law, made retroactive on collateral review by the Supreme Court, that was previously

---

**131.** Amended Petition, at p. 79.

unavailable or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence *and* (2) the facts underlying the claim are sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable fact-finder would have found the petitioner guilty of the underlying offense. *Foster v. Johnson,* 293 F.3d 766, 775 n. 9 (5th Cir.2002), *cert. denied,* 537 U.S. 1054, 123 S.Ct. 625, 154 L.Ed.2d 532 (2002); *Dowthitt v. Johnson,* 230 F.3d 733, 757 (5th Cir.2000), *cert. denied,* 532 U.S. 915, 121 S.Ct. 1250, 149 L.Ed.2d 156 (2001); 28 U.S.C. § 2254(e)(2).

Petitioner was afforded a full and fair opportunity to develop and litigate his claims for relief herein during his state habeas corpus proceeding. Petitioner inexplicable failed to present the state habeas court with any evidence supporting either his "extra-record" ineffective assistance claims or his challenges to the Texas capital sentencing scheme. Petitioner has presented this Court with no new evidence or factual theories supporting any of his claims herein that were unavailable to him, despite the exercise of due diligence, during his second state habeas corpus proceeding. Likewise, petitioner does not identify any new legal theories supporting his claims for relief herein that were unavailable at the time petitioner filed and litigated his second state habeas corpus claims. Petitioner does not offer any rational explanation for his failure to fully develop any and all evidence supporting his claims herein during his state habeas evidentiary hearing. Nor does petitioner identify any additional evidence which he and his state habeas counsel were unable to develop and present during petitioner's second state habeas proceeding despite the exercise of due diligence on their part. Under such circumstances, petitioner is not entitled to a federal evidentiary hearing to further develop the facts supporting his claims herein.

## XVIII. *Certificate of Appealability*

The AEDPA converted the "certificate of probable cause" previously required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a "Certificate of Appealability" ("CoA"). *See Hill v. Johnson,* 114 F.3d 78, 80 (5th Cir.1997)(recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson,* 114 F.3d 43, 45 (5th Cir.1997)(holding the standard for obtaining a CoA is the same as for a CPC). The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson,* 151 F.3d 256, 259 n. 2 (5th Cir.1998), *cert. denied,* 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); *Hallmark v. Johnson,* 118 F.3d 1073, 1076 (5th Cir.1997), *cert, denied sub nom. Monroe v. Johnson,* 523 U.S. 1041, 118 S.Ct. 1342, 140 L.Ed.2d 502 (1998).

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller–El v. Cockrell,* 537 U.S. 322, 335–36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C. § 2253(c)(2). Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell,* 301 F.3d 656, 658 n. 10 (5th Cir.2002)(holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain,* 227 F.3d 228, 230 n. 2 (5th Cir.2000)(holding the same); *Lackey v. Johnson,* 116 F.3d 149, 151 (5th Cir.1997)(holding the scope of appellate review of denial of a habeas petition limited

to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone. *Crutcher v. Cockrell,* 301 F.3d at 658 n. 10; *Lackey v. Johnson,* 116 F.3d at 151; *Hill v. Johnson,* 114 F.3d at 80; *Muniz v. Johnson,* 114 F.3d at 45; *Murphy v. Johnson,* 110 F.3d 10, 11 n. 1 (5th Cir.1997); 28 U.S.C. § 2253(c)(3).

A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke,* 542 U.S. 274, 282, 124 S.Ct. 2562, 2569, 159 L.Ed.2d 384 (2004); *Miller–El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel,* 529 U.S. 473, 483, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983). To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke,* 542 U.S. at 282, 124 S.Ct. at 2569; *Miller–El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604; *Barefoot v. Estelle,* 463 U.S. at 893 n. 4, 103 S.Ct. at 3394 n. 4. This Court is authorized to address the propriety of granting a CoA *sua sponte. Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir.2000).

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller–El v. Cockrell,* 537 U.S. at 338, 123 S.Ct. at 1040 (*quoting Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604). *Accord Tennard v. Dretke,* 542 U.S. at 282, 124 S.Ct. at 2569. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Foster v. Quarterman,* 466 F.3d 359, 364 (5th Cir.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 2099, 167 L.Ed.2d 817 (2007); *Dickson v. Quarterman,* 462 F.3d 470, 476 (5th Cir.2006); *Pippin v. Dretke,* 434 F.3d 782, 787 (5th Cir.2005), *cert. denied,* —— U.S. ——, 127 S.Ct. 351, 166 L.Ed.2d 49 (2006); *Bridgers v. Dretke,* 431 F.3d 853, 861 (5th Cir.2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 2961, 165 L.Ed.2d 959 (2006). Nonetheless, a CoA is not automatically granted

in every death penalty habeas case. *See, e.g., Scheanette v. Quarterman,* 482 F.3d at 828–29 (holding petitioner *not* entitled to a CoA on *Ring/Apprendi* claim virtually identical to that presented in this cause); *Turner v. Quarterman,* 481 F.3d at 301–02 (holding petitioner eligible for CoA on *neither* ineffective assistance, *Ring,* nor "failure to inform jury of the effect of a hung jury" claims); *Sonnier v. Quarterman,* 476 F.3d at 364–69 (denying CoA on a wide variety of innovative challenges to the Texas capital sentencing scheme).

None of petitioner's claims herein satisfy the standard for obtaining a CoA. Petitioner's *Brady* claim is legally frivolous. His procedurally defaulted and Teague-barred challenges to the Texas capital sentencing scheme are foreclosed by well-settled Supreme Court and Fifth Circuit precedent. Petitioner utterly failed to present the state habeas court with any evidence sufficient to overcome the presumption of reasonableness *Strickland* affords petitioner's state trial counsels' performance during petitioner's second trial. Moreover, petitioner failed to present the state habeas court with any evidence showing he was "prejudiced" within the meaning of *Strickland* by any allegedly deficient aspect of his trial counsel's performance during petitioner's second trial. Petitioner's constitutional challenges to his state habeas corpus proceedings are not cognizable in this federal habeas corpus proceeding. There is no room for disagreement among reasonable jurists as to any of the foregoing conclusions.

In most instances, petitioner's claims herein are barred not merely by petitioner's procedural default at the trial level but also by the *Teague* doctrine and squarely-in-point Supreme Court and Fifth Circuit precedent. Petitioner is not entitled to a CoA for the purpose of re-arguing claims which he failed to support with any evidence during his state habeas proceeding.

Therefore, petitioner is not entitled to a Certificate of Appealability in this cause.

Accordingly, it is hereby **ORDERED** that:

1. All of petitioner's claims for federal habeas corpus relief contained in his amended petition in this cause are **DENIED.**

2. Petitioner's request for an evidentiary hearing is **DENIED.**

3. Petitioner is **DENIED** a Certificate of Appealability.

4. All other pending motions are **DISMISSED** as moot.